IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | |
|---|---|
| HERITAGE GLOBAL NETWORK LOS ANGELES, INC.,<br><br>Plaintiff,<br><br>v.<br><br>TAYLOR WELCH; CHRIS EVANS; LANCE WELCH; WEALTH CAP HOLDINGS, LLC; WEALTH CAP FUNDS, LLC; WEALTH CAP FUND 2, LLC;<br><br>Defendants, and<br><br>WCH AL-1001, LLC; WCH AL-1002, LLC; WCH AL-1003, LLC; WCH AL-1004, LLC; WCH MO-1001, LLC; WCH MO-1002, LLC; WCH MO-1003, LLC; WCH NC-1001, LLC; WCH NC-1002, LLC; WCH NC-1003, LLC; and WCH NC-1004, LLC,<br><br>Relief Defendants. | Case No.<br><br>Judge<br><br>JURY DEMAND |

**COMPLAINT**

Plaintiff, Heritage Global Network Los Angeles, Inc., as and for its respective claims against defendants Taylor Welch, Chris Evans, Lance Welch, Wealth Cap Holdings, LLC, Wealth Cap Funds, LLC, Wealth Cap Fund 2, LLC, WCH AL-1001, LLC, WCH AL-1002, LLC, WCH AL-1003, LLC, WCH AL-1004, LLC, WCH MO-1001, LLC, WCH MO-1002, LLC, WCH MO-1003, LLC, WCH NC-1001, LLC, WCH NC-1002, LLC, WCH NC-1003, LLC, and WCH NC-1004, LLC alleges as follows:

## PARTIES

1. Plaintiff Heritage Global Network Los Angeles, Inc. ("Heritage") is a California non-profit corporation.

**Defendants**

2. Defendant Taylor Welch is a citizen and resident of Williamson County, Tennessee. Taylor Welch is a founder and Manager of Defendant Wealth Cap Holdings, LLC ("Wealth Cap"). Taylor Welch is also a control person of Defendants Wealth Cap Fund, LLC ("Fund 1") and Wealth Cap Fund 2, LLC ("Fund 2").

3. Defendant Chris Evans is a citizen and resident of Concord, North Carolina. Evans is a founder and Manager of Wealth Cap. Evans is also a control person of Funds 1 and 2.

4. Defendant Lance Welch is a citizen and resident of Williamson County, Tennessee. Lance Welch is the President, Co-Owner and Secretary of Wealth Cap. Lance Welch is also a control person of Funds 1 and 2. Lance Welch is Taylor Welch's father.

5. Defendant Wealth Cap is a Delaware limited liability company. Its principal place of business is 393 Nichol Mill Lane, #260, Franklin, TN 37067. Wealth Cap is the managing member of Wealth Cap Funds, LLC and Wealth Cap Fund 2, LLC.

6. Defendant Fund 1 is a Delaware limited liability company. Its principal place of business is 393 Nichol Mill Lane, #260, Franklin, TN 37067.

7. Defendant Fund 2 is a Delaware limited liability company. Its principal place of business is 393 Nichol Mill Lane, #260, Franklin, TN 37067.

**Relief Defendants**

8. Relief Defendant WCH AL-1001, LLC ("WCH AL-1001") is a Delaware limited liability company controlled by Defendants whose purpose is to hold properties purchased by

Wealth Cap, Fund 1 and/or Fund 2. Its principal place of business is 393 Nichol Mill Lane, #260, Franklin, TN 37067.

9. Relief Defendant WCH AL-1002, LLC ("WCH AL-1002") is a Delaware limited liability company controlled by Defendants whose purpose is to hold properties purchased by Wealth Cap, Fund 1 and/or Fund 2. Its principal place of business is 393 Nichol Mill Lane, #260, Franklin, TN 37067.

10. Relief Defendant WCH AL-1003, LLC ("WCH AL-1003") is a Delaware limited liability company controlled by Defendants whose purpose is to hold properties purchased by Wealth Cap, Fund 1 and/or Fund 2. Its principal place of business is 393 Nichol Mill Lane, #260, Franklin, TN 37067.

11. Relief Defendant WCH AL-1004, LLC ("WCH AL-1004") is a Delaware limited liability company controlled by Defendants whose purpose is to hold properties purchased by Wealth Cap, Fund 1 and/or Fund 2. Its principal place of business is 393 Nichol Mill Lane, #260, Franklin, TN 37067.

12. Relief Defendant WCH MO-1001, LLC ("WCH MO-1001") is a Delaware limited liability company controlled by Defendants whose purpose is to hold properties purchased by Wealth Cap, Fund 1 and/or Fund 2. Its principal place of business is 393 Nichol Mill Lane, #260, Franklin, TN 37067.

13. Relief Defendant WCH MO-1002, LLC ("WCH MO-1002") is a Delaware limited liability company controlled by Defendants whose purpose is to hold properties purchased by Wealth Cap, Fund 1 and/or Fund 2. Its principal place of business is 393 Nichol Mill Lane, #260, Franklin, TN 37067.

14. Relief Defendant WCH MO-1003, LLC ("WCH MO-1003") is a Delaware limited liability company controlled by Defendants whose purpose is to hold properties purchased by Wealth Cap, Fund 1 and/or Fund 2. Its principal place of business is 393 Nichol Mill Lane, #260, Franklin, TN 37067.

15. Relief Defendant WCH NC-1001, LLC ("WCH NC-1001") is a Delaware limited liability company controlled by Defendants whose purpose is to hold properties purchased by Wealth Cap, Fund 1 and/or Fund 2. Its principal place of business is 393 Nichol Mill Lane, #260, Franklin, TN 37067.

16. Relief Defendant WCH NC-1002, LLC ("WCH NC-1002") is a Delaware limited liability company controlled by Defendants whose purpose is to hold properties purchased by Wealth Cap, Fund 1 and/or Fund 2. Its principal place of business is 393 Nichol Mill Lane, #260, Franklin, TN 37067.

17. Relief Defendant WCH NC-1003, LLC ("WCH NC-1003") is a Delaware limited liability company controlled by Defendants whose purpose is to hold properties purchased by Wealth Cap, Fund 1 and/or Fund 2. Its principal place of business is 393 Nichol Mill Lane, #260, Franklin, TN 37067.

18. Relief Defendant WCH NC-1004, LLC ("WCH NC-1004") is a Delaware limited liability company controlled by Defendants whose purpose is to hold properties purchased by Wealth Cap, Fund 1 and/or Fund 2. Its principal place of business is 393 Nichol Mill Lane, #260, Franklin, TN 37067.

## JURISDICTION AND VENUE

19. The claims asserted herein arise under and pursuant to the Securities Exchange Act of 1934 (the "Exchange Act"), Rule 10b-5 promulgated thereunder (17 C.F.R. § 240.10b-5), and the Securities Act of 1933 (the "Securities Act").

20. This Court has original jurisdiction over the subject matter of this action under 28 U.S.C. § 1331, Section 27 of the Exchange Act (15 U.S.C. § 78aa), and Section 22 of the Securities Act (15 U.S.C. § 77v(a)). This Court has supplemental jurisdiction over the state law claims under 28 U.S.C. § 1367(a), because they are so related to the federal claims within the Court's original jurisdiction that they form part of the same case or controversy and derive from a common nucleus of operative facts.

21. This Court may exercise personal jurisdiction over Defendants Taylor Welch, Lance Welch, and Evans because they transacted business and/or lived in this judicial district during the relevant period. This Court may exercise personal jurisdiction over Defendants Wealth Cap, Fund 1, and Fund 2 because they were headquartered in and transacted business in this judicial district during the relevant period. In addition, Section 9.9 of Fund 2's Operating Agreement provides for jurisdiction in "the United States District having jurisdiction over matters within Williamson County Tennessee," which includes this Court.

22. This Court may exercise personal jurisdiction over the Relief Defendants, as their principal place of business is in this district, they are controlled by the other Defendants and they own properties that are the subject of this action.

23. Venue is proper under 28 U.S.C. § 1391(b) because a substantial part of the events giving rise to Heritage's claims occur within this judicial district and because Defendants are subject to personal jurisdiction within this judicial district.

## FACTUAL ALLEGATIONS

### I. Taylor Welch and Evans Form Wealth Cap and Promote Themselves as Real Estate Experts

24. Taylor Welch is an entrepreneur and business media influencer, who "talk[s] about online business, team, investing & economics," and claims to be "addicted to constant, slow and steady improvement."

25. Taylor Welch currently owns Welch Equities, which he describes as "a collection of service & education brands making the world a smarter, happier place."

26. Taylor Welch formerly worked for a "turnkey real estate company," which he claimed had 6,000 properties under management. According to Taylor Welch, he learned property management and rehab business "from the ground up."

27. Evans characterizes himself as an "Investor + Mentor" and "Growth Consultant."

28. Evans claims to have experience in real estate finance. Following the mortgage crisis of the late 2000s, Evans claims to have managed a "national rehab company" that worked with "massive banks" to manage the process of getting distressed properties rehabilitated, marketed, and sold.

29. Taylor Welch and Evans formed Wealth Cap on or about February 6, 2019, as their "private investment firm," to source, acquire, rehab, and lease single-family residential properties. Wealth Cap claimed to hold and manage "hundreds of properties diversified all over the United States."

30. According to Taylor Welch, Wealth Cap's three goals were to "create wealth for our TEAM, our VENDORS, and our CLIENTS."

31. Beginning in early 2020, Taylor Welch and Evans began a weekly podcast called Portfolio Builders, which is still available to stream and download on media platforms such as Apple Podcasts and Spotify. Taylor Welch and Evans described Portfolio Builders as follows:

> Have you ever wondered if there was one source you could trust for your real estate investing, and wealth education? In a world where it can be increasingly difficult to know who to trust, Chris Evans and Taylor Welch are your one stop shop for honest & authentic investment training - whether you're just getting started, or already a seasoned pro.

32. The Portfolio Builders podcast ran from February 14, 2020 until at least November 30, 2021, and consisted of at least 88 episodes.

33. On their initial podcast episode, released on February 14, 2020, Taylor Welch stated that he and Evans formed Wealth Cap to invest the money they had earned from other highly successful marketing businesses they had operated – this included a company called Traffic and Funnels, LLC. According to Taylor Welch, he and Evans had "millions of dollars of cash" and real estate investing provided the answer to the question, "what do we do with all the money?" and was the "perfect transformation of real estate pro to business owner and then back to real estate…"

34. During this Portfolio Builders episode, Taylor Welch claimed that Wealth Cap would "build somebody literally past a $10 million [real estate] portfolio that is air tight because of the markets it is in, the diversification of asset classes …." and that there "are not a lot of options you have to do that, no pun intended, in the stock market."

35. In the same initial episode, Evans stated that Wealth Cap would be its listeners' "guiding light" for real estate investing. As a follow-up, Taylor Welch stated that Wealth Cap has "clients, every day, that we help them invest money and produce returns."

36. The Portfolio Builders podcast was not a "one stop shop for honest & authentic investment training," it was a transparent attempt to solicit investors. For example, Taylor Welch

and Evans hosted a May 17, 2021, podcast entitled "Two Types of Investing (Fund + Rental)," where they solicited investors: Taylor Welch said Fund 1 was "a beautiful way to get started with no risk and learn the game as you go…" Evans then asked investors to contact Wealth Cap and falsely stated that Wealth Cap was "registered with the SEC," adding, "we have attorneys who have helped us set it up and structure it." Evans then said that Wealth Cap's investment approach was "absolutely brilliant and I'm glad we're doing it," to which Taylor Welch responded, "Me too, man! Me too!"

## II. The Welches and Evans Begin Raising Money From Investors

37. Taylor Welch and Evans formed Fund 1 on or about December 18, 2019, just two months before they debuted the Portfolio Builders podcast.

38. On February 19, 2020, five days after Portfolio Builders debuted, Fund 1 filed a Form D – Notice of Exempt Offering of Securities with the United States Securities and Exchange Commission ("SEC"). Taylor Welch signed the Form D, which identified him as an Executive Officer, Director, and Promoter of Fund 1, and as "Manager of Wealth Cap Holdings, LLC, Issuer's Managing Member."

39. The Form D identified Evans as an Executive Officer and Promoter of Fund 1.

40. According to the Form D, Fund 1 made a "2,500,000.00 offering expandable to $5,000,000.00."

41. Fund 1's purpose was to purchase, rehabilitate, manage, and sell residential properties, and it purportedly used investment proceeds to finance its fix-and-flip business model. Fund 1 offered investors a return equal to 12% per annum, paid in equal monthly payments.

42. According to Lance Welch on a July 23, 2020, episode of a Portfolio Builders podcast captioned "Inside Secrets of Wealth Cap Holdings Portfolio With Lance Welch," Taylor

Welch and Evans formed Fund 1 because it was in their "hearts" to "help" outside investors share in the success they had investing the proceeds from their Traffic and Funnels business in real estate.

43. Lance Welch stated that Wealth Cap's business model included "leveraging" through financing the properties it purchased, making the costs of purchasing the properties "negligible."

44. During this podcast episode, Lance Welch represented that Wealth Cap had lender relationships affording multiple options in connection with potential property purchases. These relationships allowed Wealth Cap to "bundle" groups of properties together in one "portfolio" loan, making it much easier to invest in multiple properties at the same time and benefit from the attendant leverage.

45. According to an undated posting by Taylor Welch and Evans on their Traffic and Funnels website, they "retir[ed]… (*Kind of*)" from that company to invest "a considerable amount of time and financial resources into building our long term passive wealth strategies." This would take the form of investing in real estate, which "is one of the oldest investment vehicles in the word. Time tested and safe. *That's why we're going all in on it."* (emphasis in original).

46. Taylor Welch and Evans wrote further that they were "investing a tremendous amount of money and time into sourcing safe and profitable real estate deals for our own portfolio **so you don't have to!"** (emphasis in original). They were doing so because "some of our clients found out what we were doing and wanted to piggyback off of it," and "as we grow we saw a necessity in flipping deals for cash flow to contribute to our long term goals." The announcement linked to a video, which is no longer available, where Evans told potential investors how to get involved with Wealth Cap.

47. Wealth Cap apparently began raising investor funds before it filed Fund 1's Form D with the SEC. In an email with the subject line "November Private Lender Update," sent on or about November 7, 2019, Lance Welch represented that "Wealth Cap Holdings really only performs activities in **three main categories**: 1. Deal flow (finding undervalued properties) 2. Renovation (performing necessary upgrades to bring properties up to standard) 3. Cash out (via financing or investor sell offs)," and then claimed, "The reason our returns are so good and so consistent is simple: **our standards in these 3 areas are higher than most (or all) of [the] competition.**" (emphasis in original).

48. Lance Welch also added that, "Several investors added more money into the fund because they realize the level of safety and discipline we practice when making growth decisions — if you want to do that, feel free to reach out."

49. In an April 1, 2020 "Wealth Cap Private Investor Update," Taylor Welch expanded on Wealth Cap's business model, repeatedly emphasizing its safety:

> We designed everything in Wealth Cap *NOT* for the pure maximization of "profits," but for maximum **safety** and mitigation against losses.
>
> . . .
>
> From the beginning I told people, "*We are different. We run real businesses. We have our OWN cash invested in this fund… we have to be safer (and smarter) than everyone else doing anything like this*."
>
> . . .
>
> We are being set apart as *truly* one of the safest vehicles in the world - I believe - for the safe storage & growth of capital (yours, mine, our team's, etc).
>
> . . .
>
> **We have 4 sources of income that are accessible any time we need them, diversified amongst three industries, with dozens of product lines in each industry.** Two of those income sources are 8-figures annually… one of those sources is 7-figures annually. The way we have set things up is SO SAFE, it is mind boggling & almost hard to explain to people who *do not know how fanatical we are*about [sic] safety.

> . . .
> I am glad, looking back, that we adhered to our principles. We adhered to safe decisions well within our standards — and now I can confidently tell you that you are on the winning team.
>
> We might not make "the most money" in a good market, but we sure are the absolute lowest on the list in terms of risk & vulnerability in a bear market.

(emphasis in original).

50. Taylor Welch also stated, "every company Chris & I own or manage -- we deploy these standards. We say, 'If WORST case happens, can we still win? If so… proceed. If no, FIX it now,'" and subsequently claimed that they "could go 24 months right now *without* flipping a house, *without* collecting any rent, with zero new income for Wealth Cap and still be cash-flush and poised to take advantage of the many opportunities presented on a daily basis. Read that statement again." (emphasis in original).

51. Taylor Welch concluded the April 1, 2020 email by thanking Wealth Cap investors "**for partnering with us, and thank you for trusting us as a safe vehicle for your capital.**" (emphasis in original).

## III. The Welches and Evans Convince J.B. to Invest in Fund 1

52. Heritage was formed in June 2020, and is a non-profit corporation dedicated to building an interfaith Judeo-Christian community in Los Angeles, California.

53. J.B. is one of Heritage's founders, its Chief Executive Officer, and Chairman of its Board of Directors.

54. J.B. learned about Fund 1 from a friend who had invested with Wealth Cap and said that he had been receiving consistent monthly payments. J.B.'s friend was also a very close friend of Evans, having known him for over twenty years. According to J.B.'s friend, Evans was a

devoted Christian who did business with integrity and the highest moral standards. Evans had also donated a considerable amount of money to J.B.'s friend's non-profit organization.

55. J.B's friend introduced him to Taylor Welch, Lance Welch, and Evans via email.

56. On or about August 21, 2020, J.B. had an initial call with Lance Welch to discuss Wealth Cap and Fund 1. The two spoke at least two more times via a videoconference platform to discuss the investment further.

57. According to Lance Welch, Fund 1 purchased, rehabilitated, managed, and sold residential properties and generally made a 20–25% return (sometimes more) doing this. Lance Welch also represented that Fund 1 used investors' funds to purchase real estate that met very stringent criteria.

58. On or about September 8, 2020, while on a trip to Charlotte, North Carolina, J.B. attended a dinner at The Capital Grille with his friend, Lance Welch, Taylor Welch, Evans, and two or three other people who worked with the Welches and Evans. During this dinner, the Welches and Evans told J.B. more about the investment opportunity and answered J.B.'s questions about Fund 1 and Wealth Cap.

59. Before J.B. invested, Wealth Cap required him to submit several forms concerning his financial condition, which he understood a third-party auditor was reviewing. Wealth Cap's vetting process gave Fund 1 the appearance of legitimacy and made J.B. feel like it was taking extra care to ensure compliance with applicable laws and regulations.

60. After Wealth Cap and the third-party auditor approved J.B.'s application, J.B. invested $600,000 in Fund 1 in November 2020. He invested an additional $150,000 in April 2021, for a total Fund 1 investment of $750,000.

61. J.B.'s Fund 1 investment provided for monthly payments reflecting a 12% annual return. Fund 1 immediately began making timely monthly interest payments at that rate.

## IV. Fund 1 "Closes." Trumpeting its Success, Defendants Offer a New Investment in Fund 2

62. Fund 2 was incorporated in Delaware on September 3, 2021.

63. On December 28, 2021, Fund 2 filed a Form D – Notice of Exempt Offering of Securities with the SEC. Taylor Welch signed the Form D, which identified him as an Executive Officer of Fund 2, and as an "Officer of Managing Member." By signing the Form D, Taylor Welch represented that he read the notice and "knows the contents to be true."

64. The Form D identified Evans as an Executive Officer of Fund 2.

65. According to the Form D, Fund 2 sold investments totaling $6,050,000, which equaled the amount of the offering. Its first sale occurred on September 16, 2021.

66. Item 16 of Fund 2's Form D stated $0 of the gross proceeds of the offering had been or was proposed to be used for payments to Taylor Welch or Evans. The instructions for this section provide: "If the amount is unknown, provide an estimate and check the box next to the amount." The 'estimate box' was not checked, meaning on December 28, 2021, Taylor Welch and Evans filed a notice with the SEC that stated exactly $0 of Fund 2's gross proceeds had been used to pay or proposed to be used to pay to either Taylor Welch or Evans.

67. On August 31, 2021, Lance Welch sent an email to Fund 1 investors announcing the closing of Fund 1 and opening of Fund 2, which read in part:

> I want to reach out and once again thank you for partnering with us, WealthCap, on our very first Private Placement Memorandum. It has been quite the success and I believe even greater things are still to come.
>
> Effective July 31, 2021, we made the decision not to bring any new money into this particular fund. Rest assured, we are NOT liquidating the fund. **You will continue to receive your monthly**

> **deposits at the same rate as you always have.** These higher rates will continue while your funds are still in that first fund. . .

(emphasis in original).

68. The August 31 email explained that Fund 2 was to "open up within the next week or so," and was offering two separate rates, or "tiers," of interest. Investments in Fund 1 would be included in calculating the Fund 2 tier for which a particular investment would be eligible. Investors with total deposits of $100,000 to $250,000 between the two funds would receive an 8% annualized return, while investors with $300,000 or more would receive 10%. This was a lower rate than the 12% return Fund 1 was paying, but according to Lance Welch, "[w]ith where rates are currently, this is still a very healthy, competitive return."

69. Lance Welch sent J.B. a follow-up email on September 10, 2021, stating that Fund 2 was opening that day, and that he was "reaching out to current investors first, before making a wider announcement." According to Lance Welch, Fund 2 was "open to receive an additional $600,000. So once I hit that amount, I'll close it down for a while..first come basis."

70. On September 11, 2021, after J.B. asked what amount was available for investment, Lance Welch emailed:

> … We opened up the new fund for $600,000. We've currently received $100,000, so $500,000 is still open. We have several that said they would let me know one way or the other by mid-week...but they also know it's a first come basis. Since you are already involved with Wealth Cap, you'll automatically receive the higher tier, which is 10%.

71. After he received the September 11, 2021 email, J.B. spoke with Lance Welch, who told J.B. that Wealth Cap was "doing great." According to Lance Welch, Wealth Cap no longer had to pay a 12% return to attract new investors and reduced the interest rate for Fund 2, which was to employ the same business model as Fund 1.

72. At this point, J.B. had consistently received his monthly interest payments from Fund 1 and understood that his investment was performing as promised. None of the Defendants told J.B. that Fund 1 had been losing money, that his Fund 2 investment would be transferred to or commingled with Fund 1, or that Fund 2 investment proceeds would be used to repay Fund 1 investors or paid to Taylor Welch or Evans.

73. On September 17, 2021, J.B. invested $100,000 in Fund 2. He invested an additional $50,000 in April 2022.

## V. Fund 2's Private Placement Memorandum

74. Fund 2 was offered pursuant to an undated private placement memorandum ("PPM"), which provided for a maximum offering of $2.5 million, expandable to $5 million.

75. The PPM stated that Fund 2 was formed to: "acquire, renovate, improve, rehabilitate, and eventually re-sell single-family housing properties selected by our Managing Member [Wealth Cap]."

76. According to the PPM, "[Wealth Cap's] team has years of real estate knowledge, attention to detail and pride in our work which we believe will set our properties apart from the competition."

77. The PPM described Wealth Cap as follows:

> Wealth Cap Holdings, LLC is a private, real estate investment company that seeks to deliver exceptional risk-adjusted returns to investors through superior execution of carefully developed strategies. Our Managing Member is dedicated to repositioning under-performing, neglected residential property, elevating its long-term performance while enhancing the lifestyle of residents and producing strong bottom line results for investors. Wealth Cap Holdings, LLC, focuses all of their resources in residential real estate with expertise and direct hands-on leadership in every aspect of the investment/ownership/management business. Hence, our foremost competitive advantage is our Managing Member's high level of expertise in investments and management.

78. The PPM stated that Taylor Welch and Evans, the Founders and Managers of Wealth Cap, "have been involved in various areas of real estate investment and management, in relation to multimillions of dollars of real estate value, since 2014. [Taylor] Welch and Evans also co-own a multimillion-dollar marketing and advertising company that will be leveraged to generate leads for below-market acquisitions by the Fund."

79. According to the PPM, Taylor Welch's "background in acquiring leads to off-market properties through leveraging his marketing agency's expertise will make finding significant returns likely in the valuable residential real estate market."

80. The PPM made four references to using the offering proceeds to purchase what it called the "initial Property," for which the "total planned capital outlay" would be a "combination of equity capital (in the form of cash, real property, and/or in-kind services) and senior bank financing." The PPM did not identify the initial Property.

81. Fund 2 "intend[ed] to acquire, rehabilitate and either sell or own and operate the Property or Properties indefinitely."

82. The PPM provided conflicting statements about the compensation Wealth Cap would receive:

- Page 24: "Our Managing Member will not be paid fees in connection with the acquisition and management of the Property or Properties, administration of the Fund, etc."
- Page 46: "Although Our Managing Member and/or their affiliates will not be compensated for the management of the Property or Properties and of Fund affairs, at the Managing Members discretion, they may be paid compensation in connection with Fund management of the Property or Properties and of Fund affairs."
- Page 46: Wealth Cap and/or its affiliates "may receive salaries and equity or other forms of compensation out of the proceeds of this Offering or from our revenue, capital, or other Fund assets for services performed on behalf of the

Fund," noting "[s]uch compensation terms may not have been negotiated at arm's length."

- Pages 45 and 46: Wealth Cap was to receive "a draw against future distributions of up to $12,000.00 per month."
- Page 47: Wealth Cap "and its affiliates will receive substantial compensation from the Fund and its service providers for services rendered."
- Page 82: Wealth Cap "shall be reimbursed . . . for all costs and expenses . . . incur[red] on behalf of, on in the management and operation of the business of, the Fund, including . . . salaries and other compensation expenses of employees, agents, and representatives . . . that are necessary or appropriate to the conduct of the Fund's business and allocable to the Fund"

83. The PPM makes no reference to Lance Welch, his background, or his relationship to or role with Wealth Cap, Fund 1, or Fund 2.

84. The PPM makes no reference to Fund 1, its relationship to Fund 2, its business model, its performance, its financial condition, its investors, or its future plans.

85. The PPM does not state that Fund 2 investors' funds would go to or be commingled with Fund 1 investments.

86. The PPM does not state that Fund 2 investors' funds would be used to repay Fund 1 or other Fund 2 investors.

87. The PPM does not specify that the Welches or Evans were Fund 2 investors, or the amounts they invested.

88. The PPM does not state that Fund 2 investor funds would be used to make payments to Taylor Welch or Evans.

89. The PPM states that Wealth Cap "may own or retain other forms of interest in the Property or Properties," but makes no reference to any potential sales to Wealth Cap of properties purchased by Fund 2, or what extra measures Fund 2 and Wealth Cap would take to ensure that any transactions were at arms-length and for fair market value.

## VI. Fund 2 Makes "Special Concessions" for Heritage, which Invests $5 Million

90. On October 29, 2021, Lance Welch emailed J.B., again soliciting funds, writing, "I wanted to reach out to a small group of you to let you know of an opening in Fund 2…. I'm reopening the Fund for anywhere from $100k to $500k as of now."

91. During this period Heritage was about to receive a large donation, which it was to use to fund its operations, purchase and renovate a property in Los Angeles, and build a community center.

92. Having invested in Fund 1 and received consistent monthly interest payments, followed by a second investment in Fund 2 for which he was also receiving interest payments, J.B. saw Fund 2 as a short-term investment opportunity that would generate enough income for Heritage to cover its operating expenses until it broke ground on building the community center.

93. On October 31, 2021, J.B. responded to Lance Welch's October 29 email:

> I do have a question for you. I've started a new Messianic Church in Los Angeles and we have between [a] $6-$8 million balance to purchase a building at a future date. Can you handle such a large investment? It would be a 6-24 month commitment depending on what we are able to find out and how long the process takes.

94. Between October 31 and November 16, 2021, J.B. and T.W., another Heritage board member, spoke with Lance Welch at least two times about Heritage investing $5 million in Fund 2. J.B. and T.W. asked that the investment term be limited to a year and explained the importance and significance of the proposed investment funds. J.B. and T.W. informed Lance Welch that Heritage's money was a "Kingdom investment," meaning those funds were earmarked for a specific charitable purpose and could not be put at risk. They also explained that Heritage intended to use the investment as a way to generate enough income to cover operational expenses.

95. During these conversations, Lance Welch told J.B. and T.W. that Wealth Cap's performance had been outstanding and consistent. Lance Welch never told J.B. or T.W. that

Wealth Cap was going to change its business model in connection with Fund 2, or that Fund 2's PPM did not accurately describe how investors' funds would be used.

96. Lance Welch also told J.B. and T.W. that the Heritage investment would "at most" equal half of the total amount invested in Fund 2. Heritage never would have invested had it understood that its investment would account for the vast majority of the amount invested in Fund 2.

97. On November 16, 2021, Lance Welch emailed J.B. that he had shared the "desires of the large investment with Chris [Evans] and Taylor [Welch] and I believe we've come up with a good solution." Lance Welch acknowledged that Heritage wanted to limit the investment to a 12-month term and said that he had created "a great compromise."

98. Lance Welch summarized the "great compromise" in an attachment to the November 16, 2021, email called "Special Concessions - [J.B.] Fund 2." Fund 2 proposed a $5 million Heritage investment with a 10% annualized rate of return for a term of 18+ months. The "Special Concession" was an option to Heritage allowing it to withdraw $2 million at the end of the first twelve months, but with a 6-month notice requirement. If Heritage exercised this option, it could withdraw the remaining $3 million at the end of 18 months, again with 6 months' notice. If Heritage did not exercise the Special Concession, it could withdraw the $5 million at the end of 18 months, or after any subsequent 6-month period, with 6 months' notice.

99. In one of their conversations Lance Welch told J.B. and T.W. that Heritage's $5 million would be "our single biggest investment to date," but that he, Taylor Welch, and Evans had thoroughly discussed whether to accept such a large investment and were confident that they could successfully manage it.

100. Lance Welch promised Wealth Cap would protect the $5 million investment and consistently deliver the promised interest payments, as it had with all of its previous investors. Lance Welch repeatedly assured Heritage that the investment was safe, namely because of his, Taylor Welch, and Evans' morals, integrity, and expertise and Wealth Cap's "process."

101. On December 2, 2021, Lance Welch emailed a copy of the Fund 2 PPM and a one-page summary of Fund 2 to J.B., remarking that, "[t]he PPM is written in legaleeze that basically highlights that there is no such thing as a guarantee in real estate… But as you know, we are very disciplined in what we do."

102. The summary had a number of bullet points discussing Wealth Cap's "Process," "Rules," and "Disciplines." As part of outlining its "Process," Wealth Cap represented that its 25% "[t]arget spread/profit per house" "more than covers all monthly investor payouts." One of Fund 2's Rules was that it "can only use the funds for real estate and renovations."

103. The summary concluded: "**We have **never missed, or been late,** on investor interest payments." (emphasis in original). J.B. understood that this was the "Process" Wealth Cap had deployed to great success with Fund 1, and which was to remain in place for Fund 2.

104. J.B. and T.W. talked to Lance Welch on December 8, 2021, and Lance Welch again represented that he, Taylor Welch, and Evans had conferred about whether Fund 2 could handle such a large investment from a single investor and determined they could do it. Lance Welch also reiterated that Fund 2 was restricted to buying and rehabilitating properties within the targets of their profitability guidelines and that Heritage's Kingdom investment would be used consistent with those guidelines.

105. None of the Defendants told J.B. or T.W. that Wealth Cap's "Process" had failed, that Fund 1 had been hemorrhaging money, that Heritage's Fund 2 investment would be transferred

to or commingled with Fund 1, that Fund 2 would not use investor money only "for real estate and renovations," or that Fund 2 investments would be used to repay Fund 1 investors or pay Taylor Welch or Evans.

106. Heritage wired $5 million to Fund 2 on December 15, 2021, and received 100 Units of Fund 2 Investing Membership Interests.

107. In January 2022, Fund 2 began making monthly interest payments to Heritage at the agreed-to 10% per annum rate.

## VII. Defendants Stole Heritage's $5 Million

### A. Fund 2 was an extension of Fund 1.

108. Defendants misrepresented that Fund 1 had closed and that Fund 2 was a new fund. In fact, Fund 2 never purchased a property; it simply handed over its investors' money to Fund 1.

109. According to Fund 2's balance sheet, as of December 31, 2022, 99% of Fund 2's assets–which by then consisted solely of Heritage's investment–were in Fund 1 and the remaining 1% were lent to Wealth Cap.

110. Fund 2's general ledgers do not show it acquired any property assets at any time.

111. Fund 1 included Fund 2 in its 2021 federal income tax return, which combined the Fund 2 membership interests outstanding as of December 31, 2021, with the Fund 1 membership interests as of the same date.

112. Fund 2 did not file a federal income tax return for 2021.

### B. Contrary to Defendants' representations, Fund 1 was not a success.

113. Fund 1 was not a success. According to its 2021 federal income tax return, it lost over $2 million that year.

114. Fund 1 was also not profitable in 2020: it lost over $180,000.

115. Fund 1 had $867,000 negative equity and less than $200,000 in cash at the end of 2020. This was in large part because Taylor Welch and Evans took $2.2 million in distributions in 2020.

116. Fund 1 made hundreds of thousands of dollars of interest-free transfers or loans to its manager, Wealth Cap, which owed Fund 1 $1.7 million at the end of 2021.

117. Fund 1's financial performance – which became combined with Fund 2 when that fund opened – progressively deteriorated throughout 2021:

a. From January – March 2021, Fund 1 had a loss of $63,700;

b. From April – June 2021, Fund 1 had a loss of $152,083;

c. In July and August 2021, the two months immediately before opening Fund 2, Fund 1 lost $227,458, leaving it with a net loss of $443,241 for the first 8 months of 2021; and

d. Heritage's $5 million did not stop Fund 1 from losing an additional $1,568,559 in the last quarter of 2021.

### C. The volume of properties Fund 1 purchased plummeted in 2021.

118. The number of properties Fund 1 purchased decreased dramatically throughout 2021.

119. According to a report from Fund 1, it purchased a total of 390 properties over the course of its operations.

120. Approximately 120 of these properties did not follow a pattern of purchase, rehab, and resale. Instead, Fund 1 provided a deposit for many of these properties and did not complete the purchase, or in some instances, Fund 1 transferred some of these properties to Wealth Cap.

121. An analysis of the other approximately 270 properties reveals a marked decrease in properties purchased:

a. Fund 1 purchased 122 properties in the last half of 2020, and 101 properties in all of 2021;

b. Fund 1 purchased 63 properties in the first half of 2021 and 38 properties during the last half of that year; and

c. The decline in Fund 1 property purchases is highlighted by reviewing the purchases over the last 6 months of 2021:

i. July: 14

ii. August: 8

iii. September: 7

iv. October: 3

v. November: 2

vi. December: 4

122. The precipitous drop in properties Fund 1 purchased in 2021 and into 2022 tracks its poor performance, which left it without the cash it needed to continue buying properties.

**D. Defendants misused Heritage's money.**

123. Despite promising to use Heritage's money only "for real estate and renovations," after Heritage made its $5 million investment in mid-December 2021, Defendants purchased only 8 properties, at a combined cost of approximately $830,000, and did not purchase any properties after January 2022.

124. Instead of implementing Fund 2's business model as promised in the Summary Lance Welch emailed J.B. on December 2, 2021, the Funds spent most of 2022 winding down.

125. According to its general ledger, on December 14, 2021, Fund 1's checking account had a closing balance of under $35,000.

126. On December 16, 2021, the same day Heritage made its $5 million investment, Fund 2 transferred $1,150,000 to Fund 1, which then paid Evans $500,000 and used the remainder to repay investors.

127. On December 30, 2021, Fund 2 transferred $379,315.22 to Fund 1. But for the transfer, Fund 1 would have had a balance of negative $279,911.14 in its checking account.

128. Fund 2 made additional substantial transfers of Heritage's funds to Fund 1 to repay Fund 1 investors or Taylor Welch. For example, two separate transfers of $250,403 were made to Fund 1 on January 6, 2022, and on the same day, Fund 1 paid Taylor Welch $250,403 and Fund 1 investor B.S. $250,403.

129. Fund 2's records do not reflect any investments by Taylor or Lance Welch or Evans.

130. Heritage never consented to Fund 1 using Heritage's Fund 2 investment to repay Fund 1 investors or Taylor Welch or Evans.

131. Defendants never told Heritage that it accounted for the vast majority of the investments in Fund 2: $5 million of a total of $6,050,000 invested.

132. Fund 1 lost nearly $2.5 million on property sales in 2022. After adding expenses and investor interest payments, the Funds' loss for 2022 exceeds $4.2 million.

133. Defendants knew that Heritage's money was a "Kingdom investment"; it was not expendable and earmarked for a specific charitable purpose. Heritage never would have invested had Defendants provided an accurate picture of Fund 1's financial condition or told the truth about how they were going to use Heritage's funds.

## VIII. Just Four Months After Heritage Invests, Taylor Welch Tells J.B. that its Investment Has Largely Been Lost

134. In late April or early May 2022, Lance Welch called J.B. and T.W. to inform them of "some difficult news." Lance Welch told J.B. and T.W. that Wealth Cap "had some internal

incompetence and lack of proper controls" and, as a result, "unsuitable homes were purchased" by an employee, who was trying to meet an internal quota.

135. Lance Welch explained that because this mismanagement detrimentally impacted its earning potential, Fund 2 had to suspend interest payments. Lance Welch, however, assured J.B. and T.W. that investors' principal was not at risk and everyone would be repaid in full, with the sale of Wealth Cap and the Funds' collective inventory of properties serving as a major source of the repayments.

136. On or about May 13, 2022, Taylor Welch called J.B. and told him the situation was much worse than what Lance Welch had said. Taylor Welch explained that a Wealth Cap employee had bought properties that were not consistent with its business model, and that needed much more rehabilitation work than the properties Wealth Cap typically purchased. As a result, Wealth Cap was in trouble and going to have to liquidate its properties.

137. Taylor Welch did not tell J.B. that Fund 1 had been losing money throughout 2021, that Fund 2 was an extension of Fund 1, that Fund 2 never purchased a property, that Fund 2 investments were or would be transferred to Fund 1, that Fund 1 had only purchased eight properties with Heritage's money, or that the Funds used Heritage's investment to repay investors and make payments to him and Evans.

138. During the call, Taylor Welch said that Fund 2 was going to sell its properties and dissolve, and that investors could expect to receive 44% of their principal from those sales. Taylor Welch and Evans had other assets they would use to satisfy the balance, and Taylor Welch was confident that Wealth Cap would repay the entire $5 million by the end of 2022.

139. According to Taylor Welch, he and Evans were going to forgo their "considerable" investments in Wealth Cap and the Funds in favor of repaying the Fund 2 investors. Taylor Welch

emphasized his and Evans' integrity and said that they were committed to paying back Heritage even though the law did not require them to.

140. Taylor Welch sent a follow-up email to J.B. on May 17, 2022, which he labeled "Wealth Cap Recap & Dissolution Plans," attaching a Word document summarizing the May 13 call and Fund 2's "Dissolution and Wind Down Options."

141. According to Taylor Welch, he and Evans "operate from a place of relationship & our 'word,' not just from a contractual standpoint, and as such, are not willing personally to simply walk away and allow individual investors to experience losses if we can avoid doing so."

142. Taylor Welch further wrote:

> To be 100% clear, our commitment to ensuring all investors are made whole is one that myself and Chris are willing to make, even to the extent it requires us to perform outside the confines and bounds of any existing legal or contractual obligation we may have. Put simply, we are willing to take on actions, tasks and responsibilities that go above and beyond our contractual duties; we believe that protecting our relationship & reputation with our investors, including you and your board is of paramount importance.

143. The attachment to Taylor Welch's May 17, 2022 email detailed two possible wind down options. One involved total liquidation of Fund 2, with the investors to receive 44% of their investments on or before March 31, 2023. The second involved liquidation of Fund 2, again by March 31, 2023, but with 38% repaid to the investors, and the remaining 62% repaid by Taylor Welch and Evans, in the "worst case" within the next 36 months.

144. On June 1, 2022, Lance Welch spoke with J.B. and T.W. to discuss repaying Heritage. According to Lance Welch, Wealth Cap could repay Heritage in full by the end of the year following its sale of an unnamed business Taylor Welch and Evans owned. Lance Welch also laid out two other repayment options, which both involved paying Heritage over the span of several years.

145. On June 3, 2022, Lance Welch sent J.B. a follow-up email outlining three potential options or tiers providing for repayment of Heritage, which varied from the options Taylor Welch identified in his May 17 email. The email provided that Taylor Welch and Evans were "committed to forgo[ing] their sizeable investment in the fund in order to allow the smaller investors to be addressed immediately and Heritage to receive installments."

146. The first option or tier involved repayment in full by the end of 2022, provided that Taylor Welch and Evans could find buyers for "some of their various non-fund assets." The second option mentioned an unidentified "vendor payment" Fund 2 needed to make, and entailed two separate $1 million payments to Heritage in late 2022 and early 2023, with the balance to be paid in 2026. The last option would consist of Taylor Welch assigning to Heritage all of his interest in an unidentified "new Commercial Asset," which would have a "substantial payout at the end of 48 months," and "fill in whatever gap that remains" if neither of the first two options came to fruition. Neither the Welches nor Evans ever identified the "Commercial Asset."

147. Just six days later, on June 9, 2022, Fund 2 transferred $800,000 to Fund 1, along with an additional $200,000 on June 17, 2022. Fund 1 then used $800,000 primarily to repay certain Fund 1 investors, along with some Fund 2 investors.

148. Neither the Welches nor Evans told Heritage about the June 2022 transfers, and after further conversations, it became apparent that Wealth Cap was not able to immediately return the full amount of Heritage's investment. Although the parties did not execute a formal agreement, Wealth Cap promised to pay Heritage $2 million on or before December 31, 2022.

149. On December 6, 2022, Lance Welch reiterated in a text to J.B. that "nothing has changed about our original plan [to sell the Wealth Cap Properties and pay the proceeds to

Heritage], except that the [interest] rates spiked, preventing anything from selling at normal market prices."

150. December 31 came and went, but Defendants made no payment to Heritage.

151. On February 11, 2023, J.B. and the friend who introduced him to Wealth Cap met Lance Welch for lunch in Nashville, Tennessee. Lance Welch told J.B. that Wealth Cap owned approximately 35 properties worth approximately $1.7 million and had begun marketing them for sale. Wealth Cap would use the net proceeds from the sales of the properties to repay Heritage. Rather than hold the proceeds until they reached the $2 million mark as Lance Welch had previously represented, Wealth Cap would send all net proceeds to Heritage as soon as each closing occurred.

152. Lance Welch also committed to personally cover any shortfall between the property sales and the $2 million he, Taylor Welch and Evans had committed to pay by the end of 2022, which he estimated at approximately $300,000.

153. Lance Welch said that Fund 2 could sign the properties over to Heritage, but given that Heritage's mission was to grow its church in Los Angeles and that it had no experience owning, managing or selling real estate, J.B. agreed that it made more sense for Fund 2 to sell the properties and pay the proceeds to Heritage.

154. During this lunch, J.B. asked Lance Welch directly whether they were aware of any financial issues/challenges with Wealth Cap prior to Heritage's investment in Fund 2. This question upset Lance Welch, who claimed that was a lie. J.B. asked this question after hearing that Evans had been going through a period of depression brought on by personal economic hardships he had endured. According to Lance Welch, Evans' hardships were due to Traffic and

Funnels, which was the subject of a federal government investigation that was costing Defendants hundreds of thousands of dollars.

155. Lance Welch stated there were not any economic challenges or other issues with Wealth Cap when Heritage invested, and insisted that those problems arose immediately before their April 2022 call informing J.B. about the need to stall interest payments.

156. Lance Welch's statements about the 35 properties were false, as Wealth Cap, Fund 1, or a Relief Defendant owns them, not Fund 2. According to Wealth Cap, it purchased the properties from Fund 2 in arms'-length transactions, and neither Fund 2 nor Heritage has any interest in them.

157. Defendants have begun selling properties, but to date have not provided any proceeds to Heritage.

158. To date, none of the Defendants have paid Heritage anything since it received its last interest payment in early May 2022.

159. Throughout their communications with Heritage since May 2022, none of the Defendants acknowledged any wrongdoing or mistakes, nor did they tell Heritage how they had used its investment proceeds. To the contrary, they repeatedly told Heritage that they have no contractual obligation to return any investment principal. Yet, with the exception of Heritage, Fund 2 repaid all of its investors their principal in full in 2022.

160. Wealth Cap has removed its website from the internet.

161. Taylor Welch claims that his time as owner of Wealth Cap concluded in July 2022.

## CAUSES OF ACTION

### COUNT 1
### Violation of Section 10(b) of the Exchange Act and Rule 10b-5
### (Defendants Wealth Cap, Fund 2, Taylor Welch, Lance Welch, and Evans)

162. Plaintiff incorporates paragraphs 1 through 161, by reference, as if fully alleged herein.

163. Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder prohibit fraudulent, material misstatements or omissions in connection with the sale or purchase of a security.

164. Liability under Rule 10b-5 is implicated when an individual, in connection with the purchase or sale of any security, either directly or indirectly, (a) employs any device, scheme, or artifice to defraud, (b) makes any untrue or misleading statement of a material fact, or (c) engages in any act, practice or course of business which operates or would operate as a fraud or deceit upon any person.

165. By investing in Fund 2, Heritage purchased a security.

166. In connection with the purchase and sale of securities to Heritage, Defendants individually and in concert, directly and indirectly, used the means or instrumentalities of interstate commerce, the mails and/or the facilities of national securities exchanges, and did so in violation of Section 10(b) of the Exchange Act (15 U.S.C. § 78j(b)) and Rule 10b-5 (17 C.F.R. § 240,10b-5) promulgated thereunder.

167. With respect to Heritage's Fund 2 investment, Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 by intentionally misrepresenting, omitting, concealing, and/or failing to disclose material facts as outlined herein, including, but not limited to:

- Misrepresenting that Fund 1 was a success;

- Misrepresenting that Fund 1 had closed to new investors;
- Misrepresenting that Fund 2 was a new fund, not an extension of Fund 1;
- Failing to disclose that Fund 1 had been losing hundreds of thousands of dollars in 2021;
- Failing to disclose that Taylor Welch and Evans had taken $2.2 million in distributions from Fund 1 in 2020, leaving it with $860,000 in negative equity and approximately $200,000 in cash at the end of that year;
- Misrepresenting that Heritage's investment would be used solely "for real estate and renovations";
- Failing to disclose that only $830,000 of Heritage's $5 million would be used to buy properties;
- Failing to disclose that Fund 2 would not purchase any properties after January 2022;
- Failing to disclose that $1.15 million of Heritage's investment funds would be used to immediately repay Fund 1 investors and pay Evans $500,000;
- Failing to disclose that Heritage's investment would be further used to repay Fund 1 or Fund 2 investors, and make payments to Taylor Welch; and
- Failing to disclose that Wealth Cap owed Fund 1 $1.7 million at the end of 2021.

168. Defendants were individually and collectively responsible for making the materially false and misleading statements and omissions alleged herein.

169. Defendants employed a device, scheme, or artifice to defraud Heritage through the conduct alleged herein. Defendants engaged in a plan, scheme, and course of conduct designed to deceive Heritage, by virtue of having made statements and prepared, approved, signed, and/or disseminated documents that contained untrue statements of material fact and/or omitted facts necessary to make the statements therein not misleading.

170. By engaging in the conduct alleged herein, Defendants' business operated as a fraud or deceit upon Heritage.

171. The above misrepresentations and omissions were designed to persuade Heritage to invest in Fund 2 and were therefore in connection with the purchase of securities. Defendants acted with scienter when making the aforementioned false representations and omissions of material information concerning the offering and engaging in the other unlawful conduct as alleged herein.

172. Heritage was ignorant of the materially false and misleading nature of Defendants' statements and omissions and relied upon Defendants' representations when deciding to invest in Fund 2.

173. By providing false information and omitting critical details about the true nature of the Fund 2 offering and the financial condition of Wealth Cap and the Funds, Defendants misled Heritage to believe that the Fund 2 investment was a safe investment. These omissions and misrepresentations were material to Heritage because Heritage would not have invested had it known the entities' true state of affairs and the truth about the intended use of its investment.

174. Defendants' false representations and omissions of material information caused Heritage to invest $5,000,000 in December 2021.

175. Defendants' materially false and misleading statements and omissions directly and proximately harmed Heritage and caused it to suffer damages. Heritage seeks an award of damages in an amount to be proven at trial, but no less than $5,000,000, plus interest.

176. Heritage tenders to Defendants its Fund 2 Investing Membership interests.

**COUNT 2**
**Violation of Section 20(a) of the Exchange Act**
**(Defendants Wealth Cap, Fund 1, Taylor Welch, Lance Welch, and Evans)**

177. Plaintiff incorporates paragraphs 1 through 176, by reference, as if fully alleged herein.

178. Section 20 of the Exchange Act provides that "[e]very person who ... controls any person liable under any provision of this title or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person." 15 U.S.C. § 78t(a).

179. As set forth above, Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 by their acts and omissions as alleged in this Complaint.

180. Taylor Welch, Lance Welch, and Evans were controlling persons of Wealth Cap and both Funds, within the meaning of Section 20 of the Exchange Act, by virtue of their positions, control over Wealth Cap's and the Funds' business operations, knowledge of Wealth Cap's and the Funds' actual performance, and awareness of and/or participation in the preparation and/or dissemination of statements and information to investors about Wealth Cap and the Funds. Taylor Welch, Lance Welch, and Evans had the power to influence and control, and did influence and control, directly or indirectly, the actions of Wealth Cap and the Funds, including the content and dissemination of the false and misleading statements and omissions and misuse of Heritage's investment funds as alleged in this Complaint.

181. Wealth Cap was a controlling person of the Funds by virtue of its role as the Managing Member of Fund 1 and Fund 2, giving it control over their business operations. Wealth Cap had the power to influence and control, and did influence and control, directly or indirectly, the actions of the Funds, including the content and dissemination of the false and misleading statements and omissions and misuse of Heritage's investment funds as alleged in this Complaint.

182. Fund 1 was a controlling person of Fund 2 by virtue of its Managing Member's authority over Fund 2's business operations. Fund 1 included Fund 2 in its 2021 federal income tax return, which combined the Fund 2 membership interests outstanding as of December 31, 2021,

with the Fund 1 membership interests as of the same date. Fund 2 did not file a 2021 federal income tax return. Fund 1 had the power to influence and control, and did influence and control, directly or indirectly, the actions of Fund 2, including the content and dissemination of the false and misleading statements and omissions and misuse of Heritage's investment funds as alleged in this Complaint.

183. By reason of their authority and power to control Wealth Cap, Fund 1, and/or Fund 2, the Defendants named in this Count are liable pursuant to Section 20(a) of the Exchange Act.

184. As a direct and proximate result of these Defendants' wrongful conduct, Heritage suffered damages in connection with its investment in Fund 2. Heritage seeks an award of damages in an amount to be proven at trial, but no less than $5,000,000, plus interest.

**COUNT 3**
**Violation of Section 17(a) of the Securities Act**
**(Defendants Fund 2, Wealth Cap, Taylor Welch, Lance Welch, and Evans)**

185. Plaintiff incorporates paragraphs 1 through 184, by reference, as if fully alleged herein.

186. The Sixth Circuit, among other circuits, has held that Section 17(a) of the Securities Act implies a private cause of action for "purchasers" against the "sellers" of the securities in question.

187. As alleged above, Fund 2 sold a $5 million investment to Heritage, making Heritage the purchaser and Fund 2 a seller. Heritage's investment was in a security.

188. Wealth Cap, Taylor Welch, Lance Welch, and Evans were affiliated or associated with and acted as agents of Fund 2 and, specifically, in connection with the sale of the Fund 2 investment to Heritage.

189. While Fund 2 passed title of ownership of Investing Membership interests to Heritage, the other Defendants named in this Count played a substantial role in persuading or seducing Heritage into buying the securities. Wealth Cap promoted and managed Fund 2. Lance Welch identified himself as President and Co-Owner of Wealth Cap, and solicited, negotiated, and sold Heritage the Fund 2 investment. Taylor Welch and Evans are the founders and managers of Wealth Cap. Taylor Welch signed Fund 2's Form D as an "Officer of Managing Member," and identified himself as an Executive Officer of Fund 2. According to the Form D, Evans was also an Executive Officer of the Fund. Taylor Welch and Evans communicated with, formulated, and provided direction to Lance Welch about the terms of Heritage's Fund 2 investment. In addition, through the Portfolio Builders podcast, emails, social media outlets, and other communications, Taylor Welch and Evans solicited Fund 2 investors and represented that they created and managed the Funds and developed their business models. Heritage understood that Taylor Welch and Evans were managing Fund 2, just as they had managed Fund 1. Such conduct qualifies Wealth Cap, Lance and Taylor Welch, and Evans as sellers for purposes of this Count.

190. As alleged in more detail above, in connection with Heritage's investment, Fund 2, Wealth Cap, Taylor Welch, Lance Welch, and Evans each misled and deceived Heritage about the true nature of Wealth Cap's and the Funds' financial condition and organizational structure, the prior success of their fix-and-flip enterprises, and how Fund 2 investors' funds would be used, among other things.

191. By engaging in the conduct described above, the Defendants named in this count, directly or indirectly, in the offer or sale of securities, and by the use of means or instruments of transportation or communication in interstate commerce or by use of the mails directly or indirectly: (a) with scienter employed devices, schemes, or artifices to defraud; (b) with scienter

or negligence obtained money or property by means of untrue statements of a material fact or by omitting to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and (c) with scienter or negligence engaged in transactions, practices, or courses of business which operated or would operate as a fraud or deceit upon the purchaser.

192. Defendants, by engaging in the conduct described above, violated Section 17(a) of the Securities Act, 15 U.S.C. § 77q(a).

193. Heritage has thus been damaged in an amount to be proven at trial, but not less than $5,000,000, plus interest, attorneys' fees, and lost opportunity damages.

194. Heritage tenders to Defendants its Fund 2 Investing Membership interests.

**COUNT 4**
**Violation of Tenn. Code Ann. §§ 48-1-121 and 48-1-122(a)**
**(Wealth Cap, Fund 2, Taylor Welch, Lance Welch, and Evans)**

195. Plaintiff incorporates paragraphs 1 through 194, by reference, as if fully alleged herein.

196. The Tennessee Securities Act proscribes fraudulent statements, schemes, actions, or omissions in connection with the offer, sale, or purchase of securities (Tenn. Code Ann. § 48-1-121) and imposes liability upon individuals who violate this prohibition. (§ 48-1-122(a)).

197. Heritage's Fund 2 Membership Interests are securities.

198. The Defendants named in this Count made untrue statements of fact, or omitted material facts, to Heritage in connection with the offer, sale, and purchase of securities. Upon information and belief, Defendants knew they were soliciting Heritage to invest in a sham. Defendants also misrepresented the true nature of Wealth Cap and the Funds' financial conditions

and how they actually planned to use Heritage's $5 million investment, among other material information.

199. Heritage had no reasonable means of discovering Defendants' statements were false. Defendants' representations concerning Wealth Cap and the Funds' financial conditions, how investment proceeds would be used, and the investment's other terms involved information that was a substantial factor in Heritage's investment decision. Indeed, these false and misleading statements induced Heritage to invest $5 million in Fund 2.

200. These Defendants also engaged in acts, practices, and business operations, for the purpose of defrauding or deceiving Heritage, and for the purpose of converting Heritage's funds.

201. These Defendants made fraudulent transfers of funds into accounts of other entities, including Fund 1, and converted funds belonging to Heritage.

202. Defendants' material misrepresentations and misconduct directly and proximately caused Heritage to suffer substantial financial harm. As a result, Heritage has suffered the loss of its $5 million investment entrusted to Defendants.

203. Defendants willfully engaged in the above conduct.

204. Heritage seeks an award of compensatory damages against Defendants, in an amount to be determined at trial, but no less than $5,000,000, plus interest, and an award of reasonable attorneys' fees and costs, pursuant to Section 122(f). In addition to seeking compensatory damages, because of the malicious, intentional, fraudulent, and reckless nature of the conduct of these Defendants, Heritage also seeks punitive damages in an amount sufficient to punish and deter them.

205. Heritage tenders to Defendants its Fund 2 Investing Membership interests.

**COUNT 5**
**Violation of Tenn. Code Ann. § 48-1-122(g)**
**(Wealth Cap, Fund 1, Taylor Welch, Lance Welch, and Evans)**

206. Plaintiff incorporates paragraphs 1 through 205, by reference, as if fully alleged herein.

207. Tennessee's Blue Sky Law also imposes liability for those who control or materially aid in the underlying violations, providing that:

> Every person who directly or indirectly controls a person liable under this section, every partner, principal executive officer, or director of such person, every person occupying a similar status or performing similar functions, every employee of such person who materially aids in the act or transaction constituting the violation, and every broker-dealer or agent who materially aids in the act or transaction constituting the violation, are also liable jointly and severally with and to the same extent as such person, unless the person who would be liable under this subsection (g) proves that the person who would be liable did not know, and in the exercise of reasonable care could not have known, of the existence of the facts by reason of which the liability is alleged to exist. There is contribution as in cases of contract among the several persons so liable.

Tenn. Code Ann. § 48-1-122(g).

208. A party generally involved in the business at issue and with the power to control the transactions in which the underlying securities fraud occurred is liable under this Section 122(g) of the Tennessee Securities Act.

209. As set forth above, Defendants Wealth Cap and Fund 2 violated Sections 121 and 122(a) of the Tennessee Securities Act by their acts and omissions, as alleged herein. The Defendants named in this Count are liable as they controlled and materially aided these violations.

210. Taylor Welch, Lance Welch, Evans, and Fund 1—through their affiliation with and control over Wealth Cap—had authority over verbal and written statements concerning the Fund

2 offering and controlled the use of Fund 2 investments. As a result, these Defendants were able to transfer Heritage's $5 million investment at their discretion.

211. By reason of their authority and power to directly or indirectly control Wealth Cap and Fund 2, and by materially aiding the violations alleged herein, the Defendants named in this Count are liable pursuant to Section 122(g) of the Tennessee Securities Act.

212. As a direct and proximate result of these Defendants' wrongful conduct, Heritage suffered damages in connection with its investment in Fund 2. Heritage seeks an award of compensatory and punitive damages against Defendants, in an amount to be determined at trial, including all unpaid principal, unpaid interest, and an award of reasonable attorneys' fees and costs, pursuant to Section 122(f), plus all such other relief which Heritage may be entitled to at law or equity.

**COUNT 6**
**Common Law Fraud**
**(Wealth Cap, Fund 2, Taylor Welch, Lance Welch, and Evans)**

213. Plaintiff incorporates paragraphs 1 through 212, by reference, as if fully alleged herein.

214. As alleged specifically above, each of the Defendants named in this Count made numerous false and misleading representations of then-existing or past facts to Heritage about Fund 2. These representations concerned and omitted material facts regarding, *inter alia*, Fund 2's business plan and practices, the prior success and financial condition of Wealth Cap and both Funds, and the terms of the investment, including how funds would be used and that principal would be returned.

215. Defendants knowingly without belief in their truth, or at a minimum recklessly without regard to whether it was true or false, made these representations and did so with the intent to induce reliance by Heritage when making its decision whether to invest in Fund 2.

216. At the time Defendants made these misrepresentations, Heritage had no means of discovering Defendants' representations were false and was ignorant of their falsity. As a result, Heritage detrimentally relied upon these representations in deciding whether to invest. Had Heritage known the truth, as alleged above, it would not have invested with Defendants. Given these circumstances, Heritage's reliance on these representations was reasonable and justified.

217. Defendants' knowing, or at a minimum reckless, misrepresentations and omissions of material fact constitute fraud under common law.

218. As a direct and proximate result of Defendants' false and fraudulent representations, Heritage suffered damages in an amount to be proven at trial, but no less than $5,000,000, plus interest. In addition to seeking compensatory damages, because of the malicious, intentional, fraudulent, and reckless nature of the conduct of these Defendants, Heritage also seeks punitive damages in an amount sufficient to punish and deter them.

**COUNT 7**
**Negligent Misrepresentation**
**(Wealth Cap, Fund 2, Taylor Welch, Lance Welch, and Evans)**

219. Plaintiff incorporates paragraphs 1 through 218, by reference, as if fully alleged herein.

220. A party who, in the course of any transaction in which it has a pecuniary interest, supplies false information for the guidance of others in their transactions, is subject to liability for pecuniary loss caused to the other parties by their justifiable reliance upon the information, if it

fails to exercise reasonable care or competence in the obtaining or communicating of the information.

221. As alleged throughout this Complaint, Defendants supplied false information for the guidance of Heritage in connection with its Fund 2 investment. This false information pertained to, *inter alia*, Fund 2's business plan and practices, the prior success and financial condition of Wealth Cap and both Funds, and the terms of the investment, including how funds would be used and that principal would be returned.

222. As the issuer and sellers of the investment and control persons of the Funds, Defendants were the exclusive source for this information, meaning Heritage had no opportunity to discover its falsity. As such, Heritage reasonably relied on the information supplied by Defendants.

223. As a result of Defendants' furnishing false information, Heritage suffered damages in the amount to be established at trial, but no less than $5,000,000, plus interest. In addition to seeking compensatory damages, because of the malicious, intentional, fraudulent, and reckless nature of the conduct of these Defendants, Heritage also seeks punitive damages in an amount sufficient to punish and deter them.

**COUNT 8**
**Breach of Fiduciary Duty**
**(Wealth Cap)**

224. Plaintiff incorporates paragraphs 1 through 223, by reference, as if fully alleged herein.

225. The Tennessee Revised Limited Liability Company Act provides that members of a member-managed LLC owe fiduciary duties to each other—specifically, the duties of loyalty and care. Tenn. Code Ann. § 48-249-403. Further, these fiduciary duties are comprised of

obligations to discharge those duties in good faith, to account to the LLC and hold as trustee any property derived in the conduct or winding up of the business, to refrain from dealing with the LLC or its winding up as or on behalf of an adverse interest, and to refrain from competing with the LLC prior to its termination.

226. As the Managing Member of Fund 2, Wealth Cap owed Heritage, as a Fund 2 Investing Member, these fiduciary duties of loyalty and care and accompanying obligations. Pursuant to its fiduciary duties, Wealth Cap was required to put the best interests of Heritage and other Investing Members above its own interests.

227. Wealth Cap breached its fiduciary duties by using investors' money for its benefit, and the benefit of its owners and affiliates, by repaying Fund 1 investors with Fund 2 investments, and by treating Heritage disparately from other Fund 2 Investing Members.

228. As a direct and proximate result of Wealth Cap's breaches of fiduciary duties, Heritage has been damaged in an amount to be established at trial, but no less than $5,000,000, plus interest. In addition to seeking compensatory damages, because of the malicious, intentional, fraudulent, and reckless nature of the conduct of Wealth Cap, Heritage also seeks punitive damages in an amount sufficient to punish and deter it.

**COUNT 9**
**Aiding and Abetting Breach of Fiduciary Duty**
**(Fund 1, Taylor Welch, Lance Welch, and Evans)**

229. Plaintiff incorporates paragraphs 1 through 228, by reference, as if fully alleged herein.

230. Tennessee recognizes an independent tort claim for "concert of action" and that such a claim arises when two or more persons engage in an unlawful act and one of them commits a serious civil injury upon a third party.

231. Under a concert of action theory, a defendant is liable if he (a) does a tortious act in concert with the other or pursuant to a common design with him, or (b) knows that the other's conduct constitutes a breach of duty and gave substantial assistance or encouragement to the other so to conduct himself, or (c) gives substantial assistance to the other in accomplishing a tortious result and his own conduct, separately considered, constitutes a breach of duty to third person.

232. As set forth above, Wealth Cap owed fiduciary duties to Heritage and engaged in conduct contrary to and in breach of those duties.

233. Defendants Taylor Welch, Lance Welch, and Evans knew or should have known that Wealth Cap's conduct constituted a breach of duty and, nevertheless, substantially assisted with and encouraged Wealth Cap's breaches. These Defendants' assistance was instrumental in accomplishing Wealth Cap's tortious breach.

234. As a result of their concerted action, Taylor Welch, Lance Welch, and Evans aided and abetted Wealth Cap's violation of fiduciary duties to Heritage and harmed Heritage in an amount to be established at trial, but no less than $5,000,000, plus interest. In addition to seeking compensatory damages, because of the malicious, intentional, fraudulent, and reckless nature of the conduct of these Defendants, Heritage also seeks punitive damages in an amount sufficient to punish and deter them.

**COUNT 10**
**Breach of Contract**
**(Fund 2)**

235. Plaintiff incorporates paragraphs 1 through 234, by reference, as if fully alleged herein.

236. The Operating Agreement is an enforceable contract that created and governed the obligations and duties Fund 2 owed to Heritage and other Investing Members. Among other

things, the Operating Agreement expressly set forth protocols for how and in what order Investing Members would receive distributions.

237. Section 3.3(a) set forth the priority for payment of distributions: (1) to all Investing Members in an amount equal to 8% per annum of their capital contribution; (2) to all Investing Members holding six or more Units until such Investing Members realize distributions, in the aggregate, equal to 10% of their capital contribution; and (3) any distributions in excess of the foregoing then go to Wealth Cap.

238. In the event of Fund 2's dissolution, Section 7.2 requires liquidation of its assets, with the proceeds to be distributed as follows: (1) to creditors; (2) to Investing Members and former Members in satisfaction of liabilities for distributions under applicable provisions of the Delaware LLC Act; and (c) to the Members, in accordance with Section 3.3(a) of the Operating Agreement.

239. Heritage fully performed its obligations under the Operating Agreement by transferring $5 million to Fund 2. In contrast, Fund 2 failed to fulfill its contractual obligations. Rather than applying and distributing the liquidation proceeds in accordance with the above order of priority, Fund 2 prioritized paying Taylor Welch and Evans hundreds of thousands of dollars each and returning capital contributions to Fund 1 and other Fund 2 individual Investing Members over refunding Heritage any portion of its investment.

240. By engaging in this and the other conduct alleged herein, Fund 2 materially breached its contractual obligations and duties to Heritage.

241. As a direct and proximate result of Fund 2's breach, Heritage has suffered harm. Heritage seeks damages in an amount to be established at trial, but no less than $5,000,000, as well as attorneys' fees and other costs incurred in connection with this action.

**COUNT 11**
**Breach of Implied Covenant of Good Faith and Fair Dealing**
**(Fund 2)**

242. Plaintiff incorporates paragraphs 1 through 241, by reference, as if fully alleged herein.

243. Tennessee common law imposes a duty of good faith and fair dealing in the performance and enforcement of contracts. This duty is implied in every contract, without exception.

244. As addressed above, Fund 2 entered into a valid and legally binding contract with Heritage in connection with its $5 million investment.

245. The allegations in the Complaint evidence Fund 2's lack of good faith and failure to deal fairly with Heritage. There is no justification for using Heritage's funds to pay Taylor Welch and Evans, neither of whom were Fund 2 investors, and prioritizing repaying other Investing Members and Fund 1 investors their capital contributions over Heritage. These actions, among others, breached the terms of the Operating Agreement and destroyed and injured Heritage's right to receive the fruits of the contract.

246. Heritage has incurred damages directly and proximately caused by Fund 2's breach of the implied covenant and seeks damages in an amount to be established at trial, but no less than $5,000,000, as well as attorneys' fees and other costs incurred in connection with this action.

**COUNT 12**
**Unjust Enrichment**
**(Wealth Cap, Fund 1, Taylor Welch and Evans)**

247. Plaintiff incorporates paragraphs 1 through 246, by reference, as if fully alleged herein.

248. To the extent required, Heritage pleads this Count in the alternative to the other claims under Fed. R. Civ. P. 8(d).

249. Under the theory of unjust enrichment, a party who receives a benefit that he or she desires, under circumstances rendering retention of the benefit without providing compensation inequitable, must compensate the provider of the benefit. This cause of action exists in the absence of a contract governing the parties' relationship.

250. While there is an enforceable agreement between Wealth Cap and Fund 2 and Heritage, no such contract exists between Heritage and the Defendants named in this Count. Thus, Heritage has no adequate remedy at law.

251. As alleged above, Wealth Cap and Fund 2 transferred Fund 2 investor capital to Fund 1 and subsequently used those proceeds to pay Taylor Welch and Evans hundreds of thousands of dollars, despite none of them being Fund 2 investors, and to return capital contributions to other investors in the Funds.

252. With respect to such transfers occurring on or after December 15, 2021, the funds for these payments came in whole or in part from Heritage's $5 million investment. But for Heritage's investment, the Funds would not have had the resources to make the transfers.

253. This monetary benefit was conferred upon Fund 1, Taylor Welch, and Evans at the expense and detriment of Heritage. The benefits held by these Defendants rightfully belong to Heritage, as Defendants' fraudulent conduct induced Heritage to purchase $5 million worth of Fund 2 units.

254. Because Fund 1, Taylor Welch, and Evans provided no consideration to Heritage in exchange for such benefit, it would be inequitable and unjust for these Defendants to retain any of the proceeds of Heritage's investment.

255. The Defendants named in this Count are aware of and appreciate the benefits they obtained inequitably that came from Heritage.

256. Defendants should be compelled to disgorge all proceeds they obtained inequitably as a result of the unjust and unlawful conduct alleged herein, and a constructive trust should be imposed upon all sums these Defendants obtained inequitably that are traceable to Heritage.

**COUNT 13**
**Conversion**
**(All Defendants)**

257. Plaintiff incorporates paragraphs 1 through 256, by reference, as if fully alleged herein.

258. Under Tennessee law, a tort claim for conversion can be asserted against a party who appropriated another's property for his own use by exercising dominion and control in exclusion or defiance of the owner's right to use and benefit from the property.

259. Fund 2—by and through its Managing Member, Wealth Cap, and its other control persons, Fund 1, Taylor Welch, Lance Welch, and Evans—exercised dominion and control over funds belonging to Heritage.

260. As alleged above, Heritage transferred $5 million to Fund 2 on December 15, 2021, pursuant to the PPM and Operating Agreement and in reliance on representations made by Taylor and Lance Welch. The Funds' financial records reflect that the Defendants did not use Heritage's funds as promised, and as of the date of this Complaint, none of the Defendants have returned the $5 million investment principal to Heritage.

261. By engaging in this conduct, Defendants appropriated Heritage's money for their own use and at the exclusion of Heritage's right to use and benefit from those funds. As a direct and proximate result of Defendants' wrongful appropriation of the investment principal, Heritage

suffered damages in an amount to be established at trial, but no less than $5,000,000, plus interest. In addition to seeking compensatory damages, because of the malicious, intentional, fraudulent, and reckless nature of the conduct of Defendants, Heritage also seeks punitive damages in an amount sufficient to punish and deter them.

## RELIEF REQUESTED

**WHEREFORE**, Heritage respectfully requests that this Court grant the following relief against the Defendants:

A. That process issue and Defendants be required to answer this Complaint in the time allowed by law;

B. That a jury of twelve (12) be impaneled to determine this matter as to all issues triable by jury;

C. Award Heritage all of its actual, compensatory, incidental, and consequential damages against the Defendants in an amount to be proven at trial;

D. Award Heritage punitive damages, to the extent allowed by Tenn. Code Ann. § 29-39-104 and any other any applicable law, in an amount sufficient to punish and deter the Defendants from similar future conduct;

E. Award Heritage its costs incurred in bringing this action, including its reasonable attorneys' fees and litigation expenses, to the maximum extent allowed by law pursuant to Tenn. Code Ann. § 48-2-122(f) and any other applicable law;

F. Award Heritage pre- and post-judgment interest as provided by Tenn. Code Ann. § 47-14-123 and 28 U.S.C.A. § 1961 and any other applicable statute;

G. Impose a constructive trust upon all sums these Defendants obtained inequitably that are traceable to Heritage; and

H. Award Heritage any and all other relief that this Court finds just, necessary and proper.

Dated: July 12, 2023

Respectfully submitted,

/s/*M. Thomas McFarland*

Alan Baskin (*pro hac vice forthcoming*)
Caroline Saunders (*pro hac vice forthcoming*)
Raynee Clemente (*pro hac vice forthcoming*)
Weiss Brown
6263 North Scottsdale Road, Suite 340
Scottsdale, Arizona 85250
T: 480-327-6650
alan@weissbrown.com
caroline@weissbrown.com
raynee@weissbrown.com

Christopher W. Cardwell
M. Thomas McFarland
Gullett, Sanford, Robinson & Martin, PLLC
150 Third Avenue South, Suite 1700
Nashville, TN 37201
T: 615-244-4994
F: 615-256-6339
ccardwell@gsrm.com
tmcfarland@gsrm.com

*Attorneys for Plaintiff*