# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF TENNESSEE
### NASHVILLE DIVISION

**HERITAGE GLOBAL NETWORK**                         )
**LOS ANGELES, INC.,**                              )
                                                )
**Plaintiff,**                                      )         **Case No. 3:23-cv-00685**
                                                )         **Judge Aleta A. Trauger**
**v.**                                              )
                                                )
**TAYLOR WELCH; CHRIS EVANS;**                      )
**LANCE WELCH; WEALTH CAP**                         )
**HOLDINGS, LLC; WEALTH CAP**                       )
**FUNDS, LLC; WEALTH CAP FUND 2,**                  )
**LLC; WCH AL-1001, LLC; WCH AL-1002,**             )
**LLC; WCH AL-1004, LLC; WCH AL-1004,**             )
**LLC; WCH MO-1001, LLC; WCH**                      )
**MO-1002, LLC; WCH MO-1003, LLC;**                 )
**WCH C-1001, LLC; WCH NC-1002, LLC;**              )
**WCH NC-1003, LLC; WCH NC-1004, LLC,**             )
                                                )
**Defendants.**                                     )

## MEMORANDUM

    Heritage Global Network Los Angeles, Inc. ("Heritage") has filed a Motion for Preliminary Injunction (Doc. No. 2), to which the defendants have filed a Response (Doc. No. 21), and Heritage has filed a Reply (Doc. No. 22). The defendants have filed a Partial Motion to Dismiss (Doc. No. 27), to which Heritage has filed a Response (Doc. No. 37), and Heritage has filed a Reply (Doc. No. 39). For the reasons set out herein, Heritage's motion will be denied, and the defendants' motion will be granted in part and denied in part.

# I. BACKGROUND[1]

Defendant Taylor Welch—whom the court will refer to as "T. Welch," because two of the defendants share that surname—and defendant Chris Evans are entrepreneurs who, among other things, hosted a business podcast together in 2020 and 2021. The podcast, which billed itself as "your one stop shop for honest [and] authentic investment training," was called "Portfolio Builders" and ran for at least eighty-eight episodes. (Doc. No. 1 ¶¶ 30–32.) The first episode of Portfolio Builders focused on defendant Wealth Cap Holdings, LLC ("Wealth Cap"), a company that, T. Welch suggested, could "build somebody literally past a $10 million [real estate] portfolio that is air tight because of the markets it is in, the diversification of asset classes," and other factors. (*Id.* ¶ 34.) Evans and T. Welch were in a position to make such a recommendation because, in addition to being podcast cohosts, they were also the founders and operators of Wealth Cap, which was disclosed on the podcast. (*Id.* ¶¶ 29, 33.) Indeed, according to Heritage, Portfolio Builders was not, in fact, a reliable source for general investment advice, but rather a "transparent attempt to solicit investors" for the hosts' own venture. (*Id.* ¶ 36.)

Most of the defendants are funds created by Evans and T. Welch in connection with Wealth Cap. They founded the first such entity—Wealth Cap Funds, LLC, also known as "Fund 1"—two months before launching the podcast. (*Id.* ¶¶ 2, 37.) Then, a few days after the first episode's release, Fund 1 filed a Notice of Exempt Offering of Securities, also known as a "Form D," with the United States Securities and Exchange Commission ("SEC"). (*Id.* ¶ 38). An "exempt offering" is an offering of a security that is not subject to the SEC's registration requirements for public offerings—typically because the "exempt" offering is private, as this one

---

[1] The facts are taken primarily from the Complaint. (Doc. No. 1.) Unless otherwise noted, the facts are accepted as true for the purpose of deciding the Partial Motion to Dismiss.

2

was. *See* 15 U.S.C. § 77d(a)(2); *SEC v. Ralston Purina Co.*, 346 U.S. 119, 120 (1953) (explaining the "private offering exemption").

The business model of Fund 1 was to "purchase, rehabilitate, manage, and sell residential properties"—that is to say, it flipped houses. (*Id.* ¶ 41.) Fund 1 purported to be able to provide investors an effective annual return of 12%, paid in monthly payments. (*Id.*) In podcast episodes and updates to investors, Evans, T. Welch, and the other individual defendant in this case, Wealth Cap President Lance Welch ("L. Welch"),[2] touted the reliability and safety of Fund 1. (*Id.* ¶¶ 42–44.) In an April 1, 2020 "Wealth Cap Private Investor Update," T. Welch described the Wealth Cap investment model and explained why, in his view, investors should prefer Wealth Cap to other investment opportunities:

> We designed everything in Wealth Cap *NOT* for the pure maximization of "profits," but for maximum **safety** and mitigation against losses. . . .
>
> From the beginning I told people, "*We are different. We run real businesses. We have our OWN cash invested in this fund . . . . we have to be safer (and smarter) than everyone else doing anything like this.*" . . . .
>
> We are being set apart as truly one of the safest vehicles in the world—I believe—for the safe storage & growth of capital (yours, mine, our team's, etc) . . . .
>
> We have 4 sources of income that are accessible any time we need them, diversified amongst three industries, with dozens of product lines in each industry. Two of those income sources are 8-figures annually . . . . [O]ne of those sources is 7-figures annually. The way we have set things up is SO SAFE, it is mind boggling & almost hard to explain to people who *do not know how fanatical we are* [about] safety.

(Doc. No. 1 ¶ 49 (emphasis from original document).)

Heritage is a not-for-profit corporation "dedicated to building an interfaith Judeo-Christian community in Los Angeles, California." (*Id.* ¶ 52.) Heritage was founded in 2020 by a

---

[2] L. Welch is T. Welch's father. (Doc. No. 1 ¶ 4.)

group including Jonathan Bernis, who serves as its CEO and the Chairman of its Board.[3] (*Id.* ¶¶ 52–53.) Bernis heard about Wealth Cap from a mutual friend of Evans, and, on or around August 21, 2020, Bernis had a call with L. Welch to discuss investing in Fund 1. (*Id.* ¶¶ 54–56.) During that call, L. Welch "represented that Fund 1 used investors' funds to purchase real estate that met very stringent criteria." (*Id.* ¶ 57.) Bernis had further exploratory conversations with Evans and the Welches during a trip to Charlotte, North Carolina on September 9, 2020. (*Id.* ¶ 58.) Bernis was convinced, and, in November 2020, after completing Wealth Cap's investor screening process, Bernis invested $600,000 in Fund 1, followed by an additional $150,000 in April of the next year. (*Id.* ¶ 60.) The investment appeared, at least at first, to be a success; Fund 1 began making monthly payments equivalent to a 12% annual return, just as expected. (*Id.* ¶ 61.)

On August 31, 2021, however, L. Welch sent an email to Fund 1's investors announcing that, "[e]ffective July 31, 2021, we made the decision not to bring any new money into this particular fund" but would, instead, be opening a new fund, Fund 2, which would offer lower rates of return: 8% or 10% per annum, depending on the "tier" that the investor qualified for. (*Id.* ¶¶ 67–68.) In September 2021, T. Welch and Evans incorporated Fund 2 as Wealth Cap Fund 2, LLC, and, shortly before the end of the year, Fund 2 filed its own Notice of Exempt Offering of Securities with the SEC. (*Id.* ¶¶ 62–63.)

The opportunity to invest in Fund 2 was offered through an undated private placement memorandum ("PPM"). (*Id.* ¶ 74.) According to the PPM, the investment model for Fund 2 was essentially the same as that for Fund 1: to "acquire, renovate, improve, rehabilitate, and eventually re-sell single-family housing properties." (*Id.* ¶ 75.) The PPM included a number of references to the extent to which Fund 2 would, or would not, transmit funds to Wealth Cap as

---

[3] Bernis is identified in the Complaint only as "J.B.," but he provides his full name elsewhere in the record. (*See* Doc. No. 3-1.)

fees, compensation, or reimbursement. Heritage describes those statements as "conflicting" and provides several excerpts to illustrate the point. (*Id.* ¶ 82.) Those excerpts acknowledge that Wealth Cap "and its affiliates" would receive some of the money that Fund 2 amassed, although most of the statements characterize any such payments as either compensation or reimbursement for particular purposes. None of the cited language discusses the possibility that money invested in Fund 2 would be used to pay the liabilities of Fund 1. (*Id.* ¶¶ 82–86.)

Bernis invested $150,000 in Fund 2. (*Id.* ¶ 73.) He did not, however, stop there. Heritage was, at the time, expecting a large donation to support its operations and expansion. (*Id.* ¶ 91.) Because the organization would find itself with so much cash on hand, Bernis began considering ways to obtain a favorable, safe rate of return on its funds. He contacted L. Welch about the possibility that Heritage might make a large investment in Fund 2, with a limited time commitment agreed upon by the parties. (*Id.* ¶¶ 92–94.) Bernis and L. Welch discussed the possibility over the course of a few communications, with both sides showing interest in a deal but with L. Welch expressing a need to reach some "compromise" regarding the time limit of the investment. During the discussions, L. Welch told Bernis that Heritage's investment would account for no more than half of the total amount invested in Fund 2. Bernis told L. Welch that the $5 million was a "Kingdom investment," meaning that the funds were "earmarked for a specific charitable purpose and could not be put at risk." (*Id.* ¶¶ 92–100.)

On December 2, 2021, L. Welch emailed the Fund 2 PPM and a one-page summary of Fund 2 to Bernis, explaining to Bernis that, although the PPM's "legaleeze . . . highlights that there is no such thing as a guarantee in real estate," Bernis should remember that the operators of Wealth Cap "are very disciplined in what [they] do." (*Id.* ¶ 101.) The summary included an assertion that Fund 2 "can only use the funds for real estate and renovations." (*Id.* ¶ 102.) In

further disccusions, L. Welch generally assured Bernis that Wealth Cap was capable of handling such a large investment and that Fund 2 was "restricted to buying and rehabilitating properties within the targets of [Wealth Cap's] profitability guidelines." (*Id.* ¶ 104.) On December 15, 2021, Heritage wired Fund 2 $5 million in exchange for "100 Units of Fund 2 Investing Membership Interests." (*Id.* ¶ 106.)

Heritage's investment in Fund 2 was governed by an Operating Agreement that Heritage describes as "an enforceable contract that created and governed the obligations and duties Fund 2 owed to Heritage and other Investing Members." (*Id.* ¶ 236.) The Operating Agreement set forth investors' rights to payment of distributions, as well as the procedure for liquidating Fund 2 in the event of its dissolution. (*Id.* ¶¶ 238–39.)

Bernis and Heritage believed that they were committing their money to a proven business model that had already produced reliable returns and would, barring some unforeseen difficulty, likely continue on that safe course over the near term. The truth, however, was allegedly quite different. Fund 1 had not, in fact, been a success, nor had it been administered pursuant to the rigorous, disciplined methodology that its operators had touted. Many of its purchases or attempted purchases had not turned into successful rehabilitate-and-flip projects, and the fund's losses piled up over the course of 2021—starting with $63,700 in losses over the course of the first three months of the year and ballooning to over $440,000 in losses by the end of August. (*Id.* ¶ 117.) Meanwhile, the number of properties purchased plummeted—from over 120 properties purchased in the last half of 2020 to only 38 purchased during the same period of 2021. (*Id.* ¶ 121.) Fund 1 was, in other words, failing, although it might have been capable of being bailed out by an infusion of fresh cash—like Heritage's $5 million.

6

Heritage, though, had not invested in Fund 1; it had invested in Fund 2, which supposedly used the same business model but constituted a new entity offering a somewhat less ambitious rate of return. According to Heritage, however, Fund 2 was little more than an empty vessel for conveying support to the failing Fund 1. On the very day that Heritage invested its $5 million in Fund 2, Fund 2 transferred over $1.1 million to Fund 1, followed by more transfers not long thereafter. (*Id.* ¶¶ 126–28.) Fund 2 never purchased a single property or even filed a federal income tax return. (*Id.* ¶¶ 108, 111.) According to Fund 2's balance sheet, 99% of its assets as of December 31, 2022, had simply been conveyed directly to Fund 1. The other 1% were loaned to Wealth Cap. (*Id.* ¶ 109.) Fund 2, moreover, had not, in fact, been a large venture in which Heritage was just one of many investors, with a stake amounting to no more than 50% of its investments. In reality, Heritage's $5 million amounted to over 80% of the total money invested in Fund 2. (*Id.* ¶ 131.)

In April or May of 2022—that is, just a few months after the $5 million sum had been wired—L. Welch called Bernis with the "difficult news" that, due to one Wealth Cap employee's "incompetence," as well as a "lack of proper controls," some "unsuitable homes" had been purchased, and Fund 2 would need to suspend the monthly interest payments it had been making to Heritage. He assured Heritage that its principal was safe and would be repaid in full. (*Id.* ¶¶ 134–35.)

Not long thereafter, however, T. Welch informed Heritage that the situation was significantly more dire; Wealth Cap was "in trouble" and would need to liquidate its properties. (*Id.* ¶ 136.) Wealth Cap's maneuvers to salvage the situation, T. Welch explained, would include dissolving Fund 2 and refunding investors only 44% of their principal—although he assured Heritage that he was confident that the full $5 million could be repaid by the end of 2022. (*Id.* ¶

7

138.) Neither T. Welch nor L. Welch revealed to Heritage that Wealth Cap's problems had arisen under Fund 1 and had preceded Heritage's investment. (*Id.* ¶ 137.) T. Welch reiterated Wealth Cap's commitment to making investors whole in a follow-up email. (*Id.* ¶ 142.)

That never happened, and, on July 12, 2023, Heritage sued Wealth Cap, the Welches, Evans, and Funds 1 and 2. (*Id.* at 1.) Heritage also included, as "relief defendants," a number of additional Wealth Cap funds that, according to the Complaint, were formed to hold properties originally purchased by Wealth Cap, Fund 1, or Fund 2. (*Id.* ¶¶ 8–18.) The Complaint states thirteen causes of action. Counts 1 through 3 are federal Exchange Act claims based on, respectively, section 10(b), section 20(a), and section 17(a) of that Act and the implementing regulations of those subsections, including Rule 10b-5. (*Id.* ¶¶ 162–194.) Counts 4 and 5 are pursuant to the Tennessee Securities Act and the Tennessee Blue Sky Law, respectively. (*Id.* ¶¶ 195–212.) Claims 8 and 9 are based on alleged breach of fiduciary duty under the Tennessee Revised Limited Liability Company Act, Tenn. Code Ann. § 48-249-403. (*Id.* ¶¶ 224–34.) The remaining claims are based on various common law theories, including fraud, breach of contract, and conversion. (*Id.* ¶¶ 213–61.)

In addition to Heritage's more detailed discussion of specific communications, the Complaint provides a summary, non-exclusive list of the defendants' allegedly actionable representations or omissions:

- Misrepresenting that Fund 1 was a success;

- Misrepresenting that Fund 1 had closed to new investors;

- Misrepresenting that Fund 2 was a new fund, not an extension of Fund 1;

- Failing to disclose that Fund 1 had been losing hundreds of thousands of dollars in 2021;

- Failing to disclose that Taylor Welch and Evans had taken $2.2 million in distributions from Fund 1 in 2020, leaving it with $860,000 in negative equity and approximately $200,000 in cash at the end of that year;

- Misrepresenting that Heritage's investment would be used solely "for real estate and renovations";

- Failing to disclose that only $830,000 of Heritage's $5 million would be used to buy properties;

- Failing to disclose that Fund 2 would not purchase any properties after January 2022;

- Failing to disclose that $1.15 million of Heritage's investment funds would be used to immediately repay Fund 1 investors and pay Evans $500,000;

- Failing to disclose that Heritage's investment would be further used to repay Fund 1 or Fund 2 investors, and make payments to Taylor Welch; and

- Failing to disclose that Wealth Cap owed Fund 1 $1.7 million at the end of 2021.

(*Id.* ¶ 167.)

Contemporaneously with the Complaint, Heritage filed a Motion for Preliminary Injunction asking the court to enjoin Evans, the Welches, Wealth Cap, Fund 1, or Fund 2 from "selling, transferring or encumbering any properties owned by or on behalf of or controlled by Wealth Cap, the Funds or any affiliate"—including the relief defendants—"absent order of the Court." (Doc. No. 2 at 1.) The defendants oppose the motion, arguing both that Heritage is unlikely to succeed on its claims and that, even if Heritage is likely to succeed, preliminary injunctive relief is inappropriate when the movant faces only a monetary injury. (Doc. No. 21.)

On September 8, 2023, the plaintiffs filed a Partial Motion to Dismiss directed at all claims other than Count 10 (breach of contract) and Count 12 (unjust enrichment). (Doc. No. 27.) The plaintiffs oppose the motion. (Doc. No. 37.)

## II. LEGAL STANDARD

### A. Motion for Preliminary Injunction

"Four factors determine when a court should grant a preliminary injunction: (1) whether the party moving for the injunction is facing immediate, irreparable harm, (2) the likelihood that the movant will succeed on the merits, (3) the balance of the equities, and (4) the public interest." *D.T. v. Sumner Cty. Sch.*, 942 F.3d 324, 326 (6th Cir. 2019) (citing *Benisek v. Lamone*, 138 S. Ct. 1942, 1943–44 (2018); Wright & Miller, 11A Fed. Prac. & Proc. Civ. § 2948 (3d ed. & Supp. 2019)). The district court must "weigh the strength of the four [preliminary injunction] factors against one another," with the qualification that irreparable harm is an "indispensable" requirement, without which there is "no need to grant relief *now* as opposed to at the end of the lawsuit." *D.T.*, 942 F.3d at 327 (citing *Friendship Materials, Inc. v. Mich. Brick, Inc.*, 679 F.2d 100, 105 (6th Cir. 1982)). Similarly, "a finding that there is simply no likelihood of success on the merits is usually fatal" to a request for preliminary injunctive relief. *Gonzales v. Nat'l Bd. of Med. Examiners*, 225 F.3d 620, 625 (6th Cir. 2000) (citing *Mich. State AFL–CIO v. Miller*, 103 F.3d 1240, 1249 (6th Cir. 1997)).

### B. Motion to Dismiss

In deciding a motion to dismiss for failure to state a claim under Rule 12(b)(6), the court will "construe the complaint in the light most favorable to the plaintiff" and "accept its allegations as true." *Directv, Inc. v. Treesh*, 487 F.3d 471, 476 (6th Cir. 2007); *Inge v. Rock Fin. Corp.*, 281 F.3d 613, 619 (6th Cir. 2002). Unless additional pleading requirements specific to the plaintiff's claims say otherwise, Rule 8 of the Federal Rules of Civil Procedure requires only that a plaintiff provide "a short and plain statement of the claim that will give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests." *Conley v. Gibson*,

10

355 U.S. 41, 47 (1957). The court must determine only whether "the claimant is entitled to offer evidence to support the claims," not whether the plaintiff can ultimately prove the facts alleged. *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 511 (2002) (quoting *Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974)).

The complaint's allegations "must be enough to raise a right to relief above the speculative level." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). To establish the "facial plausibility" required to "unlock the doors of discovery," the plaintiff cannot rely on "legal conclusions" or "[t]hreadbare recitals of the elements of a cause of action," but, instead, the plaintiff must plead "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678–79 (2009). "[O]nly a complaint that states a plausible claim for relief survives a motion to dismiss." *Id.* at 679; *Twombly*, 550 U.S. at 556.

In addition to those requirements, a plaintiff alleging fraud must satisfy the heightened pleading requirements of Fed. R. Civ. P. 9(b). *Frank v. Dana Corp.*, 547 F.3d 564, 569–70 (6th Cir. 2008). Under Rule 9(b), "a party must state with particularity the circumstances constituting fraud." The Sixth Circuit has explained that, while Rule 9(b) imposes a heightened standard, the underlying purpose of the rule is to serve the same ends as the general pleading requirements of Rule 8:

> [Rule 9(b)] should not be read to defeat the general policy of "simplicity and flexibility" in pleadings contemplated by the Federal Rules. Rather, Rule 9(b) exists predominantly for the same purpose as Rule 8: to provide a defendant fair notice of the substance of a plaintiff's claim in order that the defendant may prepare a responsive pleading. Rule 9(b), however, also reflects the rulemakers' additional understanding that, in cases involving fraud and mistake, a more specific form of notice is necessary to permit a defendant to draft a responsive pleading.

*United States ex rel. SNAPP, Inc. v. Ford Motor Co.*, 532 F.3d 496, 504 (6th Cir. 2008) (citations and quotation marks omitted). "So long as a [plaintiff] pleads sufficient detail—in terms of time, place, and content, the nature of a defendant's fraudulent scheme, and the injury resulting from the fraud—to allow the defendant to prepare a responsive pleading, the requirements of Rule 9(b) will generally be met." *Id.* "Rule 9(b) does not require omniscience; rather the Rule requires that the circumstances of the fraud be pled with enough specificity to put [the opposing party] on notice as to the nature of the claim." *Williams v. Duke Energy Int'l, Inc.*, 681 F.3d 788, 803 (6th Cir. 2012) (quoting *Michaels Bldg. Co. v. Ameritrust Co., N.A.*, 848 F.2d 674, 680 (6th Cir. 1988)).

Finally, in addition to the requirements of Rule 8 and Rule 9(b), the Private Securities Litigation Reform Act ("PSLRA") imposes particular heightened pleading requirements for certain elements of Heritage's claims, which the court will discuss in connection with those elements. If a plaintiff fails to satisfy the pleading requirements of the PSLRA, his securities fraud claims should be dismissed, even if he otherwise satisfies the pleading standards applicable to other fraud claims under the Federal Rules. *See In re Comshare Inc. Sec. Litig.*, 183 F.3d 542, 549 (6th Cir. 1999) (observing that the PSLRA "changed what a plaintiff must plead in his complaint in order to survive a motion to dismiss") (citation omitted).

## III. ANALYSIS

### A. Entitlement to Preliminary Injunction

"Monetary or economic harm by itself" typically "does not constitute irreparable harm" for the purposes of a request for a preliminary injunction, because injuries that are purely monetary in character can be remedied at the end of litigation by money damages. *Green v. Bauer*, No. 1:08-CV-249, 2009 WL 88609, at *1 (S.D. Ohio Jan. 12, 2009) (citing *State of Ohio*

12

*ex rel. Celebrezze v. N.R.C.*, 812 F.2d 288, 290 (6th Cir. 1987)). This case, on its face, seems to fall squarely within that rule. The only thing that Heritage ever entrusted to the defendants was money, and, as a result, money is the only thing Heritage lost. Although the requested injunctive relief would involve real property, it is not real property with any kind of unique, particularized significance to Heritage; these were investment properties whose only relationship to Heritage is, at most, that they were supposed to be used to make Heritage money. Heritage's injury, therefore, appears on its face to be one that can be remedied—that is, one that *is reparable*—with economic damages at the conclusion of litigation.

Nevertheless, Heritage argues that it is likely to suffer irreparable injury because there is "a likelihood that money [will] not be available to pay" an eventual damages award. (Doc. No. 3 at 22.) That argument, however, is arguably inconsistent with the plain meaning of "irreparable." An irreparable injury is an injury that cannot be repaired. An injury that can be entirely reduced to a dollar figure, therefore, is not irreparable, because it can be fully repaired with money. A money judgment against a defendant who is, or is likely to become, incapable of paying that judgment, in contrast, represents an injury that *can, but is unlikely to be*, repaired. Heritage's position is, in essence, that when courts use the word "irreparable" in this context, they are using it in a way that would include such a situation. That reading does not strike this court as the most natural understanding of the term "irreparable," but the word might be ambiguous enough to support such an interpretation, if there were support for it.

Heritage, however, has not identified any published Sixth Circuit or Supreme Court opinion endorsing its alternative reading of the irreparable injury requirement. Instead, it relies, in its initial briefing, on (1) a twenty-six-year-old unpublished opinion finding that it was not an abuse of discretion to follow such a rationale, *AIG Aviation, Inc. v. Boorom Aircraft, Inc.*, 142

F.3d 431 (6th Cir. Feb. 11, 1998),[4] and (2) an unpublished decision by a former judge of this court, *Vireo Sys., Inc. v. HTG Ventures, LLC*, No. 3:14-CV-02359, 2016 WL 815522, at *4 (M.D. Tenn. Mar. 2, 2016). (Doc. No. 3 at 22–23.) More recent, published Sixth Circuit guidance, however, confirms that irreparable injury is an "indispensable" requirement for preliminary relief. *See D.T.*, 942 F.3d at 326. The cited district court opinion, moreover, does not support Heritage's position, because it was not, in fact, about a motion for a preliminary injunction pursuant to Rule 65, but rather a motion to establish a receivership pursuant to Rule 66. *See Vireo Sys., Inc*, 2016 WL 815522, at *4.

Indeed, the contrast with a receivership highlights another problem with Heritage's request. The fact that this case involves money damages undermines Heritage's ability to show irreparable injury, but the specific relief requested creates an obstacle for another requirement—establishing that the injunction would not improperly harm or burden third parties. By Heritage's own account, it was not the only Wealth Cap investor. The court, however, has only very limited information regarding the full range of potential claimants against Wealth Cap entities. Moreover, the defendants have produced evidence suggesting that each of the 29 properties that would be subject to the requested injunction is secured by at least one third-party mortgage, and some of those properties are leased to tenants. (Doc. No. 21-1 ¶ 19.) The potential implications of freezing the defendants' dealings could impact any number of parties, not simply Heritage, and those other parties are entitled to a process that accounts for their interests as well. Heritage has not established—and it is not clear that it even could establish—that other potential claimants will be served by an order in this case aggressively constraining numerous business entities solely for the benefit of one investor, Heritage.

---

[4] This case has a Federal Reporter citation, despite being unpublished, because it appears in a ""Table of Decisions Without Reported Opinions."

14

There are tools—like bankruptcy, priority structures, and receivership—that exist to coordinate the claims of competing claimants against a failed or failing business. As the Supreme Court explained in *Grupo Mexicano de Desarrollo S.A. v. All. Bond Fund, Inc.*, 527 U.S. 308 (1999), the power of a federal district court to provide preliminary injunctive relief must be understood against the background of the large body of older, preexisting tools associated with enforcing money judgments.[5] *Id.* at 330–33. Those tools are designed to address the various competing considerations that arise when claims for money are at issue. Relying on this court's general power to issue an injunction under Rule 65 would, in essence, allow Heritage to sidestep those better-suited tools in favor of an *ad hoc* process centered around this court.

In Heritage's Reply, it protests that the court should not treat it as a plaintiff who seeks only to remedy a monetary injury, because its Complaint, in fact, "seek[s] both equitable and legal relief." (Doc. No. 22 at 2.) The relevant issue for Rule 65 purposes, however, is not the relief nominally sought, in and of itself, but the injury that the relief would be intended to address. Even if one assumes that Heritage's request for final injunctive relief means that it is not procedurally foreclosed from seeking corresponding preliminary injunctive relief, that does not change the fact that, for the court to actually grant that relief, it must make the same showings required of any Rule 65 movant, including a mandatory showing of some likely irreparable injury. There is nothing remarkable about the fact that a purely monetary injury can theoretically be addressed with equitable remedies—such as, for example, disgorgement. That does not, however, change the fact that the injury itself, if purely monetary, is a reparable one. That reparability—not the formal nature of the relief sought—is what Heritage is unable to overcome.

---

[5] The defendants argue that Heritage's request is categorically barred by *Grupo Mexicano*. Heritage argues that *Grupo Mexicano* should be construed narrowly to apply only to cases in which no equitable remedies were sought as part of the plaintiff's prayer for relief. (Doc. No. 22 at 2.) Because the court's conclusion would be the same whether *Grupo Mexicano* is fully controlling or whether it is, instead, merely a persuasive discussion of a closely related issue, the court does not decide this issue.

15

Heritage protests next that this case is not about simple money damages, but about investments in particular properties. The nexus between Heritage's injuries and those properties, Heritage argues, should excuse it from being treated with the disfavor ordinarily afforded to plaintiffs seeking only money damages. Heritage, though, has never owned or used any of those properties. By Heritage's own account, the sole purpose of its involvement in the underlying events was to turn its $5 million into more than $5 million dollars. Even assuming that Heritage is correct that a sufficiently "clear and close nexus" between the properties at issue and its claims could support a preliminary injunction, *Trustees of Sheet Metal Workers' Loc. Union No. 80 Pension Tr. Fund v. Winchester Land, L.L.C.*, 722 F. Supp. 2d 826, 828 (E.D. Mich. 2010) (quoting *In re Qwest Communications Int'l, Inc. Securities Litig.*, 243 F.Supp.2d 1179, 1184 (D. Colo. 2003)), there is no such nexus here, because Heritage has no interest in these particular properties—just an interest in its investment.

Finally, even if one assumes, for the sake of argument, that a particularly strong likelihood of success might allow a plaintiff to overcome these defects, Heritage has made no such showing. Heritage may well succeed on some of its claims, but that is far from assured. Heritage's right to recover depends on contestable issues of causation, reliance, and scienter that the court will discuss later in this opinion, and, while the defendants mostly overstate the alleged deficiencies in Heritage's pleading, the adequacy of its allegations does not change the fact that the court is in no position to assume that Heritage will actually make its case on those points. In particular, the question of whether Heritage actually and reasonably relied on any allegedly actionable statements is reasonably contestable and could, as far as the court can tell at this stage, ultimately be resolved in either direction. Heritage's prospects for success are by no means so remote that they would prevent the court from granting otherwise appropriate preliminary

16

injunctive relief. Nor, however, are those prospects so certain that that certainty can overcome the factors weighing strongly against Heritage's request. This motion will be denied, and the court turns now to the Partial Motion to Dismiss.

## B. Puffery/Opinion

"[T]he PSLRA mandates that," in order to survive a motion to dismiss, a plaintiff must "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint [must] state with particularity all facts on which the belief is formed." *In re Ford Motor Co. Sec. Litig., Class Action*, 381 F.3d 563, 567 (6th Cir. 2004) (quoting 15 U.S.C. § 78u-4(b)(1)). Moreover, a finding of fraud cannot be premised on a statement that is "too vague to qualify as material" or so "soft" that it "escapes 'objective verification." *Ashland, Inc. v. Oppenheimer & Co.*, 648 F.3d 461, 468 (6th Cir. 2011) (quoting *In re Ford*, 381 F.3d at 570). The defendants argue that none of the affirmative statements identified in the Complaint can satisfy those requirements, because the statements consisted solely of puffery or opinion that was too vague and/or conjectural to support a finding of fraud.

The defendants are correct that a company's general boasts of quality are often insufficient to establish liability under the Exchange Act (or otherwise), because such claims frequently "lack[] a standard against which a reasonable investor could expect them to be pegged." *City of Monroe Emps. Ret. Sys. v. Bridgestone Corp.*, 399 F.3d 651, 671–72 (6th Cir. 2005). The caselaw of this circuit, however, recognizes that even superficially broad statements of self-praise must be evaluated in context to determine if they convey more than just a generalized optimism. *See id.* at 671–72 (citing *Casella v. Webb*, 883 F.2d 805, 808 (9th Cir. 1989); *Scritchfield v. Paolo*, 274 F. Supp. 2d 163, 175–76 (D.R.I. 2003)). "[O]pinion or puffery .

17

. . in particular contexts when it is both factual and material . . . may be actionable." *Id.* at 671–72 (quoting *Longman v. Food Lion, Inc.*, 197 F.3d 675, 683 (4th Cir. 1999)) (emphasis omitted).

One of the ways in which boasting can, in context, cross over the line into being misleading is when a company's self-praise is benchmarked to the ascertainable features of other businesses, particularly the defendant's competitors. As the Supreme Court has observed, for example, a statement that a particular television had "the highest resolution available on the market" would be false "if a competitor had introduced a higher resolution TV a month before." *Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*, 575 U.S. 175, 183 (2015). The defendants' alleged statements about the safety of an investment in Fund 2 show a similar pattern. The defendants did not merely state that Fund 2 was a reliable investment in a vacuum; they contrasted it with other potential investment vehicles, touting the fund's reliance on a rigorous process specifically designed to ensure investor safety. For example, L. Welch downplayed any warnings and disclaimers in the PPM by explaining that they were merely intended to "highlight[] that there is no such thing as a guarantee in real estate," but that Wealth Cap—in an implicit contrast to the real estate investment market as a whole—was "very disciplined in what we do." (*Id.* ¶ 101.) The clear implication was that an investment in Fund 2 would be more safely and carefully managed than an ordinary real estate investment. The alleged truth, however, was that an investment in Fund 2 was, in fact, simply an infusion of cash into the already-failing Fund 1. Characterizing an investment vehicle as unusually safe—when in fact it is simply a pass-through for another investment vehicle that is already in the process of collapsing—is not simple puffery.

The defendants argue next that, even if the relevant statements were more than simply puffery, they were still not actionable, because they were statements of opinion. As the Supreme

18

Court has pointed out, however, a statement of opinion "explicitly affirms" at least "one fact: that the speaker actually holds the stated belief." *Omnicare*, 575 U.S. at 184. Heritage, however, has alleged facts sufficient to strongly suggest that the opinions conveyed were not earnestly held. For example, on August 31, 2021, L. Welch said that Fund 1 had "been quite the success" and that he "believe[d] even greater things [were] still to come." (*Id.* ¶ 67.) The alleged truth, however, was that, by that point, Fund 1's losses were piling up and its acquisition of properties was slowing to a crawl. Fund 1 was not a great success, or even a mild success; it was in the throes of failure, with a desperate need to be bailed out. "Success" is a malleable term, but not that malleable, and Heritage has alleged facts sufficient to support an inference that the opinions that L. Welch voiced were not earnestly held.

The false or misleading nature of L. Welch's assertions regarding the alleged success of Fund 1 is bolstered by the fact that those statements were accompanied by another alleged falsehood that was not puffery at all, but rather involved a specific, verifiable financial detail. L. Welch stated that, "[e]ffective July 31, 2021, we made the decision not to bring any new money into" Fund 1. (*Id.* ¶ 67.) In reality, however, Fund 1 was, if anything, in desperate need of "new money"—which it got from Fund 2 as soon as Heritage invested.

The Sixth Circuit has stressed that a district court should not "attribute to investors a child-like simplicity" or "an inability to grasp the probabilistic significance of [opinion statements]." *In re Omnicare, Inc. Sec. Litig.*, 769 F.3d 455, 472 (6th Cir. 2014) (quoting *Basic Inc. v. Levinson*, 485 U.S. 224, 234 (1988)). At the same time, however, there is no basis for treating investors and sellers as so irredeemably cynical that believing any representation about an investment's quality is at the investor's own risk. Heritage does not allege that it was defrauded by puffery into thinking an investment opportunity was simply not as promising as the

19

hype suggested. Heritage has alleged that it was tricked into believing that it was investing in a new entity with a proven strategy, when, in fact, (1) that new entity was just an extension of a preexisting entity and (2) that preexisting entity was not the proven success that the defendants suggested but was, in fact, in the midst of collapse. That is sufficient to support an allegation of fraud, including under the PSLRA's pleading requirements.

## C. Duty to Disclose

The defendants argue, next, that, insofar as Heritage's claims are based on allegedly fraudulent omissions, those claims should be dismissed, because the defendants had no duty to disclose the information omitted. "Silence, absent a duty to disclose, is not misleading under" the Exchange Act. *In re Ford*, 381 F.3d at 569 (quoting *Basic, Inc.*, 485 U.S. at 239 n.17). As a result, a plaintiff alleging fraud by omission must plead, not only what the plaintiff thinks the defendants should have disclosed, but also what circumstances actually made that disclosure required. *Id.*

A duty to disclose may come from an affirmative rule requiring a company to divulge certain information at a specific juncture—such as, for example, the rules requiring inclusion of particular information in SEC-mandated reports. *See Stratte-McClure v. Morgan Stanley*, 776 F.3d 94, 101 (2d Cir. 2015) (discussing 17 C.F.R. § 229.303(a)(3)(ii)). However, federal securities law also recognizes that a party may assume additional disclosure obligations by its statements or actions. In particular, when a company or executive chooses to make public statements on a topic material to a securities transaction, that party "assume[s] a duty to speak fully and truthfully on [the] subject[]" at hand. *In re Ford*, 381 F.3d at 569 (quoting *Helwig v. Vencor*, Inc., 251 F.3d 540, 561 (6th Cir. 2001)) (alteration in original). Once that duty arises, a

party may commit fraud by remaining silent regarding a fact that it otherwise would have had no duty to reveal.

In such a case, the original statement and the misleading omission are effectively the same lie seen from different angles; the statement misled because of what was omitted, and the omission misled because of what was said. Such allegations must be evaluated in their entirety, without becoming too bogged down by the statement/omission distinction; after all, "every misrepresentation involves an omission of the true information," and a plaintiff may, "[t]hrough word games, . . . style his or her complaint as a material misrepresentations [case] *or* [an] omissions case" without any change in the substance. *Simpson v. Specialty Retail Concepts*, 823 F. Supp. 353, 356 n.7 (M.D.N.C. 1993) (emphasis added).

Reframing the defendants' arguments under the standards for evaluating omissions, therefore, does not offer the defendants much help. Whether one considers the statements at issue to have been potentially misleading in and of themselves or whether one, instead, considers them to have been misleading because they omitted corrective information, the analysis is ultimately the same. For example, one could characterize L. Welch's statements about Fund 1's success as misleading statements, in and of themselves, or one could, just as easily, characterize them as statements giving rise to a duty to disclose the less flattering details of Fund 1's predicament. The underlying fraud, however, would be the same, and it remains actionable regardless of which framing one uses.

The plaintiff has plausibly alleged that it was misled into believing that Fund 2 would be administered in a way that protected its investment—or, at least, did not simply involve shoring up Fund 1. That situation could have been avoided by the defendants' not making those misleading statements or, in the alternative, by appending corrective context. Either way, the

fraud was the same. This argument, therefore, fails for the same reason that the defendants'

argument regarding fraud by affirmative misrepresentation fails.

## D. Group Pleading

The defendants argue next that, even if some of the statements identified in the

Complaint are actionable, they cannot form the basis of liability by Evans or T. Welch, because

they were not those statements' speakers. Heritage's primary contact appears to have been L.

Welch, and, insofar as Heritage was misled into investing, L. Welch would, under the allegations

of the Complaint, bear much of the direct responsibility. The defendants argue that the court

should, therefore, at least dismiss Counts 1 through 7 as to Evans and T. Welch.

When a plaintiff seeks to pursue fraud claims against multiple defendants, he typically

must plead "specific allegations as to each defendant's alleged involvement." *N. Port

Firefighters' Pension-Local Option Plan v. Fushi Copperweld, Inc.*, 929 F. Supp. 2d 740, 773

(M.D. Tenn. 2013) (Haynes, C.J.). Mere "'group pleading' . . . fails to meet . . . [Rule] 9(b)'s

specificity requirements . . . ." *D.E.&J Ltd. P'ship v. Conaway*, 284 F. Supp. 2d 719, 730 (E.D.

Mich. 2003), *aff'd*, 133 F. App'x 994 (6th Cir. 2005); *see Hoover v. Langston Equip. Assocs.,

Inc.*, 958 F.2d 742, 745 (6th Cir. 1992) (affirming district court's conclusion that plaintiffs had

failed to satisfy the Rule 9(b) particularity requirement because the plaintiffs "had not alleged

with specificity who had made particular misrepresentations and when they were made but

rather...had articulated general averments of fraud attributed to 'the defendants'").

It is important to stress, however, that the general prohibition on group pleading is about

the adequacy of the plaintiff's allegations—not the details of its syntax. Rule 9(b) prevents a

plaintiff from simply lumping multiple defendants together without explaining each defendant's

culpable role. If, however, multiple defendants acted in concert in some way, the plaintiff can

plead that they acted in concert—and use ordinary language to do so. Similarly, if one fact establishes culpability for more than one defendant, the plaintiff can acknowledge that fact—using, again, ordinary language. Rule 9(b) does not require a plaintiff to avoid the use of plural or collective terminology, where appropriate, for the sole purpose of appearing to be more scrupulously compliant with the Rule. *See In re Nat'l Prescription Opiate Litig.*, No. 1:17-MD-2804, 2019 WL 3737023, at *3 (N.D. Ohio June 13, 2019) (finding that Rule 9(b) particularity requirement was met, despite group pleading, because requiring duplicative individual averments was unnecessary).

Heritage does not dispute that most, if not all, of the affirmative misstatements alleged in the Complaint were made by L. Welch and/or by Fund 2 or another entity defendant. They argue, however, that Evans and T. Welch can still be held liable as "makers" of those statements pursuant to *Janus Capital Group, Inc. v. First Derivative Traders*, 564 U.S. 135 (2011), in which the Supreme Court held that, "[f]or purposes of Rule 10b–5, the maker of a statement is the person or entity with ultimate authority over the statement, including its content and whether and how to communicate it." (*Id.* at 142.) The Complaint alleges that Wealth Cap was founded and operated as the "private investment firm" of Evans and T. Welch. (Doc. No. 1 ¶ 29.) The PPM reiterated their centrality to Wealth Cap's operations and was signed by T. Welch. (*Id.* ¶¶ 63, 78.) Moreover, L. Welch's representations to Heritage while the parties were negotiating the details of Heritage's investment made clear that Evans and T. Welch were involved in the process. (*Id.* ¶ 97.) The Complaint also specifically alleges that Evans and T. Welch "had authority over verbal and written statements concerning the Fund offering"—a statement that might be improperly conclusory on its own but which resolves any ambiguity that might have been left over from the more general discussion of the roles of Evans and T. Welch in Wealth

23

Cap's operations. Heritage's allegations are, therefore, sufficient to survive a motion to dismiss based on the argument that Evans and T. Welch were not "makers" of the relevant statements or were improperly included in group pleading.[6]

## E. Strong Inference of Scienter

The defendants argue next that the court should dismiss Counts 1, 2, 4, and 5, because the Complaint does not sufficiently support an allegation of scienter. In most contexts, alleging scienter in a fraud case is relatively straightforward; even under Rule 9(b), it may be "alleged generally." Fed. R. Civ. P. 9(b). The PSLRA, however, "imposes '[e]xacting . . . requirements for pleading scienter'" in a federal securities fraud case. *Ashland*, 648 F.3d at 469 (quoting *Frank*, 547 F.3d at 570). The plaintiff must, "with respect to each act or omission alleged . . . , state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2). "To qualify as 'strong' . . . , an inference of scienter must be more than merely plausible or reasonable—it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent." *Ashland*, 648 F.3d at 469 (quoting *Tellabs, Inc.*, 551 U.S. at 314). "'Strong inferences' . . . involve deductive reasoning; their strength depends on how closely a conclusion of misconduct follows from a plaintiff's proposition of fact." *City of Monroe*, 399 F.3d at 683 (quoting *Helwig*, 251 F.3d at 563).

"In examining scienter, [the court] must decide whether all of the facts alleged, *taken collectively*, meet the PSLRA's requirements." *Ashland*, 648 F.3d at 469 (quoting *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 314 (2007)) (emphasis in original). "[T]he court's job is not to scrutinize each allegation in isolation but to assess all the allegations holistically." *Tellabs,*

---

[6] Because the court finds that Heritage has not engaged in group pleading, there is no occasion to consider whether individual liability might exist, in the alternative, pursuant to "scheme liability." *See Indiana Pub. Ret. Sys. v. AAC Holdings, Inc.*, No. 3:19-CV-00407, 2021 WL 1316705, at *4 (M.D. Tenn. Apr. 8, 2021) (Richardson, J.).

24

*Inc.*, 551 U.S. at 326. The court "must ask: When the allegations are accepted as true and taken collectively, would a reasonable person deem the inference of scienter at least as strong as any opposing inference?" *Id.* Before the court can answer in the affirmative, it "must compare [the inference of scienter] with other competing possibilities, allowing the complaint to go forward 'only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged.'" *In re Omnicare*, 769 F.3d at 473 (quoting *Tellabs, Inc.*, 551 U.S. at 324).

"In the securities-fraud context, scienter includes [1] knowing and deliberate intent to manipulate, deceive, or defraud, and [2] recklessness.'" *Doshi v. Gen. Cable Corp.*, 823 F.3d 1032, 1039 (6th Cir. 2016) (quoting *Ley v. Visteon Corp.*, 543 F.3d 801, 809 (6th Cir. 2008)). "Recklessness is defined as 'highly unreasonable conduct which is an extreme departure from the standards of ordinary care. While the danger need not be known, it must at least be so obvious that any reasonable man would have known of it.'" *Frank v. Dana Corp.*, 646 F.3d 954, 959 (6th Cir. 2011) (quoting *PR Diamonds, Inc. v. Chandler*, 364 F.3d 671, 681 (6th Cir. 2004)). The Sixth Circuit has suggested that, where an actionable statement involves a matter of opinion, the subjective nature of the statement effectively "rais[es] the bar for alleging scienter" to a requirement of actual knowledge. *In re Omnicare*, 769 F.3d at 471.

Although the Sixth Circuit has instructed courts to consider the issue of scienter holistically, it has also set forth a non-exhaustive list of nine factors—known as the *Helwig* factors—that have been specifically identified as relevant to determining scienter:

> (1) insider trading at a suspicious time or in an unusual amount; (2) divergence between internal reports and external statements on the same subject; (3) closeness in time of an allegedly fraudulent statement or omission and the later disclosure of inconsistent information; (4) evidence of bribery by a top company official; (5) existence of an ancillary lawsuit charging fraud by a company and the company's quick settlement of that suit; (6) disregard of the most current factual

25

information before making statements; (7) disclosure of accounting information in such a way that its negative implications could only be understood by someone with a high degree of sophistication; (8) the personal interest of certain directors in not informing disinterested directors of an impending sale of stock; and (9) the self-interested motivation of defendants in the form of saving their salaries or jobs.

*Doshi*, 823 F.3d at 1039–40 (quoting *Helwig*, 251 F.3d at 552). When it comes to business entity defendants, the court's inquiry looks to

the state of mind of . . . "[1] The individual agent who uttered or issued the misrepresentation; [2] Any individual agent who authorized, requested, commanded, furnished information for, prepared (including suggesting or contributing language for inclusion therein or omission therefrom), reviewed, or approved the statement in which the misrepresentation was made before its utterance or issuance; [or 3] Any high managerial agent or member of the board of directors who ratified, recklessly disregarded, or tolerated the misrepresentation after its utterance [or] issuance . . . ."

*Bondali v. Yum! Brands, Inc.*, 620 F. App'x 483, 493 (6th Cir. 2015) (quoting *Omnicare*, 769 F.3d at 476).

The defendants fault the plaintiffs for having "fail[ed] to plead the *Helwig* factors." (Doc. No. 28 at 23.) The *Helwig* factors, however, are neither elements of any cause of action nor a checklist that every plaintiff must mechanically work its way down. They are, rather, merely a "non-exhaustive list of factors that do not necessarily establish scienter, but are 'usually relevant'" to that inquiry. *Frank*, 646 F.3d at 959 n.2 (quoting *Helwig*, 251 F.3d at 552). Indeed, treating the *Helwig* factors as an ironclad set of requirements would not only be unsupported by the caselaw, but would make little, if any, sense, given that several of the factors are wholly irrelevant to many fraudulent schemes.

There is, for example, no defensible rationale in support of penalizing a plaintiff for failing to plead the fourth *Helwig* factor—evidence of bribery—in connection with a fraudulent scheme in which bribery played no role in the first place. What does it matter, to an investor who

26

lost millions based on, for example, a knowingly false financial statement, that no one was bribed? This same basic flaw applies to several other *Helwig* factors as well. The first *Helwig* factor involves insider trading, but insider trader is not part of most securities fraud cases. The fifth *Helwig* factor looks to the existence of other lawsuits, but not all securities fraud schemes have multiple victims, and, in any event, someone will always be the first plaintiff. The seventh *Helwig* factor involves "disclosure of accounting information," but there are plenty of ways to commit securities fraud without relying on accounting information at all. The eighth *Helwig* factor involves dealings between interested directors and disinterested directors, but not every investment vehicle is governed by a board with interested and disinterested directors. All in all, more than half of the *Helwig* factors involve situational circumstances with little bearing on many types of fraud.

The court's analysis, therefore, must focus on what would support a strong inference of scienter in the context of the particular scheme alleged. When securities fraud allegations involve the concealment of flaws or risks, the court looks, *inter alia*, at whether "the plaintiffs sufficiently explained *why or how* the defendants knew about" the danger. *Ashland*, 648 F.3d at 470 (citing *In re Merrill Lynch Auction Rate Sec. Litig.*, No. 09-MD-2030, 2011 WL 1330847, at *2 (S.D.N.Y. March 30, 2011)). The defendants argue that Heritage has failed to plead a strong inference of scienter because it does not assert that any defendant could have predicted the particular chain of events that led to the funds' failure, which the defendants identify as including not only the purchase of "unsuitable homes," but also "lingering supply-chain issues" and the Federal Reserve's 2022 interest rate hikes. (Doc. No. 28 at 26.) That argument might be persuasive if the defendants were being sued by an early investor in Fund 1. Heritage, however, is suing the defendants for luring it into investing in Fund 2 after Fund 1 had already begun to

27

fail. The defendants are not being accused, then, of having concealed purely latent flaws of which they may have been unaware. They are being accused of having concealed risks that were already in the process of being realized before the defendants' own eyes.

Heritage has, moreover, pleaded facts sufficient to support an inference that L. Welch, T. Welch, and Evans were aware of Fund 1's struggles. The idea that the individuals responsible for the day-to-day operations of Wealth Cap would have been ignorant of the major slowdown of that business at Fund 1 is highly implausible. That inference is not contrary to the Sixth Circuit's general rule that "fraudulent intent cannot be inferred merely from the Individual Defendants' positions in the Company and alleged access to information." *PR Diamonds, Inc.*, 364 F.3d at 688. That rule acknowledges the fact that executives may not know about, for example, "accounting issues [that are] relatively arcane in nature and scope" and that do not "pertain[] to central, day-to-day operational matters." *Id.* The Sixth Circuit has held, however, that "high-level executives *can* be presumed to be aware of matters central to their business's operation." *Id.* (citing *In re Complete Mgmt., Inc. Sec. Litig.*, 153 F. Supp. 2d 314, 325-36 (S.D.N.Y. 2001)) (emphasis added).

Wealth Cap was a simple business with a single, central operational strategy. It was not buying or selling complex, inscrutable financial assets that might have masked their own flaws; nor was it doing so many things that it would have been easy for a failing aspect of the business to escape notice. Wealth Cap bought houses, fixed houses, and then sold houses. It claimed to have a system for doing so safely, and maybe its operators believed, originally, that it did. By late 2021, however, it would be impossible to be familiar with the internal operations of Wealth Cap and Fund 1 and not realize that the system had gone awry. Even if the Complaint does not permit the court to infer that the defendants knew every detail of why that happened or that they

28

could have predicted all of the economic headwinds that would eventually exacerbate Wealth Cap's plight, the Complaint does permit the court to infer strongly that each of the defendants was aware that Fund 1 was failing and that representations to the contrary would be misleading.

The dire straits of Fund 1 support an inference of scienter in another way as well. As the court has already discussed, the severity of those problems and their centrality to Wealth Cap's investment strategy make any profession of the defendants' ignorance implausible. Fund 1's plight, however, is not merely evidence of why the defendants likely knew the truth; it is also evidence of why they would consciously choose to conceal that truth from Heritage—that is to say, it is evidence of motive. The Sixth Circuit has acknowledged that strong evidence of a motive to commit fraud can support an inference of scienter, particularly when supported by other evidence as well. *See In re Comshare Inc. Sec. Litig.*, 183 F.3d 542, 551 (6th Cir. 1999). Wealth Cap's desperate need of cash to salvage its operations, or, at the very least, cover some of its mounting losses, would obviously have made a sudden $5 million cash infusion very attractive. Heritage, however, would presumably be unwilling to offer that cash infusion—which was being made from a donation that Heritage planned to use for a particular purpose—if it actually knew that it was more of a life raft for Wealth Cap than a real investment for Heritage. The defendants' powerful incentive to engage in exactly the kind of fraud that has been alleged, when combined with the other evidence of scienter, is more than enough to satisfy the PSLRA.

## F. Loss Causation

The defendants argue next that Heritage has not sufficiently alleged that its losses were caused by the alleged misstatements and omissions. A securities fraud plaintiff must plead facts showing a "causal link between the alleged misconduct and the economic harm ultimately

29

suffered by the plaintiff."[7] *Ohio Pub. Emps. Ret. Sys. v. Fed. Home Loan Mortg. Corp.*, 830 F.3d 376, 384 (6th Cir. 2016) (quoting *Lentell v. Merrill Lynch & Co.*, 396 F.3d 161, 172 (2d Cir. 2005)). In a case, like this one, that involves representations to a specific purchaser of a privately offered security, that inquiry typically begins with scrutinizing the effect of the defendants' statements and/or omissions on the decision of that investor to invest. *See Chelsea Assocs. v. Rapanos*, 527 F.2d 1266, 1271 (6th Cir. 1975) ("In the usual fraud case or case brought for misrepresentation in violation of Rule 10b-5, proof of reliance upon the misstated or false fact is required.") (citing *Schlick v. Penn-Dixie Cement Corp.*, 507 F.2d 374, 380 (2nd Cir. 1974), *cert. denied*, 421 U.S. 976 (1975)). As the defendants point out, however, such a showing—sometimes referred to as a showing of "transaction causation" but more often discussed in the context of "reliance"—is not, in and of itself, enough to support a claim. Rather, the plaintiff must show that the defendant's statements and/or omissions also caused the ultimate injury at issue—typically referred to as "loss causation." *See Brown v. Earthboard Sports USA, Inc.*, 481 F.3d 901, 917 (6th Cir. 2007)

The fact that transaction causation and loss causation are distinct concepts, however, does not mean that they are unrelated; to the contrary, an assertion of loss causation often requires little more than a showing of transaction causation, supplemented by the basic contextual facts that brought the parties to court in the first place. In securities fraud cases involving the concealment of investment risk, for example, the gap between the fraudulently induced transaction and the plaintiff's later injury is typically bridged by the simple fact that the investor was harmed by the very same "underlying circumstance that [was] concealed or misstated" in the

---

[7] A comparable causation requirement exists for common law fraud claims, as well. *See Walker v. Sunrise Pontiac-GMC Truck, Inc.*, 249 S.W.3d 301, 311 (Tenn. 2008) (citations omitted); *Malinak v. Kramer*, No. CIV.A. CPU6-11002145, 2012 WL 174958, at *2 (Del. Com. Pl. Jan. 5, 2012) (citing *Stephenson v. Capano Dev., Inc.*, 462 A.2d 1069, 1074 (Del. 1983)).

first place. *Ohio Pub. Emps. Ret. Sys.*, 830 F.3d at 384 (quoting *Lentell*, 396 F.3d at 173). For example, if a defendant induced a plaintiff to invest in a company by claiming, falsely, that the company had developed a revolutionary technology, that would be transaction causation. If that lie was later exposed and caused the investment to lose value, however, it would amount to loss causation.

Heritage's allegations fit well into that pattern. Heritage alleges that it was misled into investing in Fund 2 by statements concealing or misrepresenting the health of Fund 1, the independence of Fund 2, and the reliability of Wealth Cap's business model. Then, when Fund 1's flailing status and Wealth Cap's inability to right the ship became impossible to hide, Heritage's losses materialized. The defendants dispute that that is the case and argue that Wealth Cap's problems were actually the result of intervening factors, and that may ultimately be true. The fact that a claim is subject to the PSLRA, however, does not override the principle that, when a court considers a Rule 12(b)(6) motion, it must "accept plaintiff's allegations as true and construe the complaint in its favor." *In re Omnicare*, 769 F.3d at 469 (citing *Kottmyer v. Maas*, 436 F.3d 684, 688 (6th Cir. 2006)); *see also Tellabs*, 551 U.S. at 322 ("[F]aced with a Rule 12(b)(6) motion to dismiss a § 10(b) action, courts must, as with any motion to dismiss for failure to plead a claim on which relief can be granted, accept all factual allegations in the complaint as true."). The PSLRA's heightened pleading standards are still *pleading* standards—not evidentiary ones—and they should not be misconstrued as an invitation for defendants to "finess[e] the evidentiary limits of a 12(b)(6) motion." *Union Asset Mgmt. Holding AG v. Sandisk LLC*, 227 F. Supp. 3d 1098, 1100 (N.D. Cal. 2017). Heritage has plausibly alleged loss causation, which is all it was required to do in this regard. The court, therefore, has no basis for dismissing any claims on that ground.

31

**G. Status as "Sellers" under Section 17(a)/ "Control Persons" under Section 15(a)**

As the court has already discussed in the context of the defendants' individual liability for specific statements, one of the key issues in this case is the extent to which Heritage, which dealt primarily with L. Welch and made its $5 million investment in Fund 2, can proceed against other individuals and entities involved in Wealth Cap's operation. Because Heritage is pursuing multiple theories of liability, however, that basic problem arises in a few different ways, which call for different standards. With regard to sections 17(a) and 15 of the Exchange Act, the relevant question is whether the relevant defendant is, respectively, a "seller" or a "control person." Evans, T. Welch, and Wealth Cap argue that they were neither and that any claims based on those theories should, therefore, be dismissed. Fund 1 joins in that argument with regard to control person liability under section 15, although Fund 1 does not dispute that it is a seller under section 17(a).

1. "Sellers" under Section 17(a)

Section 17(a) of the Exchange Act provides as follows:

It shall be unlawful for any person in the offer or sale of any securities (including security-based swaps) or any security-based swap agreement (as defined in section 78c(a)(78) of this title) by the use of any means or instruments of transportation or communication in interstate commerce or by use of the mails, directly or indirectly—

(1) to employ any device, scheme, or artifice to defraud, or

(2) to obtain money or property by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

(3) to engage in any transaction, practice, or course of business which operates or would operate as a fraud or deceit upon the purchaser.

32

15 U.S.C. § 77q(a). "The elements of an action for securities fraud under Section 10(b) of the Exchange Act (and Rule 10b–5 thereunder) and Section 17(a)(1) of the Securities Act are substantially the same," except that "section 17(a) requires pleading fraud 'in the offer or sale of any securities,' not simply 'in connection with the purchase or sale" of a security as required by section 10b.'" *S.E.C. v. Delphi Corp.*, No. 06-14891, 2008 WL 4539519, at *3 (E.D. Mich. Oct. 8, 2008). Section 17(a), accordingly, "applies only to sellers." *Aaron v. SEC*, 446 U.S. 680, 687 (1980).

The term "seller" has been interpreted to refer "not only [to] the party who passes title of ownership in the transaction, but also those parties that have played a 'substantial role' in persuading or seducing the purchasers into buying the securities." *Craighead v. E.F. Hutton & Co.*, 899 F.2d 485, 493 (6th Cir. 1990) (collecting cases). The defendants do not dispute that Heritage has sufficiently alleged that L. Welch, Fund 1, and Fund 2 are sellers for the purposes of section 17(a). They argue, however, that Evans, T. Welch, and Wealth Cap are not sellers and that Heritage's section 17(a) claims against those defendants should, therefore, be dismissed.

The plaintiffs, in their Response, argue first that they are premising Wealth Cap's liability on the actions of L. Welch as its agent. The Complaint alleges that, when L. Welch solicited Heritage's investment in Fund 2, he was acting in his capacity as President of Wealth Cap. (Doc. No. 1 ¶¶ 4, 67–68, 90–104, 106, 189.) For the purposes of summary judgment, that allegation is sufficient.

The question of whether Evans or T. Welch is a seller, however, cannot rely solely on L. Welch's role in the company. Heritage, moreover, has not identified any allegations in its Complaint suggesting that those two individuals actually played a substantial role in persuading Heritage to make its investment. They may well have played central roles in the underlying

33

fraud, but any liability based on those roles is wholly encompassed by Heritage's Section 10(b) claims. The court, accordingly, will dismiss Heritage's Section 17(a) claims as to those two defendants.

### 2. "Control Persons" under Section 15 (Count 2)

Section 15 of the Exchange Act provides that "a 'controlling person' shares the liability for violations of securities laws with the primary violator it controlled." *Sanders Confectionery Prods. ., Inc. v. Heller Fin., Inc.*, 973 F.2d 474, 485 (6th Cir.1992) (citing 15 U.S.C. § 77o and 15 U.S.C. § 78t). The primary violators, in this instance, were, for the most part, L. Welch and Fund 2. Count 2 alleges that Wealth Cap, Fund 1, and T. Welch are liable as control persons for those defendants' violations and that, insofar as individuals other than L. Welch made actionable statements or omissions, L. Welch is liable as a control person for those statements.

The Sixth Circuit has declined to adopt a particular test for establishing control person liability, but it has held that, at a minimum, a plaintiff must show that (1) the defendant had, in the past, actively exercised a general power of control over the primary violator, even if it did not do so with regard to the violation itself, and (2) the defendant had the power to control the primary violator's actions in connection with the transaction on which the primary violation is predicated. *Id.* at 486. The defendants argue that the plaintiffs have failed to assert either requirement with regard to Fund 1, which was a peer entity to Fund 2, not a controller. In contrast, the defendants do not dispute that the plaintiffs have alleged that Evans, T. Welch, or Wealth Cap possessed general control over Fund 2 and/or L. Welch, but they dispute that the plaintiffs have sufficiently pleaded that those defendants had the specific power to control the actions of L. Welch or Fund 2 giving rise to the Exchange Act claims.

34

The defendants' argument regarding Fund 1 appears correct. Whether or not one believes that Fund 1 and Fund 2 were truly distinct, it does not appear that Fund 1 controlled Fund 2. Rather, the Complaint merely alleges that "Fund 1 was a controlling person of Fund 2 by virtue of its Managing Member's"—that is, Wealth Cap's—"authority over Fund 2's business operations." (Doc. No. 1 ¶ 182.) The fact that two entities have the same controlling member, however, does not make one of those entities the controller of the other.

Heritage's assertions of control by Wealth Cap, Evans, and the Welches, however, are sufficient. Because there is no dispute that those defendants possessed a power of general control over Fund 2, control person liability requires only that Heritage establish that they had the power to control the actions of each relevant primary violator in the relevant instances. Heritage has alleged that Wealth Cap, Evans, and the Welches "had the power to influence and control, and did influence and control, directly or indirectly, the actions of Wealth Cap and the Funds, including the content and dissemination" of marketing materials. (Doc. No. 1 ¶ 180.) The process by which the Heritage investment was made, moreover, was a lengthy one that involved departing from Fund 2's originally anticipated approach—specifically, with regard to the timing of Heritage's right to withdraw its principal. The facts alleged clearly support an inference that Wealth Caps, Evans, T. Welch, and (to the extent L. Welch was not the primary violator) L. Welch had the actual power to control representations to Heritage during that process. The court, accordingly, will dismiss Count 2 solely as to Fund 1.

**I. State Law Issues**

<u>1. Tennessee Revised Limited Liability Company Act (Counts 8 and 9)</u>

Counts 8 and 9 assert claims for breach of fiduciary duty under the Tennessee Revised Limited Liability Company Act, Tenn. Code Ann. § 48-249-403. The defendants argue that the

court should dismiss those claims, because the defendants' fiduciary duties are covered by Delaware, not Tennessee, law, pursuant the following provision of Fund 2's Operating Agreement:

> ALL MATTERS IN CONNECTION WITH THE POWER, AUTHORITY AND RIGHTS OF THE MEMBERS AND ALL MATTERS PERTAINING TO THE OPERATION, CONSTRUCTION, INTERPRETATION OR ENFORCEMENT OF THIS AGREEMENT SHALL BE GOVERNED AND DETERMINED BY THE INTERNAL LAWS OF THE STATE OF DELAWARE, WITHOUT GIVING EFFECT TO THE PRINCIPLES OF CONFLICTS OF LAWS.

(Doc. No. 3-1 at 100.)[8] The defendants argue that, because Counts 8 and 9 pertain to the operation, construction, and/or interpretation of the Operating Agreement, then they are governed by that clause.

As a general rule, when a federal court hears a diversity action, "the law of the forum state, including the choice-of-law rules, appl[ies]." *Montgomery v. Wyeth*, 580 F.3d 455, 459 (6th Cir. 2009) (citing *Uhl v. Komatsu Forklift Co.*, 512 F.3d 294, 302 (6th Cir. 2008)). Tennessee law provides for the enforcement of choice-of-law provisions in contracts, with the caveats that "[t]he choice of law provision must be executed in good faith, the chosen jurisdiction must bear a material connection to the transaction, the basis for the jurisdiction must be reasonable and not a sham, and, finally, the choice of the jurisdiction must not be contrary to the fundamental policy of a state having a materially greater interest and whose law would otherwise govern." *Sw. Tex. Inns, Inc. v. Prime Hospitality Corp.*, 462 F.3d 666, 672 n.8 (6th Cir. 2006) (citations omitted).

Heritage's choice-of-law briefing in its Response—which takes up barely more than a page—does not address the Operating Agreement's choice of law provision in any meaningful way. (Doc. No. 37 at 25–26.) Its briefing in connection with the Motion for Preliminary

---

[8] The defendants specifically identify only Counts 8 and 9 as subject to this argument. (Doc. No. 28 at 36–37.) They have made no choice-of-law argument specifically directed at Heritage's other Tennessee statutory claims. The court, accordingly, will not consider whether those other claims should be dismissed on choice-of-law grounds.

Injunction provides somewhat more detail, suggesting, in a footnote, that Heritage takes the position that a contractual choice-of-law provision cannot determine which state's law will govern a claim that sounds in tort. (Doc. No. 3 at 18 n.3.) That proposition, however, is not true, at least in most American jurisdictions. *See* Tanya Monestier, *The Scope of Generic Choice of Law Clauses*, 56 U.C. Davis L. Rev. 959, 967 (2023) ("Surprisingly, courts have not expressed any concern about parties being able to choose their tort or other law through a contractual choice of law clause. For the most part, they just want parties to do it *clearly*.").

Heritage's only argument that Tennessee would depart from that ordinary approach consists of citations to decades-old federal cases applying Tennessee law. (*See* Doc. No. 3 at 18 n.3.) There are more recent federal decisions, however, holding that Tennessee law does, in fact, permit choice-of-law clauses that govern tort claims. *See EPAC Techs., Inc. v. Thomas Nelson, Inc.*, 438 F. Supp. 3d 847, 853 (M.D. Tenn. 2018) (Crenshaw, C.J.); *Credit Payment Servs., Inc. v. Moneygram Payment Sys., Inc.*, No. 1:14-CV-62, 2015 WL 12531989, at *4 (E.D. Tenn. Feb. 13, 2015); *Medtronic Sofamor Danek, Inc. v. Michelson*, No. 01-2373 MLV, 2004 WL 2905403, at *8 (W.D. Tenn. May 20, 2004).

In any event, what ultimately matters is what the Tennessee Supreme Court would do. As the Supreme Court recognized in *Erie Railroad Co. v. Tompkins*, 304 U.S. 64 (1938), "no clause in the Constitution purports to confer . . . upon the federal courts" any "power to declare substantive rules of common law applicable in a state." *Id.* at 78. Federal courts can, and frequently must, apply state law, but the actual substance of that law must be "declared by [that state's] Legislature in a statute or by its highest court in a decision." *Id.* In order to honor those boundaries, the Supreme Court has held that, "[w]hen resolving an issue of state law," a federal court must "look to the final decisions of that state's highest court, and if there is no decision

directly on point, then [it] must make" what is sometimes referred to as "an *Erie* guess"—that is, an informed prediction as to how the state's court of last resort, "if presented with the issue, would resolve it." *In re Fair Fin. Co.*, 834 F.3d 651, 671 (6th Cir. 2016) (quoting *Conlin v. Mortg. Elec. Registration Sys., Inc.*, 714 F.3d 355, 358–59 (6th Cir. 2013)).

This court finds that the Tennessee Supreme Court would most likely follow the ordinary rule that a choice-of-law provision may govern tort claims, if those claims fall within its scope. That is the majority rule, and Heritage has identified nothing to suggest that Tennessee would be an outlier. Heritage's only argument that these claims do *not* fall within that scope, moreover, hinges on its mistaken assumption that tort claims can be treated as categorically excluded. It makes no argument regarding the text of the provision itself. Delaware law, accordingly, applies to Counts 8 and 9, unless there is some basis for treating the choice-of-law provision as unenforceable.

The arguments that Heritage has offered, however, provide nothing that would permit the court to disregard the choice-of-law clause under Tennessee's ordinary test for enforceability. First, the plaintiffs have not provided any basis for concluding that the choice-of-law provision itself was a product of bad faith. Delaware does, moreover, have a material connection to this conflict, given that Wealth Cap, Fund 1, and Fund 2 are all incorporated under Delaware law. *Cf. Hicks ex rel. Union Pac. Corp. v. Lewis*, 148 S.W.3d 80, 84 (Tenn. Ct. App. 2003) (noting a state's interest in the affairs of corporations incorporated under its laws). The plaintiff is unable to rely on any argument that Delaware's approach to these issues would be contrary to a fundamental policy of Tennessee, because the plaintiff's position is that either state's laws would reach the same conclusion with regard to the matters currently at issue. The plaintiff's entire argument, therefore, hinges on Tennessee's supposedly greater connection to the underlying

events. That, though, is an appeal to the test that would apply in the absence of any choice-of-law provision—not an argument for disregarding such a provision. The court, accordingly, will dismiss Counts 8 and 9.

Heritage protests that, even if it cited the wrong state's statute for the purposes of Counts 8 and 9, the court should permit it to pursue similar claims under Delaware law. The only claims that the court can evaluate in connection with Rule 12(b)(6), however, are those that have been pleaded. If the court were to simply hold that hypothetical Delaware claims, which the defendants have not yet had any opportunity to challenge pursuant to rule 12(b)(6), would necessarily be viable, it would improperly allow Heritage to circumvent the ordinary scrutiny applicable to the allegations in a complaint. Heritage is free to seek leave to amend its Complaint to add claims under Delaware law, and the court can address those claims, as needed, at that time.[9]

### 2. Good Faith and Fair Dealing (Count 11)

The defendants argue that the court should dismiss Count 11, for breach of the duty of good faith and fair dealing, because Delaware does not recognize a "standalone" cause of action for such a breach, distinct from a claim for breach of contract. (Doc. No. 28 at 38.) Rather, Delaware—like other states—reads an implied covenant of good faith into contractual performance obligations, such that a failure to act in good faith is, as a formal matter, a "breach" of a contractual provision, albeit an unwritten one. *See Cygnus Opportunity Fund, LLC v. Washington Prime Grp., LLC*, 302 A.3d 430, 458 (Del. Ch. 2023).

---

[9] Indeed, Heritage ends its Response by "request[ing] permission to amend the complaint or the opportunity to move for leave to amend pursuant to Rule 15." (Doc. No. 37 at 28.) The court cannot grant such a request based on the Response, because Rule 15.01 of this court's Local Rules requires a motion to amend to be accompanied by appropriate supporting documentation that Heritage has not yet supplied. L.R. 15.01(a). Heritage, however, needs no permission from this court to seek leave to amend. It has a right to seek leave to amend under Fed. R. Civ. P. 15, and the court will consider any such request when filed.

Because Heritage has pleaded a cause of action for breach of contract related to the alleged misuse of Fund 2 assets in violation of the Operating Agreement's established priority rights and liquidation procedures, and the defendants have not sought dismissal of that claim, the argument that there is no "standalone" claim for breach of the implied covenant of good faith and fair dealing accomplishes very little. At most, it would mean that Heritage should not have set this argument forth through a specific, separate "count" and should, instead, have advanced all the same theories and arguments in connection with its breach of contract claims. Even that argument, though, would be a stretch, because there is nothing in the Federal Rules of Civil Procedure that would forbid Heritage from organizing its "counts" in this way. Heritage is entitled to argue that Fund 2 violated the Operating Agreement's express terms or that, in the alternative, its performance under those terms was undertaken in bad faith. The court, accordingly, will not dismiss Count 11.

### 4. Conversion (Count 13)

"In order to prevail on a claim for conversion, the plaintiff must establish by a preponderance of the evidence that: (1) [it] has a property interest in the allegedly converted property; (2) [it] has a right to immediate possession of the property; and (3) the defendant wrongfully possessed or disposed of such property as if it were [the defendant's] own." *McNair v. Automart, LLC*, No. CV CPU4-15-002419, 2016 WL 6477028, at *5 (Del. Com. Pl. Nov. 2, 2016) (citing *ESG Cap. Partners II, LP v. Passport Special Opportunities Master Fund, LP*, No. CV 11053-VCL, 2015 WL 9060982, at *15 (Del. Ch. Dec. 16, 2015)). The defendants argue that the court should dismiss Count 13, for conversion, on the ground that Heritage has not sufficiently identified a discrete piece of underlying "property," as that term is used in the conversion context, but rather a fungible dollar amount that is already governed by a contract.

Such a claim, the defendants argue, is not appropriately considered under the framework of conversion under either Tennessee or Delaware law.

Heritage does not dispute "the general rule . . . that money is an intangible and therefore not subject to a claim for conversion." *PNC Multifamily Cap. Institutional Fund XXVI Ltd. P'ship v. Bluff City Cmty. Dev. Corp.*, 387 S.W.3d 525, 553 (Tenn. Ct. App. 2012) (quoting 90 C.J.S. Trover and Conversion § 16 (2012)). Heritage argues, however, that it may pursue a claim for conversion in this instance because it has identified a "determinate sum" that was allegedly converted—specifically, its $5 million principal. (Doc. No. 37 at 28.)

As a matter of Delaware law, however, merely identifying a determinate sum is not sufficient to salvage a conversion claim like Heritage's. "[I]n Delaware, a conversion claim will not lie where the complainant simply seeks the payment of some sum of money derived from a contract or other right." *CLP Toxicology, Inc. v. Casla Bio Holdings LLC*, No. CV 2018-0783-PRW, 2021 WL 2588905, at *14 (Del. Ch. June 14, 2021) (citing *Kuroda v. SPJS Holdings, L.L.C.*, 971 A.2d 872, 890 (Del. Ch. 2009)). The fact that the amount of money at issue is identifiable does not change the facts that (1) there is no specific, non-fungible and unmingled sum at issue, such as a single account holding only Heritage's funds and (2) Heritage's right of recovery is covered by its contractual relationship with Fund 2.

Tennessee law is somewhat more flexible, recognizing a cause of action for conversion of funds, "where the money is specific and capable of identification or where there is a determinate sum that the defendant was entrusted to apply to a certain purpose." *PNC Multifamily Cap. Institutional Fund XXVI Ltd. P'ship*, 387 S.W.3d at 553 (quoting 90 C.J.S. Trover and Conversion § 16 (2012)). Tennessee courts, however, have shared Delaware courts' hostility to conversion claims that are "necessarily founded upon a breach of contract." *E Sols. for*

*Buildings, LLC v. Knestrick Contractor, Inc.*, No. M2018-02028-COA-R3-CV, 2019 WL 5607473, at *9 n.7 (Tenn. Ct. App. Oct. 30, 2019) (citing *Yinghong Mach. Int'l Ltd. v. Wholesale Equip.*, Co., No. 213CV02671JTFCGC, 2014 WL 12887673, at *4 (W.D. Tenn. Oct. 17, 2014). Count 10 of the Complaint states a cause of action for breach of contract pursuant to the following theory:

> Heritage fully performed its obligations under the Operating Agreement by transferring $5 million to Fund 2. In contrast, Fund 2 failed to fulfill its contractual obligations. Rather than applying and distributing the liquidation proceeds in accordance with the above order of priority, Fund 2 prioritized paying Taylor Welch and Evans hundreds of thousands of dollars each and returning capital contributions to Fund 1 and other Fund 2 individual Investing Members over refunding Heritage any portion of its investment.

(Doc. No. 1 ¶ 239.) The conversion claim relies on the same events:

> Heritage transferred $5 million to Fund 2 on December 15, 2021, pursuant to the PPM and Operating Agreement and in reliance on representations made by Taylor and Lance Welch. The Funds' financial records reflect that the Defendants did not use Heritage's funds as promised, and as of the date of this Complaint, none of the Defendants have returned the $5 million investment principal to Heritage . . . . By engaging in this conduct, Defendants appropriated Heritage's money for their own use and at the exclusion of Heritage's right to use and benefit from those funds. As a direct and proximate result of Defendants' wrongful appropriation of the investment principal, Heritage suffered damages in an amount to be established at trial, but no less than $5,000,000, plus interest.

(*Id.* ¶¶ 260–61.) Accordingly, while Tennessee law is more favorable to conversion claims for sums of money generally, that is not sufficient to support such a claim in this instance. Count 13 will be dismissed.

## IV. CONCLUSION

For the foregoing reasons, Heritage's Motion for Preliminary Injunction (Doc. No. 2) will be denied, and the defendants' Partial Motion to Dismiss (Doc. No. 27) will be granted in part and denied in part. The court will dismiss Count 2 as to Fund 1, Count 3 as to Evans and T. Welch, Count 8, Count 9, and Count 13.

An appropriate order will enter.

ALETA A. TRAUGER
United States District Judge