# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE
### NASHVILLE DIVISION

| | | |
|---|---|---|
| HERITAGE GLOBAL NETWORK LOS ANGELES, INC., | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | Case No. 3:23-cv-00685 |
| | ) | Judge Aleta A. Trauger |
| TAYLOR WELCH; CHRIS EVANS; LANCE WELCH; WEALTH CAP HOLDINGS, LLC; WEALTH CAP FUNDS, LLC; WEALTH CAP FUND 2, LLC, | ) ) ) ) ) ) | |
| Defendants, and | ) ) | |
| WCH AL-1001, LLC; WCH AL-1002, LLC; WCH AL-1003, LLC; WCH AL-1004, LLC; WCH MO-1001, LLC; WCH MO-1002, LLC; WCH MO-1003, LLC; WCH NC-1001, LLC; WCH NC-1002, LLC; WCH NC-1003, LLC; and WCH NC-1004, LLC, | ) ) ) ) ) ) ) ) ) | |
| Relief Defendants. | ) | |

## <u>MEMORANDUM</u>

Having lost $5,000,000 in what turned out to be a bad investment, plaintiff Heritage Global Network Los Angeles, Inc. ("Heritage") filed this lawsuit to recover those funds, asserting federal and state statutory securities fraud claims, along with related state common law claims. (Compl., Doc. No. 1.) Now before the court are two Motions for Summary Judgment, one filed by defendants Wealth Cap Holdings, LLC ("WCH" or "Holdings"), Wealth Cap Funds, LLC ("Fund 1") and Wealth Cap Fund 2, LLC ("Fund 2" and, collectively with Fund 1, the "Funds")

(collectively, the "WC entities"), Lance Welch,[1] and the "Relief Defendants"[2] (together, the "WC defendants") (Doc. No. 76), and the second filed by defendants Taylor Welch and Chris Evans (Doc. No. 79), seeking judgment on all claims asserted against them. As discussed herein, the defendants' motions will, for the most part, be denied.

## I.        LEGAL STANDARD – RULE 56

Under Federal Rule of Civil Procedure 56, any party "may move for summary judgment, identifying each claim or defense . . . on which summary judgment is sought." Fed. R. Civ. P. 56(a). "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Id.*

By its very terms, Rule 56 anticipates "that the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986) (emphasis in original). In other words, even if genuine, a factual dispute that is irrelevant or unnecessary under applicable law is of no value in defeating a motion for summary judgment. On the other hand, "summary judgment will not lie if the dispute about a material fact is 'genuine.'" *Id.* at 248.

"[A] fact is 'material' within the meaning of Rule 56(a) if the dispute over it might affect the outcome of the lawsuit under the governing law." *O'Donnell v. City of Cleveland*, 838 F.3d

---

[1] There are two defendants with the surname "Welch." The parties have adopted different strategies to differentiate between them, but the court refers to them by their first names, or both first and last names, to avoid any possibility of confusion.

[2] The Complaint does not actually assert any substantive claims against the Relief Defendants. Rather, it alleges that the Relief Defendants are entities controlled by the other defendants and whose purpose is to hold properties purchased by WCH, Fund 1, and/or Fund 2. Although the parties do not address their presence in the lawsuit, the plaintiff apparently understands that assets held by the Relief Defendants could be liquidated to cover any judgment awarded in this case.

718, 725 (6th Cir. 2016) (citing *Anderson*, 477 U.S. at 248). A dispute is "genuine" "if the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Peeples v. City of Detroit*, 891 F.3d 622, 630 (6th Cir. 2018).

In ruling on a motion for summary judgment, it is not the judge's function to make credibility determinations, "weigh the evidence[,] and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249. In determining whether a genuine issue of material fact exists, the court must assume as true the evidence of the nonmoving party and draw all reasonable inferences in that party's favor. *Id.* at 255; *Tolan v. Cotton*, 572 U.S. 650, 660 (2014). However, the "mere existence of a scintilla of evidence in support of the" nonmoving party is not sufficient to avoid summary judgment. *Anderson*, 477 U.S. at 252. "There must be evidence on which the jury could reasonably find for the [nonmoving party]." *Id.* The inquiry, therefore, "asks whether reasonable jurors could find by a preponderance of the evidence that the" nonmoving party is entitled to a verdict. *Id.*

## II.  FACTS[3]

Heritage, a non-profit business, invested $5,000,000 in Fund 2 on December 15, 2021, with the expectation that it would make an 8–10% (annualized) return on its investment over the next

---

[3] The defendants filed a Joint Statement of Undisputed Material Facts ("SUMF") (Doc. No. 81) and a substantial quantity of evidentiary material, attached as exhibits to the SUMF (Doc. Nos. 81-1 through -68.) The plaintiffs filed a Response to the SUMF ("RSUMF") (Doc. No. 100) and their own voluminous evidentiary material (Doc. Nos. 96-1 through -40, 97-1 through -35.) The facts set forth herein are drawn from RSUMF and the documents cited by both parties in support of their statements. Facts for which no citation is provided are undisputed for purposes of both Motions for Summary Judgment.

The court observes that the defendants' joint SUMF does not contain all of the material facts that are included in their Memoranda of Law, which makes it more difficult for the court to ascertain whether those facts are disputed. For its part, the plaintiff's RSUMF is generally not compliant with Local Rule 56.01, which requires that each numbered response in a response to a statement of undisputed material facts must "start with 'Undisputed,' 'Undisputed for Summary Judgment Purposes Only,' or 'Disputed.'" L.R. 56.01(e)(2). And, if a respondent disputes a fact,

couple of years, before being permitted to withdraw its investment. Instead, by early spring 2022, Heritage, through its Chief Executive Officer ("CEO"), Jonathan Bernis, learned that Fund 2 and the defendants' other related investment vehicles had failed and would not be able to meet their investors' expectations or, indeed, even to return all of the investors' capital investments. Heritage brings this suit to try to recover its $5,000,000 investment.

### A.      The Wealth Cap Entities

Taylor Welch and Chris Evans formed WCH in February 2019. As set forth in the WCH Amended and Restated LLC Agreement dated July 28, 2020, WCH was formed "for the sole business purposes of acquiring, renovating, remodeling, performing construction on, owning, managing, leasing, maintaining, selling and transferring residential real estate and/or owning any entities that have been or will be formed for such same business purposes." (Doc. No. 96-1 at 7.) They formed Fund 1 in December 2019 to acquire undervalued residential properties, renovate them, and resell them. Typically, once a property owned by Fund 1 was renovated, it was sold to an outside investor or to WCH.

As Taylor Welch explained, Fund 1 was created as a vehicle to raise money from outside investors for the purpose of acquiring real estate. (Doc. No. 81-1, Taylor Welch Dep. 27.)[4] While Fund 1 was an "acquisition renovation model," WCH was "the repository that held the assets long term." (Doc. No. 81-1, Taylor Welch Dep. 26; *see also* Doc. No. 81-4, Corry Dep. 36, 38.)

---

"the evidentiary citations supporting the respondent's position must be limited to evidence specific to that particular fact." L.R. 56.01(e)(3). The plaintiff's RSUMF is generally argumentative, and its record citations are not tailored to the facts it seeks to dispute. Despite these deficiencies, the court has attempted to construe the facts in the light most favorable to the plaintiff.

[4] Most of the deposition transcripts in the record are in condensed form, with four transcript pages per standard page. The court refers to the deposition transcripts by their original pagination rather than by the pagination assigned by the court's electronic filing system.

Fund 2 was formed in September 2021. According to Taylor, Fund 2 was formed "to pursue the same general real estate strategy" as Fund 1: "to locate and acquire undervalued residential properties, renovate them, and then re-sell them." (Doc. No. 81-8, T. Welch Decl. ¶ 3.) WCH was the Managing Member of both Funds. (*Id.*) Fund 2 never acquired any property.

Taylor Welch viewed WCH as a "backstop," meaning that, while he wanted the Funds to be self-sustaining, the WCH portfolio of assets could at any time be tapped to support the Funds and protect investors, if necessary. (*See* T. Welch Dep. 167–69.) Lance Welch also understood WCH as a "backstop." (Doc. No. 81-3 at 284–85 ("That was a big part of the whole process was if something didn't go as planned, we always had that [WCH] as a way to – to backstop it to make up the difference."); *see also id.* at 261–62 (stating his belief that profits from the sales of houses had, as of early December 2021, been sufficient to cover "monthly investor payments" to Fund 1 investors because "we were also willing to release some of the Holdings properties to make sure we did"); *see also* Corry Dep. 166–67 ("[I]t was always viewed as Holdings' properties would be sold if Funds needed money.").)

Lance Welch conceded that, as it turned out, there was not "enough in Holdings to pay everyone back." (Doc. No. 81-3, L. Welch Dep. 285.) Heritage also purports to dispute the defendants' characterization of WCH as a "backstop" by pointing out that WCH did not ultimately function to guarantee the return of any portion of Heritage's investment in Fund 2. (*See* Doc. No. 96-4, Bernis Decl. ¶ 10.)

From shortly after their inception through September of 2021, the day-to-day operations for the WC entities were delegated to a management team led by Taylor Welch's father, Lance Welch. (T. Welch Decl. ¶¶ 6–9; L. Welch Dep. 54–56.) As discussed below, Taylor Welch became

more actively involved in operations beginning in September 2021. (Taylor Welch Decl. ¶¶ 10–11.)

The WC entities' management team consisted of full-time professionals with real estate experience, including a controller, acquisitions director, director of operations, and renovations manager. As of the latter half of 2021, these department heads were Taylor Streitmatter (Acquisitions Director), Sarah Jaksich (Director of Operations), Lori Corry (Head of Finance/Controller), and John Di Bella (Renovations Manager). The managers and their teams were responsible for the routine operational decisions within the scope of their respective roles.

Corry, the controller, holds a Master of Business Administration, is a licensed Certified Public Accountant, and has worked for real estate firms or businesses for twenty years. She and other WCH employees tracked intercompany transfers and "obligations" among Fund 1, Fund 2, and WCH.

The WC entities employed a "buy box" to guide the purchase of investment real estate. A "buy box," as explained by Lance and Taylor, is a set of parameters for helping select what properties to buy, which includes such factors as the purchase price, the estimated cost of renovation, and the estimated after-repair value ("ARV"), meaning the estimated market value of the property after improvements. (*See* T. Welch Dep. 151; L. Welch Dep. 109; Doc. No. 81-38 (2021 "Wealth Cap Buy Box").) The "buy box" was not static and was adjusted as needed, particularly in the fall of 2021 when Taylor Welch learned that the management team, led by Taylor Streitmatter, had made a series of "bad buys." (*See, e.g.*, Doc. No. 96-5 at 70 (Oct. 18, 2021 text communication between Lance and Taylor); Doc. No. 96-10 at 8–9 (Oct. 28, 2021 text communication between Taylor and Evans, describing recent losses).)

In fact, in a text-message conversation among the members of the WCH executive team, Taylor Welch informed the team on October 9, 2021 that they were "breaking even on current buys. . . . Unless we fix what we are buying it's the worst business model in the world." (Doc. No. 96-9 at 52.) As of mid-October, in another communication among Lance Welch, Taylor Welch, and Evans, Taylor Welch said that he thought "Streits [Streitmatter] might have to go," that his acquisitions team was "out of cash," and that the other members of the WCH executive team (Sarah Jaksich and Devon Johnson) thought Streitmatter had been "covering stuff up." (Doc. No. 96-5 at 70–71.) A few days later, Taylor Welch instructed Sarah Jaksich to remove Streitmatter as an authorized signer for the WC entities; he told John Di Bella that Di Bella needed to "sign off on every single portfolio property that [Streitmatter] is trying to buy" because he did not "trust Streits' numbers and that, going forward, the entire team needed to sign off on any real estate purchases, "so we can avoid blowing budgets and timelines and having to loose money on deals." (Doc. No. 96-9 at 55–56.) In a separate message thread between Taylor Welch and Chris Evans dated October 28, 2021, Taylor candidly explained to Evans how badly the real estate model on which the Funds relied had been performing, because the "buy box" parameters had not been followed, and the company had been operating at a deficit "for several months." (Doc. No. 96-10 at 7–9.) At the same time, however, Taylor Welch purported still to be confident that they could "dig out" and that there was "zero chance" that their investors were going to lose money. (*Id.* at 9, 11.)

According to the defendants, rehabilitation estimates were performed using "standardized processes like scope sheets," which were prepared by the project manager overseeing the rehabilitation of a particular property and reviewed by Renovations Director John Di Bella. (*See* Doc. No. 81-28, Di Bella Dep. 54–57, 192–93; *see also* Doc. No. 81-34 (scope sheet template).) Property valuations of houses sold either to WCH or to third parties were performed by

independent third-party appraisers or based on market comparables. The defendants have presented some evidence that they "tracked asset values and the anticipated buffer over investor obligations" (to which Taylor Welch referred as a "hedge"). (SUMF ¶ 16 (citing T. Welch Dep. 153; *see also* Doc. No. 81-37 ("Current Asset Value and Equity Hedge" spreadsheet).) The plaintiff disputes that the "anticipated buffer" was always accurate, based on the financial performance of Fund 1. (RSUMF ¶ 16.)

### B. Evans' and Taylor Welch's Roles and Investments

Chris Evans was not involved in the management or day-to-day operations of the Wealth Cap Entities. (Doc. No. 81-9, Evans Decl. ¶ 4 ("I was not involved in the management of or day-to-day operations for Fund 1, Fund 2, or Holdings. . . . Instead, my primary focus was on a different businesses [sic] that Taylor and I had, which was a coaching and consulting business. It was my full-time job and consumed most of my time."); *id.* ¶ 7 (stating that he accepted Taylor Welch's "operational calls" and "relied on Taylor to keep [him] updated at a high level about the general condition of the business").) He did not regularly review financial reporting or daily metrics for the WC entities and instead relied on periodic updates from Lance Welch and Taylor Welch about the status of the business. ( *Id.* ¶ 8.)

Taylor Welch likewise was not involved in the day-to-day operations of the Wealth Cap entities through the first half of 2021, having delegated the day-to-day operations to Lance and the various WCH department heads. (Doc. No. 81-9, T. Welch Decl. ¶¶ 5–9.) However, by October 1, 2021, Taylor replaced Lance as CEO of the Funds, while Lance stayed in the role of investor relations. (*See* Doc. No. 96-7 at 4; *see also* T. Welch Decl. ¶ 15.) According to Taylor Welch, he "increased his involvement" in the WC entities in the Fall of 2021 to "tighten leadership expectations, enforce [key performance indicators], and adjust the buy boxes which defined the parameters for what types of properties were to be targeted." (T. Welch Decl. ¶ 11.)

According to the plaintiff, Taylor increased his involvement at this time because the business was "objectively failing." (RSUMF ¶ 20.) It points to conversations among Taylor Welch, Lance Welch, Chris Evans, and other members of the WCH executive team, showing a growing awareness among all of them, beginning in August or September 2021, that Taylor Streitmatter had made a series of bad acquisition decisions, underestimated the costs of renovation, and overestimated the resale value of the renovated properties, as a result of which Fund 1 was "in a hole" that they needed to dig out of. (*See generally* Doc. No. 96-5; Doc. No. 96-9 at 22–23, 36–39; Doc. No. 96-18 at 3–4; Doc. No. 96-21 at 20.)

Evans had invested $1,875,000.00 in Fund 1, and he made $235,592.06 in monetary contributions to WCH. According to Evans, he decided not to "renew one of [his] investments in Fund 1 in December 2021," as a result of which he received a $500,000 payment from Fund 1 on December 16, 2021[5] that was "completely unrelated to the financial condition of the real estate business at that time." (Evans Decl. ¶¶ 19–20; *see also* Doc. No. 81-57 (summary document prepared by the defendants purporting to show that Evans invested $1,875,000 in Fund 1 between January 14, 2020 and July 2021 (but with no $500,000 investment occurring in December 2020), and received one return-of-investment payment of $500,000 on December 16, 2021).) He also received twenty-four monthly investor "interest" payments, beginning in February 2020 and continuing through February 2022, that totaled $274,653.98. (Doc. No. 81-57.) Evans contends that he lost the other $1,375,000 he invested in the Funds, plus the capital investment he had made in WCH. (*Id.* ¶ 19.)

---

[5] Evans' Declaration states that he received a $500,000 payment on December 16, 202**2** (Evans Decl. ¶ 20), but the court presumes that this is a typographical error.

The plaintiff purports to dispute some of this, pointing to accounting records that are not readily decipherable and for which it provides no explanation. In any event, the plaintiff points out that the defendants' financial records do not document a one-year investment made by Evans in December 2020 (*see* Doc. No. 81-57), and it further claims that the payment Evans received in December 2021 was recorded as the return of an investor loan. (Pl.'s RSUMP ¶ 26.) In addition, the plaintiff claims that Evans received "financial returns from Fund 1 that were recorded as member distributions totaling $1,321,236 between 2020 and 2022," even though the accounting records show that the money was "directly transferred from Fund 1 to Holdings (*i.e.*, a shortcut for the money going from Fund 1 to Evans, and then from Evans to Holdings)." (*Id.*)[6]

Taylor Welch personally invested $1,425,000 in Fund 1, and he made $235,592.06 in monetary contributions to WCH. Taylor Welch asserts that the only return of investment capital he received from Fund 1 was on January 6, 2022, in the amount of $250,000, which coincided with the expiration of the one-year investment term for those funds. (T. Welch Decl. ¶¶ 29–30; *see also* Doc. No. 81-56 (summary of Taylor Welch's investments in and returns from Fund 1 and a return payment of $250,000 on January 6, 2022 (but no corresponding investment of $250,000 in January 2021).) Taylor Welch received interest payments between 2020 and 2022 totaling $235,538. (Doc. No. 81-56.) He claims to have lost over $1,000,000 when the WC entities folded. (T. Welch Decl. ¶ 29.)

The plaintiff asserts that the $250,000 payment in January 2022 was recorded in the defendants' financial records as the return of an investor loan and does not correspond to any one-

---

[6] In support of its denial of Evans' assertion that he lost over $1,000,000 of his investment in the WC entities, Heritage cites documents that either do not support its position (Doc. Nos. 96-22, 96-23, 96-24) or accounting records that the court is not qualified to decipher (Doc. Nos. 97-10, 97-11, 97-12).

year investment made in January 2021. (RSUMF ¶ 24.) It also asserts that Taylor Welch received $1,286,668 in "financial returns from Fund 1 that were recorded as member distributions to Welch in the accounting records with the money directly transferred from Fund 1 to Holdings (*i.e.*, a shortcut to the money going from Fund 1 to Welch, and then from Welch to Holdings). (*Id.*; *see also* RSUMF ¶ 58.)[7]

### C.      Heritage and Jonathan Bernis

Plaintiff Heritage was formed in June 2020 as a non-profit corporation. Jonathan Bernis is one of Heritage's founders, its CEO, and the Chairman of its Board of Directors. Troy Wallace was a member of Heritage's Board at the time Heritage made the decision to invest in Fund 2. Bernis and Wallace were the two decision makers responsible for causing Heritage to invest in Fund 2. Prior to Heritage's investment in Fund 2, Bernis had personally invested $750,000 in Fund 1 (investing $600,000 in November 2020 and $150,000 in April 2021) and $100,000 in Fund 2. Bernis was originally introduced to Lance Welch, Taylor Welch, and Evans by Scott Volk, who had also invested in Fund 1 and was a long-time friend of both Evans and Bernis.

On August 31, 2021, Lance Welch circulated an email announcing the opening of Fund 2. On September 11, 2021, per Bernis's request, Lance forwarded his August 31, 2021 email to Bernis. On or about September 17, 2021, Bernis personally invested $100,000 in Fund 2.

On October 12, 2021, Bernis agreed to be a reference for another investor interested in investing in Fund 2.

On October 18, 2021, Lance Welch texted Bernis, notifying him that his original $600,000 investment in Fund 1 was "coming up on its one-year mark" and asking him to confirm whether

---

[7] Again, the plaintiff cites, without much explanation, accounting records that the court is not qualified to decipher (Doc. Nos. 97-10, 97-11, 97-12).

he wanted to roll-over the investment at the "current 12% rate." (Doc. No. 81-18.) Bernis responded, "Absolutely." He asked only when the remaining $150,000 would come up for renewal. (*Id.*) According to Bernis, his decision to renew his investment was based on "representations defendants made at the time of [his] original investment" and his "receipt of the regular monthly interest payments," which led him to believe that Fund 1 was profitable. (Doc. No. 96-4, Bernis Decl. ¶ 6.)

On October 29, 2021, Lance sent an email to a group of investors, including Bernis, informing them that Fund 2 was open for investments of up to $500,000. On October 31, 2021, Bernis responded to Lance Welch with an email asking whether Fund 2 could accept an investment in the range of $6–$8 million for a "6–24 month commitment." (Doc. No. 81-60.) On December 2, 2021, Lance Welch sent Bernis an email along with a one-page summary of Fund 2 that he had prepared and the Fund 2 Private Placement Memorandum ("PPM"). (Doc. No. 81-21.) The email explained:

> I've attached a one-page summary of how the fund works. But for it to be compliant, I'm including the actual PPM. The PPM is written in legaleeze that basically highlights that there is no such thing as a guarantee in real estate (the job of an attorney). But as you know, we are very disciplined in what we do.
>
> Please review and let me know if there is anything you think should be cleared up. If I can, I'm happy to do so . . . as long as it stays compliant.

(Doc. No. 81-21 at 1.)

On December 8, 2021, Bernis texted Lance Welch that he was "99% certain we're a go and may be able to wire you the funds as early as Friday." (Doc. No. 81-52 at 6.) On December 15, 2021, Bernis wired $5,000,000 to "Wealthcap" on behalf of Heritage. (*See id.*; *see also* Doc. No. 81-61.)

**D.      Lance Welch's Role**

Lance Welch served as the President of WCH and was responsible for investor relations. (T. Welch Decl. ¶ 15; Doc. No. 1, Compl. ¶ 4; Doc. No. 50, Lance Welch Answer ¶ 4.) As the exhibits cited by Heritage show, Lance conferred with Taylor and Chris Evans regularly, including regarding the structuring, terms and timing of the Heritage investment (*see, e.g.*, Doc. No. 96-8 at 14–15, 18–20; Doc. No. 96-26), but Lance was generally responsible for handling inquiries, preparing and sending materials, and determining the wording, content, and timing of communications to prospective and existing investors, including Heritage (T. Welch Decl. ¶ 15; Evans Decl. ¶ 6). Although Lance Welch could not accept Heritage's investment without approval from Evans and Taylor Welch, the plaintiff has not presented any evidence that Taylor Welch or Evans reviewed or approved any statements, summaries, emails, or other written communications that Lance Welch sent to Bernis or to Heritage before the communications were distributed, with the possible exception of a document that Lance Welch called the "special concessions for Jonathan Bernis," which apparently comprised the proposed terms of the Heritage investment. (*See* Tr. of Nov. 12, 2021 Lance Welch audio recording, Doc. No. 81-53;[8] "Special Concessions" email, Doc. No. 97-31.)[9]

---

[8] The parties manually filed the audio recording of this conversation as well. In this conversation, the participants apparently reviewed and discussed the "special concessions" they would make for Heritage's investment, as later drafted by Lance Welch, and they discussed in particular whether Lance Welch anticipated a $5,000,000 lump sum investment or whether they should "stair step" the investment by taking, for example, $1,000,000 per month until they reached $5,000,000. (See Doc. No. 96-8 at 13–15.)

[9] The Special Concessions anticipated that Fund 2 would hold Heritage's investment for eighteen months, with full withdrawal at that time permitted as long as Heritage provided at least six months' notice of its intent to withdraw the full investment. They also anticipated the possibility of a partial withdrawal of $2,000,000 at the end of the first year, as long as Heritage provided at least six months' notice. (Doc. No. 97-13 at 3.)

More specifically, however, neither Taylor nor Evans saw Lance Welch's one-page summary of Fund 2 before it was sent to Bernis, and neither of them edited, approved, or authorized the summary before it was sent. (T. Welch Decl. ¶ 18; Evans Decl. ¶ 9.) Neither Taylor nor Evans directed Lance on what to say during his oral communications with Bernis, and they did not script or supervise the substance of those conversations. (T. Welch Decl. ¶ 19; Evans Decl. ¶ 11.) Neither personally spoke to or communicated with Bernis or any other Heritage representative prior to Heritage's investment in Fund 2. (T. Welch Decl. ¶ 17; Evans Decl. ¶ 10.)

### E.  The WC Entities' Financial Situation

The plaintiff's theory in this case is basically that Fund 1 was objectively failing as of the time it invested $5 million in what was represented to be a new fund. Their position is supported by the Perry Report and the documents on which Perry relies to reach his conclusions. The defendants, to counter that theory, rely on their own financial documentation that, they contend, shows that they were not objectively failing but still had assets in excess of equities as of the end of 2021. To that end, they point to a "Balance Sheet" for Fund 1 showing that, as of August 31, 2021, Fund 1 possessed real property assets with a book value of approximately $6 million (Total Fixed Asset Line), as well as approximately $2.3 million due from WCH (Line 19000). (*See* Doc. No. 81-31, at 1.) Heritage disputes the defendants' interpretation of the Balance Sheet, insofar as the defendants do not explain other entries that show, under "Liabilities & Equity," $347,007 "Due to" WCH, or, under "Other Current Asset," -$554,551 "Due From" WCH. (*See id.*)[10] The plaintiff interprets this to mean that the Balance Sheet actually shows just over $1.4 million due from WCH,

---

[10] It is unclear to the court what a negative "due from" amount means. The plaintiff interprets it to mean a liability due to WCH in the amount of $554,551, which suggests that the amount should not be listed under assets.

rather than $2.3 million. (PRSUMF ¶ 50; *see also* Expert Report of David R. Perry ("Perry Report") App. D, Doc. No. 96-11 at 64.)[11]

According to the defendants, WCH's Balance Sheet for August 31, 2021 shows "Total Fixed Assets" worth $9,601,477 and $6,235,077 in mortgage liability. (Doc. No. 81-25 at 1–2.) Heritage disputes the accuracy of these figures, asserting that

> Fund 1's [sic][12] 2021 general ledger shows the total fixed assets net of depreciation as of August 31, 2021 as $8,539,575 not $9,601,477 (a difference of $1,061,902). This number is comprised of the August 31, 2021 amounts in Accounts 13010, 14000, 15000, 17000, 16400 and 16500 on WCH's 2021 general ledger. Additionally, the total mortgage liabilities as of August 31, 2021 were $6,485,136 not $6,235,076 (a difference of $250,060). $6,485,136 is the August 31, 2021 amount in Account 26000 on WCH's 2021 general ledger.

(RSUMF ¶ 51.) In support of that assertion, Heritage cites its own "Ex. 50 (at FUND_000226)." (*Id.*) Exhibit 50, however, is a 134-page document comprising the 2022 Funds Consolidated General Ledger, of which the page that is Bates-numbered FUND 2_000226 is the cover page for the Funds 12/31/21 Consolidated Balance Sheet as of 12/31/21. (*See* Doc. No. 97-10 at 130–32.) It does not include the figures the plaintiff cites. The plaintiff might have intended to refer to Exhibit 51, which is identified on the docket as the "2021 Funds Consolidated General Ledger (FUND 2_000226)." This is a 483-page exhibit that does not contain any Bates numbers, and the court declines to track down the entries to which the plaintiff refers.[13] However, the Perry Report

---

[11] In a separately filed Memorandum and Order, the court will deny in part the defendants' pending Motion to Exclude the Opinions of Plaintiff's Disclosed Expert David Perry (Doc. No. 109).

[12] The court presumes that Heritage intended to refer to WCH's general ledger.

[13] The plaintiff also asserts, in something of a *non sequitur*, that it disputes the assertion regarding WCH's financials "to the extent [the allegation] contends that Heritage had any ownership interest in or rights to WCH's properties or their equity, as Fund 2 investors had no ownership interest in or rights to any properties WCH or Fund 1 owned as they were separate and distinct entities." (RSUMF ¶ 51 (citing Doc. No. 96-1 (WCH Amended and Restated LLC Agreement); Doc. No. 96-2 (Fund 1 Offering Memorandum); Doc. No. 96-3 (Fund 2 Units of Investing Membership Interest); Doc. No. 96-4, Bernis Decl. ¶ 4 ("At no time did defendants

appears to substantiate the plaintiff's assertion. (*See* Perry Report App. G, Doc. No. 96-11 at 75 (spreadsheet showing "Property-Related Fixed Assets" valued at $8,539,575 as of 8/31/2021).)

According to the defendants, Fund 1's November 30, 2021 monthly Balance Sheet listed real property assets with a book value of approximately $7.2 million, as well as approximately $2 million due from WCH. (Doc. No. 81-27 at 1.) Heritage again disputes the amount due Fund 1 from WCH, based on other entries on the same Balance Sheet showing amounts due from Fund 1 to WCH of almost $400,000, making the net amount due from WCH closer to $1.6 million. (RSUMF ¶ 52 (citing Doc. No. 81-27 at 1); *see also* Perry Report App. D, Doc. No. 96-11 at 64 (showing $1,617,338 "Due from Wealth Cap" as of 11/30/2021).)

According to the defendants, WCH's November 30, 2021 monthly Balance Sheet listed $9,326,050 in "Total Fixed Assets" and $6,072,263 in mortgage liability. (Doc. No. 51-30 at 1–2.) Heritage similarly disputes this statement, asserting that Fund 1's 2021 general ledger shows the total fixed assets net of depreciation as of November 30, 2021 as $8,433,888, rather than $9,326,050, a difference of almost $900,000 (RSUMF ¶ 53)—again citing "Exh. 50 (at FUND 2_000226)," which does not adequately support its position, as discussed above. However, the Perry Report also shows total "Property-Related Fixed Assets" of $8,433,888 on WCH's Balance Sheet as of November 31, 2021. (Perry Report App. G, Doc. No. 96-11 at 75.)

According to the defendants, as of December 13, 2021, internal financial reports showed that the Funds had "sufficient equity ($11.6 million) to repay all investors ($11.1 million), not including an additional $3 million in equity from Holdings." (SUMF ¶ 54 (citing Doc. No. 81-17

---

represent to me that Heritage was investing in or would have an interest in Fund 1 or [WCH].").) While arguably a true statement of law, this assertion is at odds with the plaintiff's decision to name as defendants in this lawsuit every entity associated with WCH, precisely because the defendants' intermingling of funds and failure to recognize corporate formalities give Heritage a basis for piercing the corporate veil.

(reflecting "Fund portfolio value" of $11,620,700, "Total equity" of $11,893,158, and "Investor dollars of $11,100,000)); T. Welch Decl. ¶ 25.)[14]

Heritage "objects" to this statement as "vague and ambiguous as to the meaning and scope of the term 'equity,'" particularly insofar as, according to Heritage, "defendants are conflating [sic] 'equity' to mean the purported value of some, or all, of the Funds' assets, instead of its true meaning which is the residual value, if any, left after subtracting the Funds' liabilities from its assets." (RSUMF ¶ 54.) Subject to that objection, Heritage also disputes the statement. (*Id.*) Its dispute is premised upon, first, its assertion that Fund 2, itself, never owned any properties and therefore never had equity in any property. (*Id.*) In addition, Heritage again points out that the Balance Sheets to which the defendants refer do not show as much "equity" due to the Funds from WCH as the defendants state. Regarding the remainder of the statement, the plaintiff asserts that

> As of November 30, 2021 and December 31, 2021, the Funds' equity was negative (i.e., negative $1,575,709 as of November 30, 2021 and negative $2,034,869 as of December 31, 2021). Similarly, the value of the Funds' assets was less than the value of its liabilities as of both November 30, 2021 and December 31, 2021. Regardless of the internal estimates, the Funds' properties were being sold in November and December 2021 for less than their book values such that the Funds had net losses on property sales of $183,658 for November 2021 and $73,038 for December 2021. Additionally, the Funds' properties continued to be sold for less than their book values in 2022 such that the Funds had overall losses on property sales of $2,492,988 for the year.

(RSUMF ¶ 54 (citing Perry Report 2, 15, 19, 21, 26, 29,[15] and Apps. C & D).)[16]

---

[14] The defendants' citation to Doc. No. 81-30 does not appear to support this statement of fact.

[15] The internal pagination of the Perry Report is not consistent with the pagination assigned by CM/ECF. The court will employ the original pagination.

[16] The plaintiff's other record citations are, as previously noted, not sufficient to rebut the defendants' statement.

According to Taylor Welch, in addition to the "internal reports" that showed that the Funds had sufficient equity to repay all investors as of the end of 2021, he also received "cash flow work sheets and projections . . . from the management team," based on which he "believed that the deficit was decreasing." (T. Welch Decl. ¶ 25.) He also states that the WC entities' "internal projections" "suggested that the wholesaling strategy" (purportedly adopted in late 2021) "would result in approximately $750,000 in income during the first quarter of 2022." (*Id.*) In other words, according to Taylor Welch, he was in possession of information as of the end of 2021 "showing positive trends heading into 2022." (*Id.*; *see also* Doc. No. 81-19, "WC Funds 2022 Operating Budget").) For its part, the plaintiff does not dispute that the WC entities had generated such projections, but it argues that these projections were "unsupported and speculative." (RSUMF ¶ 55.)

According to Taylor Welch and Evans, they "did not learn that the equity in the Holdings portfolio was less than [they] believed that it was until the spring of 2022." (T. Welch Decl. ¶ 26; Evans Decl. ¶ 16.) According to Taylor Welch, the "catalyst" for this discovery was their hiring Justin Colby to "review the way that things were being valued from the Funds team," which also carried over to "some of the Holdings properties." (T. Welch Dep. 271–72.) The plaintiff disputes this assertion "to the extent [it] implies that there were no signs of issues until Spring 2022." (RSUMF ¶ 56.) Heritage points to evidence in the record showing that Fund 1's property purchases decreased throughout 2021 and had effectively stopped by December 2021 and that the Funds had a negative total income each of the three months immediately preceding Heritage's investment, for the fourth quarter of 2021 and for the first quarter of 2022, along with other negative financial indicators. (*See, e.g.*, Perry Report Apps. C–D, F–G.) It also points to conversations among Lance, Taylor, and Evans establishing their awareness of how poorly the Funds were performing in the

Fall of 2021. (*See, e.g.*, Doc. No. 97-15 (Tr. of Oct. 1, 2021 audio message from Taylor Welch to Lance Welch).)

The WC entities halted investor payments and began winding down the Funds and WCH in the Spring of 2022, after the adjustment to the value of their real estate portfolios.

### F. Heritage's Due Diligence

In addition to being CEO of Heritage, Jonathan Bernis is also the CEO and a Board member of Jewish Voice Ministries International ("JVMI"). JVMI has averaged about $32–$34 million in gifts and donations per year for the last five years. Bernis has been a member of JVMI's finance committee since its inception. According to Bernis, the finance committee's role is to take a "deeper dive" into the budget and give feedback to the executive leadership team and CFO, and also to get "far more involved in the details, the financial details, including how investments were made." (Bernis Dep. 32–33.) The finance committee consulted with outside professional financial advisors to undertake these responsibilities.

In his role as CEO of Heritage, however, Bernis did not read in its entirety the Fund 2 PPM provided by Lance Welch. Troy Wallace, Heritage's other decision maker, also did not read it. Neither Bernis nor Wallace requested "financials" before Heritage invested $5 million in Fund 2, and they did not have an attorney or financial advisor review the terms of the investment.

Wallace does not recall asking for any specific financial information regarding the Funds. (Doc. No. 81-10, Wallace Dep. 66–67.) Wallace also specifically testified that he was not "dissuaded from asking to see financials." (*Id.* at 67.) Asked if he would have made the investment based on Lance Welch's representations about Fund 2 without the testimonials of Bernis and Volk, vouching for the performance of Fund 1 and the personal integrity of Chris Evans, Wallace testified, "No, I would not have." (Wallace Dep. 169; *see also id.* at 64 (stating that he relied on Scott Volk's "vouching for Chris [Evans'] integrity" and Volk's "counsel" in deciding to invest);

*id.* at 109 (stating that he "was depending on Mr. Bernis's experience in this area").) However, he also testified that he relied on Lance Welch's "testimonials" about the "success" of Fund 1, and he understood "success" to mean, in that context, that "they were earning 25 percent through their flip activities to be able to pay their investors 10 [percent]." (*Id.* at 99, 102.) He also stated that he understood that Heritage's investment in Fund 2 "would be used for purchasing properties exclusively." (Doc. No. 81-10, Wallace Dep. 96.)

Bernis states in his Declaration that, when he originally invested in Fund 1 in the Fall of 2020, he "relied upon defendants' various representations, including that they were a successful and disciplined real estate investment operation." (Bernis Decl. ¶ 4.) In particular, Lance Welch "continued to tout . . . the success of their businesses, including Fund 1," in September 2021. (*Id.* ¶ 5.) Bernis decided to reinvest his $600,000 in personal funds in Fund 1 in October 2021 based on the representations "defendants" made at the time of his original investment and his "receipt of the regular monthly interest payments." (*Id.* ¶ 6.)

In deciding to make Heritage's investment in Fund 2, Bernis relied on, "among other things," "defendants' statements and the documents they provided to me," "representations both at the time of [his] original investment and [his] investment in Fund 2 in Fall 2021, including statements about their successful and disciplined approach." (*Id.* ¶¶ 8–9, 11.) Among other documents on which Bernis purportedly relied, Heritage points to the "Hello investor" email from Lance Welch dated August 31, 2021 that Lance that forwarded to Bernis on September 11, 2021. Lance's email describes Fund 1 as having been "quite the success," with "even great[er] things . . . still to come." (Doc. No. 97-1 at 2.) The email also announces WealthCap's decision not to "bring any new money" into Fund 1 (while continuing to provide the same 12% return to investors in

monthly installments) and instead to open a new "Fund2," employing the same investment model but a "new tier structure and new terms." (*Id.*)

Bernis also points to the email from Lance Welch that accompanied the one-page summary and Fund 2 PPM, in which Lance characterized the PPM as "legaleeze that basically highlights that there is no such thing as a guarantee in real estate (the job of an attorney). But as you know, we are very disciplined in what we do." (Doc. No. 96-40 at 2.) Bernis testified that he understood "disciplined" to mean that, "although real estate is a tricky business, we know how to do it right and we don't make mistakes." (Bernis Dep. 189.)

The one-page summary laid out Fund 2's anticipated "Process" for selecting investments, the "Rules" for investors and the "non variable returns" that would pertain depending on the level of investment (8% for investments of less than $300,000 and 10% for investments greater than $300,000), and the "Disciplines" the fund would follow in making real estate investments. (Doc. No. 96-40 at 4.) The one-page summary described the "Process" as follows:

- Our acquisitions team sources properties by either direct from seller, wholesalers and occasionally, the MLS

- Locate homes that are in disrepair, allowing for an under market value, quick close, cash purchase

  o Example:

    ▪ purchase home for $100,000

    ▪ Put $50,000 in renovations

    ▪ New ARV (after rehab value) of *$200,000

    *ARV verified by 3rd party Appraiser

- Sell renovated home to our waiting list of investors for $200,000

  o Rent on this home ranges from $1,700 - $2,000 per month

- Target spread/profit per house is 25%

o   The spread more than covers all monthly investor payouts

(*Id.*)

Lance's one-page summary described the "Disciplines" to which the fund would adhere as follows:

- Only invest in deals that are *more valuable* than the cost

- Only invest in "income-producing properties" that make sense on day 1

- At the onset of each purchase, there must "appear" to [sic] 25% spread/margin*

    *There will always be unknowns with real estate. The 25% spread affords for multiple surprises during the renovation process and still have the ability to pay investors each month.

    **We have never missed, or been late, on investor interest payments[.]

(*Id.*)

## G.     The Fund 2 PPM

Bernis read the first forty-five pages of the PPM, until he got "a little bit sidetracked on the legal proceedings and tax discussion" and "then found it to be confusing." (Bernis Dep. 190.) He did not have an attorney or financial advisor review it before Heritage made its investment. (*Id.*)

Page 1 of the Fund 2 PPM articulates the objectives of Wealth Cap Fund 2, LLC (*i.e.*, Fund 2) and intended purpose of the fund ("to acquire, renovate, improve, rehabilitate, and eventually re-sell single-family housing properties selected by our Managing Member"), using terms such as "seek to," "intend to," "may also," "expect to," and "aim to." (Doc. No. 81-13, Fund 2 PPM at 1.) It expressly states that, while Fund 2 "seek[s] to deliver . . . [w]orld-class performance, quality and value," "[t]op-tier customer satisfaction," and "[r]apidly growing revenue, profitability & market share growth," "[t]here can be no assurance any of these objectives will be achieved." (*Id.*)

It specifically states, in bold font, that the investment "**involves a high degree of risk**" and "**should be considered only if you can afford a possible total loss of your investment**." (*Id.*)

Under the heading "**IMPORTANT NOTICE ABOUT INFORMATION PRESENTED IN THIS MEMORANDUM**," this warning is repeated: "There can be no assurance that our objectives will be realized or that there will be any return of your invested capital." (*Id.* at 3; *see id.* at 4 ("**Investment in these securities may not be suitable for you if you do not meet the suitability requirements established by the Fund or if you cannot afford a total loss of your investment.**").) In bold, all-caps font, the PPM advises potential investors: "**IF YOU OR YOUR REPRESENTATIVE(S) DESIRE ADDITIONAL INFORMATION, PLEASE CONTACT OUR MANAGING MEMBER.**" (*Id.* at 4.) WCH is the Managing Member of Fund 2 (*see id.* at 20, 44), but Lance Welch's contact information is provided just after this notice (*id.* at 4).

Similar notices regarding the risk involved in investing in real estate are repeated throughout the PPM. (*See id.* at 16 ("Purchase of Units in this offering involves a high degree of risk and is suitable for you only if you have adequate resources and if you understand the long-term nature and risk factors associated with investing in single-family real estate properties and/or other forms of real estate. You must be able to bear the economic risk of this investment for an indefinite period of time and can, at the present time, afford to lose your entire investment."); *id.* at 26 ("Our ability to achieve our development plans will depend upon a variety of factors, many of which are beyond our control. There can be no assurance that we will not suffer delays, which could slow our growth and/or adversely affect your interests.").) In one place, the Memorandum advises that no "person unaffiliated with the Fund has been authorized to give you any information or make any representation to the fund other than those contained in this Memorandum." (*Id.* at 2.) Elsewhere, the PPM specifically advises, in a "call out box": "You should rely only on the information contained in this Memorandum. **We have not authorized any other person to**

**provide you with different information. If anyone provides you with different or inconsistent information, do not rely on it.**" (*Id.* at 26.)

The PPM contains disclaimers related more specifically to the risks of investing in real estate, "including the possibility that we may experience delays in obtaining necessary zoning, land use, building, occupancy, licensing and other required governmental permits and authorizations"; "construction costs that exceed original estimates"; that construction projects may not be completed on schedule; that the company "may experience competition in the search for suitable development sites"; and that the fund could experience "difficulties in working with general contractors and subcontractors, which could result in increased construction costs and delays." (*Id.* at 26.) In addition, the PPM advises that the fund "may require additional financing" in order to achieve its objectives and that it "may utilize leverage and incur the adverse consequences of indebtedness." (*Id.* at 27.)

The PPM contains provisions relating to the discretion of the Managing Member to allocate the invested funds, including the following:

> **Our use of proceeds is discretionary and may materially vary from the estimates provided in this Memorandum.**
>
> We expect to use the net proceeds from this offering to fund the acquisition of the Property or Properties and the development of a single-family property and for working capital and general corporate purposes. Our management will retain broad discretion in allocating the net proceeds of this offering. See "Fund Capitalization and Use of Proceeds" and "Compensation."

(*Id.* at 29.)

Under the heading "Fund Capitalization and Use of Proceeds," the PPM states:

> Inasmuch as it is impossible to predict exact costs and the expenses necessary to conduct the business of the Fund, actual expenditures could vary substantially and materially from the following estimated use of proceeds (rounded):
>
> Our total planned capital outlay for the initial Property may be comprised of a combination of equity capital (in the form of cash, real property, and/or in-kind

services) and senior bank financing, although we may proceed without obtaining financing. . . . The Managing Member may also take a draw against future distributions of up to $12,000.00 per month (See "Compensation"). Our use of proceeds is subject to material change in our Managing Member's sole discretion.

A record of the capital . . . initially contributed to the Fund by each Member shall be maintained by our Managing Member. These funds will be held in one or more Fund bank accounts until such time as our Managing Member disburses them for expenses and/or costs incurred by the Fund in connection with its objectives. Such expenses and/or costs may include such items related to real estate acquisition, development, and construction, such as, property due diligence expenses, soils tests, parking studies, environmental impact reports, feasibility studies, economic impact reports, brokerage fees, technical evaluation, engineering, architectural, and geological consulting, legal counsel, accounting expenses, administration, printing, distribution, marketing, due diligence expenses, retail sales commissions, and the costs of operations as well as the establishment of reserves to pay Investing Members, a contingency fund to handle cost overruns, fees, etc.

(*Id.* at 45.)

The PPM's language regarding compensation is confusing (to say the least). Under the heading "Compensation," it states in relevant part:

Although Our Managing Member and/or their affiliates will not be compensated for the management of the Property or Properties and of Fund affairs, at the Managing Members [sic] discretion, they may be paid compensation in connection with Fund management of the Property or Properties and of Fund affairs.

(*Id.* at 46.) In addition, the Managing Member may, at its discretion, "take a draw against future distributions of up to $12,000 per month," and the "Managing Member and/or their affiliates may own or retain other forms of interest in the Property or Properties." (*Id.*)[17] Further,

[s]uch persons may receive salaries and equity or other forms of compensation out of the proceeds of this Offering or from our revenue, capital, or other Fund assets for services performed on behalf of the Fund. Such services may include, but are not limited to, legal, accounting, marketing, overhead, investor relations,

---

[17] Heritage points out that Fund 2's Form D filing with the SEC states "$0.00" as the "amount of gross proceeds of the offering that has been or is proposed to be used for payments to any of the persons required to be named as executive officers, directors or promoters" of the entity. (*See* Doc. No. 97-21 at 5.) Taylor Welch is named as Fund 2's Executive Officer on Form D. (*Id.* at 2.)

communications, administrative support, etc. Such compensation terms may not have been negotiated at arm's length. See "Conflicts of Interest."

(*Id.*)[18]

Fund 2's Operating Agreement, attached to the PPM, also grants discretion to the Managing Member to conduct the business of the Fund. (*See* Doc. No. 81-13 at 82–83, Fund 2 Operating Agreement ¶ 4.1(c).) Sections 3.10(a) and (b) of the Fund 2 Operating Agreement provide that the Managing Member and/or its affiliates are entitled to compensation "related to management of the Property or Properties including, but not limited to, management, operational, or other contracts as may be entered into from time to time with the Fund and/or others" and that the Managing Member can be reimbursed for "costs and expenses that the Managing Member and their respective affiliates incur on behalf of, or in the management and operation of the business of, the Fund." (*Id.* at 82, Fund Operating Agreement ¶ 3.10(a) & (b).)

Regardless, according to the defendants, Fund 2 did not pay compensation or salary to Evans or Taylor Welch.[19] (T. Welch Dep. 282–83.) Lance Welch was employed by, and received a salary from, WCH.

Although Bernis stated that he read only about forty-five pages of the PPM, he initialed the final page to confirm that he had "read and underst[oo]d the above information." (Doc. No. 81-13

---

[18] Under "Conflicts of Interest," the PPM discloses, among other things, that the Fund, its Managing Member, and their various "affiliates" are engaged in relationships and activities that "may result in conflicts of interest." (Doc. No. 81-13 at 47.)

[19] Heritage does not effectively dispute the fact that Fund 2 did not pay a salary to Taylor Welch or Evans. However, it does contend that the WC Entities commingled funds and that, two days after the wire transfer from Heritage, Evans withdrew $500,000 of his investment—capital that apparently would not have been available without Heritage's infusion of cash. (RSUMF ¶ 74; *see* Perry Report 3, 22.) Interest payments were made to both Taylor Welch and Evans in January 2022, and funds were also transferred to "Evans & Welch" and "Traffic and Funnels, LLC," business entities owned and controlled by Evans and Taylor Welch—again, funds that would not have been available to the WC Entities without Heritage's investment. (Perry Report 28–29.)

at 97.) In signing the Subscription Agreement, he also acknowledged that he had read the PPM, that he was an "accredited investor" with "sufficient knowledge and experience in business and financial matters" and "capable of evaluating the merits and risks" of investing in Fund 2, and that he was "aware of the high degree of risk in investing in the Fund both generally and as more particularly described in the 'Risk Factors' portion of the [PPM]." (*Id.* at 107.)

## H. Winding Down the Funds

The defendants decided in May 2022 to wind down the Funds. Taylor Welch and Lance Welch conveyed that decision to Bernis in a telephone call on May 13, 2022, along with the news that, once all assets were liquidated, the Funds would be able to "pay off all debts and return all but about five and a half million dollars of capital to the members." (Doc. No. 97-4 at 4.) Because Taylor Welch and Evans had decided to forego "any return of [their] own capital until and unless all investors receive their capital back," the deficit would be around $3 million. (*Id.* at 4–5.) Given this shortfall, and in conjunction with Taylor Welch's stated "commitment . . . to make every investor whole" over time, Bernis was presented with two options: (1) a *pro rata* approach, consistent with the dissolution provisions in the Fund 2 Operating Agreement, meaning that all investors would bear losses in proportion to their investment, and Heritage would receive back approximately $2.24 million of its $5 million investment; or (2) an off-books approach, pursuant to which Heritage would accept less money in the short term (approximately $1.9 million instead of $2.3 million) but with the expectation of repayment of the remaining $3.1 million over time. (*Id.* at 6–7; *see also id.* at 8 ("Option one, $343,000 extra dollars, but there will be no repayment in the future versus [option two] $300,000 less plus an amortization period . . . to pay [the remaining investment] off on, probably, a three-month rolling basis.").) These options were reiterated in an email to Bernis from Taylor Welch on May 17, 2022. (Doc. No. 97-5 at 4.) In the email, Taylor Welch acknowledged that he and Evans "cannot guarantee the success of [their]

plan," but he reiterated that they were "committed to doing everything in [their] power to make it right." (*Id.* at 3.) Taylor noted that Option 1, which would entail an immediate return of 44% of investors' capital (and, thus, approximately $2.3 million to Heritage), was "NOT [their] preferred option." (*Id.* at 4.) He explained that Option 2 would mean that

> 38% of the existing outstanding Capital [would be] returned to investors (likely on or before March 31, 2023) with the remaining 62% amortized as an independent obligation of Taylor and Chris (or some combination thereof) over a likely period of approximately 36 months*. This . . . option represents and would require an independent agreement by Chris/Taylor to incur a stand-alone obligation to make investors whole in a manner and course outside the Fund's existing contractual obligations to investors. Further, this scenario would take place following the full liquidation and wind-up of the Fund in order to ensure any existing third-party creditors are made whole from the Fund's liquidation proceeds.

(*Id.*) The asterisk regarding the time frame for repayment is accompanied by a note outlining three scenarios: "Good, but worst case," "Better," and "Best." (*Id.*) At worst, Taylor anticipated a full return of Heritage's remaining $3.1 million capital investment in thirty-six months. The best case scenario envisioned full repayment by the end of 2022. (*Id.*)

Option 2 was later modified in an email Lance sent to Bernis on June 3, 2022, in which he indicated that, due to "vendor payment . . . due within the next 6 months," they proposed that, "[i]nstead of committing to $2M by the end of Q1 2023, and then starting the payment plan, we [would] provid[e] $1M [to Heritage] by mid/late November of this year and the other $1M by the end of Q1, 2023," with the payment plan for the remaining $3M to "begin after the initial $2M and be over the next 36 months." (Doc. No. 97-8 at 2–3.) Bernis responded, asking if it would be possible for Heritage to receive back $1.9 million, as initially offered by Taylor, by the end of the year, so that Heritage could meet its obligations relating to a building it had just purchased. (*Id.* at 3.) He added that he could "accept an agreement to take up to 36 months to pay the remaining $3 million back if this is what it takes but would ask that Chris and Taylor put in writing what they verbally agreed to [and] putting in writing a lien on other assets until this is paid back." (*Id.* at 3–

4.) Lance replied that he believed all of that would be possible and that he was "moving this forward as quickly as [he could]." (*Id.* at 2.)

Although Heritage received several "interest" payments on its investment during the first several months of 2022, it ultimately received neither the initial $1.9 million promised before the end of 2022 nor, apparently, a written commitment by Taylor and Evans for repayment of any part of Heritage's capital investment. (*See* Doc. No. 97-9 at 4 (Lance Welch handwritten notes from July 12, 2022 telephone conversation with "Josh" (who may be in-house counsel)).) Heritage did not receive a return of any of its $5 million capital investment. (Compl. ¶¶ 150, 158; Doc. No. 47, WC Entities' Answer ¶¶ 150, 158.)

## III. THE COMPLAINT

Heritage filed this lawsuit in July 2023, asserting twelve claims for relief, or "counts." (Compl. at 30–47.) Following the court's ruling on the plaintiff's Motion for Preliminary Injunction (Doc. No. 2) and the defendants' Partial Motion to Dismiss (Doc. No. 27) in February 2024, the following claims for relief remain pending:

Count 1: Violation of § 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") (*i.e.*, 15 U.S.C. § 78j(b)) and Rule 10b-5 (*i.e.*, 17 C.F.R. § 240,10b-5) against WCH, Fund 2, Taylor, Lance, and Evans, for intentionally misrepresenting, omitting, concealing, and/or failing to disclose material facts" in connection with Heritage's Fund 2 investment, including but not limited to:

- Misrepresenting that Fund 1 was a success;

- Misrepresenting that Fund 1 had closed to new investors;

- Misrepresenting that Fund 2 was a new fund, not an extension of Fund 1;

- Failing to disclose that Fund 1 had been losing hundreds of thousands of dollars in 2021;

- Failing to disclose that Taylor Welch and Evans had taken $2.2 million in distributions from Fund 1 in 2020, leaving it with $860,000 in negative equity and approximately $200,000 in cash at the end of that year;

- Misrepresenting that Heritage's investment would be used solely "for real estate and renovations";

- Failing to disclose that only $830,000 of Heritage's $5 million would be used to buy properties;

- Failing to disclose that Fund 2 would not purchase any properties after January 2022;

- Failing to disclose that $1.15 million of Heritage's investment funds would be used to immediately repay Fund 1 investors and pay Evans $500,000;

- Failing to disclose that Heritage's investment would be further used to repay Fund 1 or Fund 2 investors, and make payments to Taylor Welch; and

- Failing to disclose that Wealth Cap owed Fund 1 $1.7 million at the end of 2021.

(Compl. ¶ 167.)

Count 2: Violation of Section 20(a) of the Exchange Act (*i.e.* 15 U.S.C. § 78t(a)) against WCH, Taylor Welch, Lance Welch, and Evans, for "control person" liability,[20] based on the same fraudulent misrepresentations and omissions on which Count 1 is premised (Compl. ¶ 183);

Count 3: Violation of Section 17(a) of the Securities Act of 1933 ("Securities Act") (*i.e.*, 15 U.S.C. § 77q(a)) against WCH, Fund 2, and Lance Welch,[21] based on these defendants' having "misled and deceived Heritage about the true nature of [WCH]'s and the Funds' financial condition and organizational structure, the prior success of their fix-and-flip enterprises, and how Fund 2 investors' funds would be used, among other things" (Compl. ¶ 190);

---

[20] The court dismissed this claim as to Fund 1. (*See* Order, Doc. No. 44.)

[21] The court dismissed this claim as to Taylor Welch and Evans. (*See id.*)

Count 4: Violation of the Tennessee Securities Act ("TSA"), Tenn. Code Ann. §§ 48-1-121 and 48-1-122(a), against WCH, Fund 2, Taylor Welch, Lance Welch, and Chris Evans, based largely on the same misrepresentations alleged in support of the federal claims;

Count 5: Violation of Tennessee's "Blue Sky Law," Tenn. Code Ann. § 48-1-122(g), against WCH, Fund 1, Taylor Welch, Lance Welch, and Chris Evans, based on their "control[ling] or materially aid[ing] in the underlying [TSA] violations" (Compl ¶ 207);

Count 6: Common law fraud, against WCH, Fund 2, Taylor Welch, Lance Welch, and Chris Evans;

Count 7: Negligent misrepresentation, against WCH Fund 2, Taylor Welch, Lance Welch, and Chris Evans;

Count 10: Breach of contract, against Fund 2 only;

Count 11: Breach of the implied covenant of good faith and fair dealing, against Fund 2 only; and

Count 12: Unjust enrichment, against WCH, Fund 1, Taylor Welch, and Chris Evans.

## IV.     THE WC DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

The WC defendants, comprised of WCH, Fund 1, Fund 2, Lance, and the "Relief Defendants," move for summary judgment on all claims against them. (Doc. No. 76.) Their motion was filed with a supporting Memorandum of Law (Doc. No. 77) and, as noted, the joint SUMF and the evidence cited therein. The plaintiff filed an Amended Response (Doc. No. 112), its RSUMF, and its own voluminous documents. The defendants filed a Reply (Doc. No. 117) in further support of their position.

### A.     Fraud Claims (Counts 1–7)

#### 1.     Count 1

"Section 10(b) of the Securities Exchange Act of 1934 and the Securities and Exchange Commission's Rule 10b-5 prohibit making any material misstatement or omission in connection with the purchase or sale of any security." *Halliburton Co. v. Erica P. John Fund, Inc.* ("*Halliburton II*"), 573 U.S. 258, 267 (2014). "To recover damages for violations of section 10(b) and Rule 10b-5, a plaintiff must prove '(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation.'" *Id.* (quoting *Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*, 568 U.S. 455, 460–61 (2013)); *see also In Re FirstEnergy Corp. Sec. Litig.*, 149 F.4th 587, 601–02 (6th Cir. 2025).

The WC defendants contend that the plaintiff cannot establish the first, second, fourth or sixth elements of their claims. As threshold matters, however, they also argue that the plaintiff cannot pursue fraud claims (1) based on any alleged misrepresentations or omissions or theories not adequately pleaded in the Complaint[22] or (2) based on purported omissions that are not tethered

---

[22] Included under this heading is the defendants' argument that a "scheme liability claim is . . . different and separate from a nondisclosure claim" and that the Complaint does not plausibly allege facts to support a "scheme liability" claim. In ruling on the Partial Motion to Dismiss, the court found that Heritage had not engaged in "group pleading" and therefore declined at that juncture to consider whether individual liability existed, in the alternative, under a theory of "scheme liability." (Doc. No. 43 at 24 n.6.) The court finds it unnecessary to address scheme liability on the part of Lance Welch and the entity defendants, because they may be directly liable. Scheme liability is addressed below, in the context of ruling on Chris Evans' and Taylor Welch's Motion for Summary Judgment. The court's ruling there effectively also applies to the WC defendants.

to specific misrepresentations, under *Macquarie Infrastructure Corp. v. Moab Partners, L.P.*, 601 U.S. 257 (2024).

The plaintiff characterizes the first argument as "attacking the sufficiency of the pleadings" and asserts that the defendants' reliance on the Private Securities Litigation Reform Act of 1995 ("PSLRA"), 15 U.S.C. § 78u-4(b)(2), which imposes a heightened pleading standard, is untimely and foreclosed by the court's ruling at the motion to dismiss stage. It also argues that the Complaint sufficiently identifies the misrepresentations and omissions on which its fraud claims are premised; that its discovery answers simply "expound upon and stem from the omissions and misrepresentations alleged in the complaint" (Doc. No. 112 at 18); and that *Macquarie*, does not, contrary to the defendants' representations, bar its omissions-based fraud claims. Substantively, the plaintiff argues that material factual disputes as to each of the elements of its fraud claims bar summary judgment.

### a) The Alleged Misrepresentations and Omissions

The defendants have produced a chart purporting to identify all of the alleged misrepresentations and omissions upon which the plaintiff's claims are premised, drawn from the pleadings and discovery. (Doc. No. 81-51.)[23] The plaintiff does not appear to dispute the list provided by the defendants. The defendants contend that some or all of these alleged misrepresentations or omissions are not adequately pleaded and that the plaintiff cannot use these unpleaded misrepresentations and omissions as a basis for their securities fraud claims. (Doc. No. 77 at 7.)

---

[23] The defendants refer to the listed misrepresentations and omissions as "M1," "M2," etc. and "O1," "O2," etc. (*See* Doc. No. 77 at 6 n.5.) The court adopts this usage as well.

Insofar as the plaintiff contends that this argument is "untimely," it is simply incorrect. To the extent the plaintiff seeks to pursue securities fraud claims premised upon misrepresentations and omissions that were not alleged in the Complaint, the defendants would not have been in a position to know of that intent at the time they filed their Motion for Partial Dismissal. Moreover, the law is clear that plaintiffs cannot rely on alleged misrepresentations or omissions not pleaded with particularity in the complaint. *Accord, e.g.*, *Samuels v. Wilder*, 871 F.2d 1346, 1350 (7th Cir. 1989) ("The court [in ruling on summary judgment] correctly prevented plaintiffs' attempted bypass of Rule 9(b) (pleading fraud with particularity in the complaint) and concentrated only on the averments of fraud originally pleaded."); *Burket v. Hyman Lippitt, P.C.*, 560 F. Supp. 2d 571 (E.D. Mich. 2008) ("[A]t the [summary judgment] hearing, Plaintiffs argued that Givens misrepresented to Mohn that the investors' money would be 'safe.' Plaintiffs never alleged this specific misrepresentation in their complaints . . . , as required by the [PSLRA]. Therefore, . . . Plaintiffs cannot rely on this alleged misrepresentation."), *vacated in other part*, No. 05-72110, 2008 WL 2478308 (E.D. Mich. June 17, 2008). However, the court agrees with the plaintiff that, insofar as its discovery answers simply "elaborate" or "expound upon" misrepresentations and omissions adequately identified in the Complaint, the plaintiff would not be precluded from pursuing claims based on those alleged misrepresentations and omissions. The plaintiff also contends that all of the misrepresentations on which it relies were adequately pleaded—but does so in a largely conclusory fashion that does not grapple with each of the specific misrepresentations and omissions identified in the defendants' charts, including the chart in the Wealth Cap defendants' Memorandum specifically identifying the misrepresentations and omissions the defendants contend were not adequately alleged in the Complaint.

The court, to more readily identify which misrepresentations remain the subject of this lawsuit, has created its own charts, below, identifying by number (1) the misrepresentations and omissions at issue as identified by the defendants (and apparently not disputed by the plaintiff); (2) whether, in the defendants' view, each misrepresentation or omission was adequately pleaded; and (3) if not, whether the plaintiff has shown that each misrepresentation or omission was adequately pleaded in the Complaint.

| M# | Alleged Misrepresentation | Adequately Pleaded? | Plaintiff Shows Adequately Pleaded |
|---|---|---|---|
| 1 | "Fund 1 was a commercial success" | Yes in part | |
| 2 | "Fund 2 was a new fund and not an extension of or related to Fund 1" | Yes in part | |
| 3 | "Defendants were disciplined in their approach" | No. | Yes. *See* Compl. ¶ 10 ("On December 2, 2021, Lance Welch emailed a copy of the Fund 2 PPM and a one-page summary of Fund 2 to [Bernis], remarking that "[t]he PPM is written in legaleeze that basically highlights that there is no such thing as a guarantee in real estate. . . . But as you know, we are very disciplined in what we do."); *see also id.* ¶ 102 (identifying the "Rules" Fund 2 would follow). |
| 4 | "Defendants only invested in deals that were more valuable than the cost" | No. | Plaintiff does not address. |
| 5 | "Defendants only invested in income-producing properties that make sense on day 1" | No. | Plaintiff does not address. |
| 6 | "Defendants only invested in properties that, at the outset of the purchase, there must appear to be a 25% spread/margin, which afforded for multiple surprises during the renovation process and the ability to still pay investors each month." | No. | Plaintiff does not address. *But see* Compl. ¶ 102 ("Wealth Cap represented that its 25% "[t]arget spread/profit per house" "more than covers all monthly investor payouts."). |
| 7 | "Heritage's investment would be used only for the purposes of purchasing and renovating real estate" | Yes. | |
| 8 | "Heritage's investment would account for no more than half of the total amount invested in Fund 2" | Yes. | |

| | | | |
|---|---|---|---|
| 9 | "Defendants would not be compensated in connection with the management of Fund 2" | No. | Plaintiff addresses this only as an omission rather than an affirmative misrepresentation. |

| O# | Alleged Omission | Adequately Pleaded? | Plaintiff Shows Adequately Pleaded |
|---|---|---|---|
| 1 | "Fund 1 had lost hundreds of thousands of dollars in 2021" | Yes. | |
| 2 | "Taylor Welch and Chris Evans had taken $2.2 million in distributions from Fund 1 in 2020, leaving Fund 1 with just $860,000 in negative equity and approximately $200,000 in cash at the end of that year" | Yes. | |
| 3 | "Only $830,000 of Heritage's $5 million investment would be used to buy properties" | Yes. | |
| 4 | "Fund 2 would not purchase any properties after January 2022" | Yes. | |
| 5 | "Defendants were aware their business model was not working and that Fund 1 was in dire straits financially" | No. | Yes. *See* Compl. ¶¶ 113–22 (allegations that Fund 1 was failing). |
| 6 | "Defendants contemplated shutting down Fund 1 and Wealth Cap due to their financial struggles in the latter part of 2021" | No. | Plaintiff does not address. |
| 7 | "Heritage's investment would be comingled with Fund 1 investments" | No. | Yes. *See* Compl. ¶ 105 ("None of the Defendants told [Bernis] that . . . Heritage's Fund 2 investment would be . . . commingled with Fund 1."). |
| 8 | "Defendants were acquiring properties that fell outside of their (self-described) disciplined acquisition model" | No. | Plaintiff does not address. |
| 9 | "Heritage's investment accounted for more than half of the capital invested in Fund 2" | Yes. | |
| 10 | "Defendants had significantly decreased the number of properties they were acquiring at the time of Heritage's investment" | No. | Yes. *See* Compl. ¶¶ 118–22 (tracking decline in purchases over 2021) |
| 11 | "Heritage's investment would be used to repay other Fund 1 and Fund 2 investors, as well as to make payments to Taylor Welch and Chris Evans" | Yes. | |
| 12 | "Wealth Cap owed Fund 1 $1.7 million at the end of 2021" | Yes. | |

(*See* Doc. No. 81-51 at 3–4; Doc. No. 77 at 7 (citing Doc. No. 81-7 at 7–9); Doc. No. 112 at 18.)

Based on the plaintiff's failure to respond and the court's own review of the Complaint, the court

presposes that the plaintiff does not intend to pursue claims based on M4, M5, or M9, or on O6 or O8. The remaining misrepresentations and omissions appear, at a minimum, to be adequately pleaded for purposes of the PSLRA.

> b)      *Claims Based on Omissions: Macquarie Infrastructure Corp. v. Moab Partners, L.P.*

Section 10(b) of the Exchange Act makes it "unlawful for any person . . . [t]o use or employ, in connection with the purchase or sale of any security . . . [,] any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [SEC] may prescribe." 15 U.S.C. § 78j(b). Rule 10b-5, which implements this prohibition, makes it unlawful for issuers of registered securities to "make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading." 17 C.F.R. § 240.10b-5(b).

The Supreme Court, in *Macquarie*, held that the prohibition in Rule 10-b does not extend to "pure omissions" as opposed to half-truths. 601 U.S. at 260. As the Court explained, "[a] pure omission occurs when a speaker says nothing, in circumstances that do not give any particular meaning to that silence. . . . Half-truths, on the other hand, are 'representations that state the truth only so far as it goes, while omitting critical qualifying information.'" *Id.* at 263 (quoting *Universal Health Services, Inc. v. U.S. ex rel. Escobar*, 579 U.S. 176, 188 (2016)). Based on the plain language of the regulation, the Court held that

> Rule 10b-5(b) does not proscribe pure omissions. The Rule prohibits omitting material facts necessary to make the "statements made . . . not misleading." Put differently, it requires disclosure of information necessary to ensure that statements already made are clear and complete . . . . This Rule therefore covers half-truths, not pure omissions. Logically and by its plain text, the Rule requires identifying affirmative assertions (*i.e.*, "statements made") before determining if other facts are needed to make those statements "not misleading."

*Id.* at 264.

This court's ruling on the defendants' Partial Motion to Dismiss was issued in February 2024, two months before *Macquarie*. However, it has long been the law, as the court recognized in its earlier ruling, that "[s]ilence, absent a duty to disclose, is not misleading under [the Exchange Act]." *In re Ford Motor Co. Sec. Litig., Class Action*, 381 F.3d 563, 569 (6th Cir. 2004) (quoting *Basic Inc. v. Levinson*, 485 U.S. 224, 239 n.17 (1988)). And one way in which a duty to disclose may arise is through making statements on a subject. (*See* Doc. No. 43 at 20 ("In particular, when a company or executive chooses to make public statements on a topic material to a securities transaction, that party 'assume[s] a duty to speak fully and truthfully on [the] subject[]' at hand." (quoting *In re Ford Motor Co.*, 381 F.3d at 567).) The court rejected the defendants' arguments in their Partial Motion to Dismiss that the allegedly fraudulent omissions are not actionable because the defendants had no duty disclose. The WC defendants essentially reprise the same argument, though it is now bolstered by *Macquarie*'s affirmation that "pure omissions" are not actionable, even if a duty to disclose arguably exists. They contend that they are entitled to summary judgment on *all* of Heritage's omissions-based claims because "Heritage rests [those claims] on a general duty to disclose when soliciting an investment, and it has not identified any specific statements rendered misleading." (Doc. No. 77 at 10.)

> The plaintiff responds that *Macquarie* is inapplicable because the Complaint in this case
>
> identifies several representations rendered misleading by defendants' omissions. The complaint asserts Heritage's omission-based claims arise from various statements by defendants concerning: (i) their success (ECF 1 at ¶¶ 67–68, 71–72, & 103); (ii) how Heritage's investment was to be used (*Id.* at ¶¶ 74–107); (iii) the Funds being separate entities (*Id.* at ¶¶ 70 & 108); (iv) defendants' disciplined approach (*Id.* at ¶¶ 101-102); and (v) the Funds' business model and operations (*See id.* at ¶¶ 74-89).

(Doc. No. 112 at 19.)

While this broad response does not address every omission on which the plaintiff's claims are based, the alleged statements regarding the defendants' disciplined and principled approach to

real estate investment and their great success to date in implementing that model are adequately linked to the defendants' failure to disclose that, in fact, Fund 1 had "lost hundreds of thousands of dollars in 2021" (O1), that the business model was not working, and that Fund 1 was "in dire straits financially" (O5). The alleged representation that Fund 2 was a new fund and not an extension of Fund 1 was misleading precisely because the defendants knew from the outset that the funds Heritage invested in Fund 2 would be commingled with Fund 1 investments (O9). The statement that Heritage's investment in Fund 2 would be used for the purposes of purchasing and investing in real estate arguably gave rise to a duty to disclose that, in fact, Heritage's funds would be used to repay investors in Fund 1, including Taylor Welch and Evans (O11).

Heritage has not, however, identified what representations were rendered false or misleading by the defendants' failure to disclose what distributions from Fund 1 Taylor Welch and Chris Evans took in 2020 or the precise amount of equity and cash on hand held by Fund 1 at the end of 2020 (O2). As for O3 and O4 ("Only $830,000 of Heritage's $5 million investment would be used to buy properties" and "Fund 2 would not purchase any properties after January 2022"), the plaintiff contends that the defendants had an obligation to make these disclosures because they rendered untrue the alleged statement that Heritage's funds would only be used for the purpose of purchasing and renovating real estate. However, the plaintiff does not allege actual knowledge on the part of Lance Welch or any other defendant in December 2021 of these specific omissions. The claims based on these omissions will be dismissed.

O10 presents something of a close call. The Complaint clearly alleges that the defendants had significantly decreased the number of properties they were acquiring by the time of Heritage's investment in Fund 2. The relevance of these allegations, however, is to show that the defendants knew that Fund 1 was not the "success" that Lance Welch claimed it to be and that the defendants

were aware at the time of soliciting Heritage's investment that their business model was not working. These allegations, however, do not support an inference that the defendants had an affirmative duty to disclose to Heritage the precise number of properties Fund 1 or WCH had purchased over the course of 2021. Likewise, the amount of cash owed to Fund 1 by WCH is not tethered to any particular representation regarding Fund 1's financials made to Bernis and Wallace.

In sum, the defendants are entitled to summary judgment on the claims based on O2, O3, O4, O10, and O12, in addition to those identified above: O6 and O8. The court will proceed to consider on their merits the plaintiff's claims based on O1, O5, O7, O9, and O11. The representative chart of claims to be considered on their merits now looks like this:

| M# | Alleged Misrepresentation | Related Omission |
|---|---|---|
| 1 | "Fund 1 was a commercial success" | O1: "Fund 1 had lost hundreds of thousands of dollars in 2021"<br><br>O5: "Defendants were aware their business model was not working and that Fund 1 was in dire straits financially" |
| 2 | "Fund 2 was a new fund and not an extension of or related to Fund 1" | O7: "Heritage's investment would be comingled with Fund 1 investments" |
| 3 | "Defendants were disciplined in their approach" | O1: "Fund 1 had lost hundreds of thousands of dollars in 2021"<br><br>O5: "Defendants were aware their business model was not working and that Fund 1 was in dire straits financially" |
| 6 | "Defendants only invested in properties that, at the outset of the purchase, there must appear to be a 25% spread/margin, which afforded for multiple surprises during the renovation process and the ability to still pay investors each month." | O5: "Defendants were aware their business model was not working and that Fund 1 was in dire straits financially" |
| 7 | "Heritage's investment would be used only for the purposes of purchasing and renovating real estate" | O11: "Heritage's investment would be used to repay other Fund 1 and Fund 2 investors, as well as to make payments to Taylor Welch and Chris Evans" |
| 8 | "Heritage's investment would account for no more than half of the total amount invested in Fund 2" | O9: "Heritage's investment accounted for more than half of the capital invested in Fund 2" |

*c)        False Statements*

As set forth above, the first element of a Section 10(b) claim is that the defendant made materially false statements or omissions. At this stage, of course, the plaintiff's factual allegations in the Complaint must be supported by evidence. The defendants argue that several of the alleged misrepresentations are not actionable, either because the plaintiff cannot show that they were false or because they consist of "[i]nactionable [o]pinions and [p]uffery." (Doc. No. 77 at 15.)

i. Statements related to property selection

The defendants assert that the plaintiff cannot show that the three alleged misrepresentations (M4, M5, and M6) relating to property selections were factually false at the time they were made, even assuming they were adequately alleged in the Complaint. More specifically, they assert that the plaintiff "cannot show that Defendants were not attempting to achieve these targets at the time the statements were made" and that "after-the-fact evaluation of property values does not establish fraud." (Doc. No. 77 at 12, 13.)

As set forth above, M4 and M5 are not alleged in the Complaint as specific misrepresentations on which Heritage relied. M6 is that "Defendants only invested in properties that, at the outset of the purchase, there must appear to be a 25% spread/margin, which afforded for multiple surprises during the renovation process and the ability to still pay investors each month." The plaintiff points to evidence that the defendants were discussing among themselves the fact that WCH's "purported systems and protocols were not being followed." (Doc. No. 112 at 23.) The plaintiff does not point to evidence that the defendants were purchasing property that did not *appear*, at the front end, to have a "25% spread/margin." Instead, they were discovering that the Acquisitions Director for Fund 1 had purchased properties that turned out to cost more than anticipated to renovate and were valued, post-renovation, lower than projected. Moreover, up until the time of Heritage's investment, despite "surprises"—*i.e.*, the discovery that Streitmatter had

made a series of bad acquisitions—Fund 1 had been paying investors each month. At the same time, however, insofar as the defendants represented that their point spread was sufficient to afford for surprises, meaning that they would not lose money on their investment even when their aim for a 25% spread was off, that portion of the statement was untrue, and there is evidence in the record indicating that they knew it was untrue, because Fund 1 was indisputably losing money. At least part of M6, that is, was arguably factually false, while part of it was not.

### ii. Statements and omissions related to compensation

M9 is that "Defendants would not be compensated in connection with the management of Fund 2." The defendants make several arguments as to why this statement was not factually false. Most cogently, they assert that Heritage has not identified probative evidence showing that any compensation was paid from Fund 2 for management services that would render the statement factually false. As set forth above, the plaintiff did not adequately plead that the defendants affirmatively misrepresented to Heritage that the defendants would not be *compensated* in connection with the management of Fund 2; nor has it presented any evidence of any such affirmative representation.

As also discussed above, however, the court has found that the plaintiff adequately pleaded that the defendants' failure to inform Heritage that Heritage's investment would be used to repay other Fund 1 and Fund 2 investors, including Taylor Welch and Chris Evans (O11), is an actionable omission, and its disclosure was triggered by the defendants' telling Heritage that investment in Fund 2 was a new fund and that Heritage's investment in Fund 2 would be used only for the purposes of purchasing and renovating real estate, which is addressed below.

### iii. Fund 2 as a new fund

M2 is that Lance Welch, in his August 31, 2021 email and subsequent oral communications, represented that Fund 2 was a "new fund and not an extension of or related to Fund 1." The defendants argue, first, that the Complaint does not allege that Lance Welch or anyone else represented to the plaintiff that the two Funds were not "related." (*See* Doc. No. 77 at 7 (chart).) The plaintiff does not respond to that assertion, and the court finds that neither the Complaint nor any evidence to which the plaintiff has drawn the court's attention supports the plaintiff's assertion that the defendants misrepresented to it that the two Funds were not "related." Indeed, Bernis clearly understood that the two Funds were related in the sense that they were both under the WCH umbrella and operated by the same individuals employing the same investment strategy.

As for whether the defendants misrepresented that Fund 2 was not an extension of Fund 1, nowhere in the August 31, 2021 email does Lance Welch actually state that Fund 2 was not an extension of Fund 1, and Bernis himself testified that he was told only that WCH was "opening a new fund" or "another fund." (Bernis Dep. 172–73, 174.) He was never told that Fund 1 and Fund 2 "would be intermingled," and he "never considered that" possibility. (*Id.* at 173.) The defendants contend both that "failing to consider a possibility does not equate to being affirmatively misled" and that Fund 2 was, in fact, a "separate corporate entity." In other words, they argue that there was no misrepresentation because Fund 2 was not an extension of Fund 1, and WCH employees tracked the various intercompany transfers and obligations, "thereby acknowledging the separateness of each entity." (Doc. No. 77 at 14–15.)

As the plaintiff argues, however, the representation that Fund 2 was a new fund was clearly false and misleading, insofar as the defendants apparently intended from the outset to use

Heritage's monetary investment in Fund 2 to shore up Fund 1 and to pay Fund 1's obligations. It seems fairly clear that Fund 1, by the time of Heritage's investment in December 2021, was out of cash and would have been unable to pay its obligations without, at a minimum, liquidating assets at a significant loss—facts that were not disclosed to Heritage. Irrespective of the tracking of intercompany transfers, Fund 2 was never operated as its own independent entity but as an extension of Fund 1. The plaintiff has presented evidence from which a jury could conclude that the representation that Fund 2 would be a new fund was objectively false.

### iv. Puffery and opinions

Next, the WC defendants contend that Lance Welch's statements that Fund 1 had been "quite the success," with "even great[er] things . . . still to come" (Doc. No. 97-1 at 2), and that Wealth Cap is "very disciplined in what they do" in his December 2, 2021 email to Bernis (Doc. No. 81-21 at 1), accompanying his one-page summary of Fund 2 and the PPM, are "quintessential puffery" and "[s]tatements of opinion" that cannot give rise to a fraud claim (Doc. No. 77 at 15).

For a misrepresentation or omission to be actionable in the federal securities fraud context, it must be "material." *Halliburton II*, 573 U.S. at 267. To be "material," there must be a "substantial likelihood that a reasonable investor would have viewed the misrepresentation or omission as having significantly altered the total mix of information made available." *In re Ford Motor Co.*, 381 F.3d at 570 (internal quotation marks and citations omitted). "Immaterial statements include vague, soft, puffing statements or obvious hyperbole upon which a reasonable investor would not rely." *Id.* (internal quotation marks and citations omitted). Thus, as the Sixth Circuit recognizes, "[c]ourts everywhere have demonstrated a willingness to find immaterial as a matter of law a certain kind of rosy affirmation commonly heard from corporate managers and numbingly familiar to the marketplace—loosely optimistic statements that are so vague, so lacking in specificity, or

so clearly constituting the opinions of the speaker, that no reasonable investor could find them important to the total mix of information available." *Id.* (collecting cases) (internal quotation marks and citations omitted).

This court, however, already rejected the defendants' "mere puffery" argument at the motion to dismiss stage, and little has changed since. As the court stated then, and as still applicable now regarding the "very disciplined in what they do" statement,

> The defendants did not merely state that Fund 2 was a reliable investment in a vacuum; they contrasted it with other potential investment vehicles, touting the fund's reliance on a rigorous process specifically designed to ensure investor safety. For example, L. Welch downplayed any warnings and disclaimers in the PPM by explaining that they were merely intended to "highlight[] that there is no such thing as a guarantee in real estate," but that Wealth Cap—in an implicit contrast to the real estate investment market as a whole—was "very disciplined in what we do." ([Compl.] ¶ 101.) The clear implication was that an investment in Fund 2 would be more safely and carefully managed than an ordinary real estate investment. . . . Characterizing an investment vehicle as unusually safe—when in fact it is simply a pass-through for another investment vehicle that is already in the process of collapsing—is not simple puffery.

(Doc. No. 43 at 18.) The evidence now available supports Heritage's contention that, when Lance Welch sent Bernis an email on December 2, 2021 along with his one-page summary of Fund 2 and the PPM (Doc. No. 81-21), he knew that Fund 1 was floundering and needed a cash infusion, making his statements actionable fraud rather than mere puffery. The defendants continue to argue that this is the type of "unverifiable statement that courts have rejected as a basis for securities fraud claim[s] absent specific representations about, for instance, how risk is managed." (Doc. No. 77 at 19.) But Lance's one-page summary contained such specific representations—stating, for example, that renovated homes were sold "to our waiting list of investors for $200,000," which indicated the existence of a reliable and stable market of buyers for the renovated homes, at a stable price point; and that "[t]he spread more than covers all monthly investor payouts"—not that the

company merely targeted a spread that covered all monthly investor payouts but that they achieved it.

Regarding Lance Welch's statements regarding Fund 1's "success" and his opinion that "even great[er] things are still to come," set forth in his email accompanying the announcement of Fund 1 in late August 2021 and forwarded to Bernis in early September 2021, the court found at the motion to dismiss stage that these were not mere puffery in light of specific allegations regarding the actual state of Fund 1 at the time. The defendants continue to challenge that conclusion, but their primary argument is that Heritage has not "come forward with evidence sufficient to create a genuine dispute that [Lance] Welch did not subjectively believe his statements to be true when he made them." (Doc. No. 77 at 16.) Here, the court finds only that the statements were material misstatements. Whether Lance Welch made the statements with knowledge of their falsity is reserved for the scienter analysis, discussed below.

### d) Reliance

"Reliance by the plaintiff upon the defendant's deceptive acts is an essential element of the § 10(b) private cause of action." *Erica P. John Fund, Inc. v. Halliburton Co.*, 563 U.S. 804, 810 (2011) (quoting *Stoneridge Inv. Partners, LLC v. Sci.-Atlanta*, 552 U.S. 148, 159 (2008)). Further, the plaintiff, to prevail, must show both "actual reliance" and "justifiable reliance." *Wright v. Nat'l Warranty Co.*, 953 F.2d 256, 261 n.1 (6th Cir. 1992) (quoting *Cavalier Carpets, Inc. v. Caylor*, 746 F.2d 749, 753 n. 16 (11th Cir. 1984)); *see id.* at 262. In the Sixth Circuit, courts must "engage in a contextual analysis in order to ascertain whether, as a matter of law, a party has introduced sufficient evidence of reasonable reliance to withstand summary judgment." *Brown v. Earthboard Sports USA, Inc.*, 481 F.3d 901, 921 (6th Cir. 2007). The Sixth Circuit has identified a non-exclusive list of factors to consider in assessing reliance, including:

(1) The sophistication [and] expertise of the plaintiff in financial and securities matters; (2) the existence of long standing business or personal relationships; (3) access to the relevant information; (4) the existence of a fiduciary relationship; (5) concealment of the fraud; (6) the opportunity to detect the fraud; (7) whether the plaintiff initiated the stock transaction or sought to expedite the transaction; and (8) the generality or specificity of the misrepresentations.

*Id.* (quoting *Wright*, 953 F.2d at 261). Generally, "the question of recklessness requires a case-by-case, fact-specific inquiry." *Rubin v. Schottenstein, Zox & Dunn*, 143 F.3d 263, 269 (6th Cir. 1998). "[O]nly when the plaintiff's conduct rises to a level of culpable conduct comparable to that of the defendant's will reliance be unjustifiable." *Molecular Tech. Corp. v. Valentine*, 925 F.2d 910, 921 (6th Cir. 1991) (citation omitted).

The defendants argue that Heritage did not *actually* rely on the alleged fraudulent statements and omissions and that, even if it did, such reliance was reckless. Heritage responds that it is entitled to a presumption of reliance because the defendants had a "duty to disclose certain information to Heritage that was material to its decision to invest in Fund 2, including the financial condition of the WC Entities, following prior statements made regarding related topics (*i.e.*, the WC Entities' success)." (Doc. No. 112 at 26.) It also points to the testimony of Bernis and Wallace as evidence of actual reliance. Further, while Heritage weighs the same factors pertaining to recklessness as the defendants, it contends that these factors establish that it was not reckless.

The court finds that there is sufficient evidence in the record to permit the plaintiff to withstand summary judgment based on the issue of actual reliance. Bernis testified that he relied on Lance Welch's characterization of Fund 2 as a "new fund," a "separate fund," and that he was "specifically" "concerned about percentages." (Bernis Dep. 172–73.) He also stated that he relied on Lance Welch's "repeated" statements about Fund 1's success, and he also relied on the one-page summary prepared by Lance, outlining Fund 2's process and "Disciplines," along with the email accompanying it, which incorporated Lance Welch's minimizing of the PPM

as "legaleeze" and his assurance, despite that "legaleeze," that "we are very disciplined in what we do." (Doc. No. 81-21; *see* Bernis Dep. 189; *see also* Bernis Decl. ¶ 9.)

As for reasonable reliance, certainly there are questions about Bernis's and Wallace's due diligence that might well persuade a jury that Heritage was unreasonable in relying on Lance Welch's statements. At the same time, however, the disclaimers in the PPM are just one circumstance to be considered. *Accord Brown*, 481 F.3d at 921 (finding disclaimer clause to be just one factor to be considered and not dispositive of the reasonableness of the plaintiff's reliance); *In re Nat'l Century Fin. Enters.*, 846 F. Supp. 2d 828, 882 (S.D. Ohio 2012) (recognizing that "general disclaimers of accuracy do not shield sellers who knowingly make false statements"), *reconsideration denied sub nom. Crown Cork & Seal Co. Master Ret. Tr. v. Credit Suisse First Boston Corp.*, No. 12-cv-05803-JLG, 2013 WL 490717 (S.D.N.Y. Feb. 6, 2013). In addition, while a jury could find to the contrary, there is evidence in the record supporting the inference that neither Bernis nor Wallace was a particularly sophisticated investor. Moreover, their trust in the WC defendants was based in no small part on their belief, encouraged by the defendants, that they shared with the individual defendants a religious faith and integrity grounded in that faith. (*See* Bernis Dep. 142 ("I trusted them. I believed them. I thought we had a relationship. I never, in my paradigm, imagined that they would be dishonest and embezzle money."); *id.* at 64 (explaining that "commitment to faith" was very important to him); *id.* at 71–72 (explaining an early telephone calls with Lance Welch in which Lance "[e]mphasized their integrity, their discipline, their commitment to their faith, and supporting . . . organizations and individuals that were promoting the gospel, helping people find faith, that sort of thing"); *id.* at 76 (describing early communications from the defendants as repeated "reaffirmations of their integrity, their discipline, their commitment to their . . . investors, their faith").

As for concealment, the defendants were in possession of information about the financial difficulties Fund 1 was experiencing, and, while they claim that Heritage had access to Fund 1's and WCH's financial documents, it is not clear that any documentation the defendants might have provided would have disclosed the extent to which the companies were floundering. While some of the relevant factors weigh in support of a finding of recklessness, the court finds that the reasonableness of Heritage's reliance presents a jury question.

e)      Scienter

"Scienter is 'a mental state embracing intent to deceive, manipulate, or defraud.'" *Pittman v. Unum Grp.*, 861 F. App'x 51, 54 (6th Cir. 2021) (quoting *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 319 (2007)). Courts recognize scienter as "the lynchpin of most" Section 10(b) claims. *Plymouth Cnty. Ret. Ass'n v. ViewRay, Inc.*, 556 F. Supp. 3d 772, 791 (N.D. Ohio 2021) (citation omitted), *aff'd*, No. 21-3863, 2022 WL 3972478 (6th Cir. Sept. 1, 2022).

Recklessness will satisfy the scienter requirement for misstatements or omissions of present fact. With respect to forward-looking statements, the required level of scienter is "actual knowledge." *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 48 n.14 (2011) (quoting 15 U.S.C. § 78u-5(c)(1)(B)). While the court's analysis is holistic, *see Tellabs*, 551 U.S. at 323, "scienter must be found with respect to each defendant and with respect to each alleged violation of the statute," *Phillips v. Scientific-Atlanta, Inc.*, 374 F.3d 1015, 1017–18 (11th Cir. 2004); *see also Plymouth Cnty. Ret. Ass'n*, 556 F. Supp. 3d at 793. "Although the question of scienter is typically left to the trier of fact, summary judgment is appropriate if no reasonable jury could find that a defendant acted without scienter." *Sec. & Exch. Comm'n v. Watkins Pencor, LLC*, 810 F. App'x 823, 830 (11th Cir. 2020) (citation omitted).[24]

---

[24] The Sixth Circuit has articulated several factors that may "aid our scienter analysis" including, among others, "insider trading at a suspicious time or in an unusual amount";

The only individual who made statements on which Bernis and Wallace relied, on behalf of Heritage, is Lance Welch. Accordingly, only his state of mind is relevant to the question of scienter, even if his statements are attributed to Fund 2 or WCH. *In re Omnicare*, 769 F.3d at 476. The defendants argue very generally, without addressing each specifically alleged misrepresentation or omission, that the "more compelling" inference to be drawn from the evidence in the record is that, when Lance Welch made the statements at issue, the defendants did not know that the real estate portfolio they viewed as a "backstop" for repaying investors would be devalued and "did not foresee the issues that would come to pass just months later to put further constraints on the business." (Doc. No. 77 at 30.) The defendants contend that they continued engaging in business as usual—adjusting the buy box, purchasing properties through January 2022, and implementing a new "wholesaling" strategy—but were effectively blindsided by a "cascade of adverse developments" that took place over the course of the first quarter of 2022. (*Id.* at 30–31 (citing Doc. No. 81-22, Cherney Report at 9 & n.1).)

More specifically, they contend that Heritage lacks evidence of an improper motive, that Lance Welch's general access to information is insufficient to establish that he was in possession of specific information in light of which he actually knew that his statements were false or misleading, and that the timing of Lance's statements and the decision to wind down the Funds in May 2022 is not sufficiently close in time to give rise to an adverse inference. They also point out

---

"divergence between internal reports and external statements on the same subject"; "closeness in time of an allegedly fraudulent statement or omission and the later disclosure of inconsistent information"; and "disregard of the most current factual information before making statements." *Lim v. Hightower*, No. 24-3960, 2025 WL 2965692, at *11 (6th Cir. Oct. 21, 2025) (quoting *In re Omnicare, Inc. Sec. Litig.*, 769 F.3d 455, 473 (6th Cir. 2014)). The court finds that these factors have little relevance here and are more typically applicable at the motion to dismiss stage when a plaintiff relies primarily upon circumstantial evidence of scienter to avoid dismissal under the PSLRA.

that Lance Welch is not alleged to have engaged in insider trading and that, even if other insiders' insider trading could establish Lance Welch's scienter, the circumstances surrounding Taylor Welch's and Chris Evans' withdrawal of a portion of their investment funds do not support a strong inference of scienter.

In response, the plaintiff asserts that it has sufficient evidence of scienter to withstand summary judgment. It asserts that, when the opening of Fund 2 was announced, "Fund 1 was already experiencing substantial issues, with an established and marked downward trend in the amount of properties it was purchasing," of which Lance Welch, as President of WCH, would have been aware, particularly because the trend "continued and worsened" into 2022, with the cessation of purchases a month after Heritage's investment. It argues that the defendants cannot "credibly argue" that they were not actually aware of their problems, because they were "internally discussing the deficit, their performance issues, and even potentially closing down the Fund prior to Heritage's investment." (Doc. No. 112 at 33 (internal record citations omitted).) Despite these internal discussions, Lance Welch was not forthcoming with Heritage about these issues, and the degree of Fund 1's difficulties was made all the more apparent by the fact that, as soon as Heritage's funds were wired, the defendants immediately began spending it on paying Fund 1's liabilities (including payments to Evans and Taylor Welch).

The basic point that the plaintiff's expert makes is that the defendants' financial statements were inaccurate and that the defendants should have known sooner than they did that the value of the equity in their real estate holdings was substantially less than the amount due investors. According to the plaintiff's expert, Fund 1 was not profitable in 2020 and lost over $2 million in 2021, with relatively small losses each of the first three quarters but a loss of $1.1 million during the last quarter of 2021; its purchase of properties declined over the course of 2021 and stopped

altogether after January 2022. (*See* Doc. No. 112 (citing Perry Report 7–16; Perry 2023 Decl. ¶¶ 19–21).) The plaintiff claims that the "defendants" were aware of these trends, pointing to the following evidence: a June 2021 email exchange between Sarah Jaksich and Lance Welch, in which Jaksich projected operating losses for July, August, and September 2021 (Doc. No. 97-25); an August 18, 2021 exchange among Lori Corry, Jaksich, and Lance Welch, in which Corry summarized items they needed to address, based on a conversation the previous day, which included consideration of how "to break even or [be] profitable by the end of the year," given that Fund 1 was "[c]urrently" "showing a loss of ($254K)" (to which Lance Welch responded by noting an intent to "break even by 10/31/21") (Doc. No. 97-26 at 2–3); a September 1, 2021 email from Jaksich to Lance Welch projecting YTD net profit of -$395K by the end of September and -$440K by the end of October (but projecting net profit of $290K for November and ending the year with a net profit of $127K) (Doc. No. 96-18 at 3); a communication between Lance and Taylor Welch about the "depressing" state of affairs in early September 2021 (Doc. No. 96-5); Taylor Welch's telling the team on October 1, 2021 that they had a "shit storm to dig out of in October" (Doc. No. 96-9 at 30) and telling them on October 19, 2021 that, unless they "fix[ed] what [they were] buying," their operation employed the "worst business model in the world: float the money at 0 profit and pay investors to do it" (Doc. No. 96-9 at 52); conversations on October 1, 2021 between Taylor Welch and Chris Evans and a message from Taylor to Lance about how poorly the Funds were doing and considering winding them down and starting over (*see* Doc. No. 97-15; Doc. No. 96-21 at 61–63); and an October 25, 2021 voice message from Lance Welch to Taylor Welch after Taylor had referred to their operation as a "Ponzi scheme" during a team meeting, in which Lance advised him against using such language (Doc. No. 96-16). In other words, according to Heritage,

it was apparent to the defendants that the "ship was sinking fast" and that they viewed the investment from Heritage as a potential lifeboat. (*See* Doc. No. 112 at 7.)

The court finds, based on the evidence in the record, that it is unlikely that Lance Welch (or any other individual defendant) was directly aware that the value of the companies' assets was lower than their investor obligations or that Lance Welch had studied the companies' financial documentation with the granular precision of the plaintiff's expert. Nonetheless, the evidence also shows that Lance Welch was in possession of a trickle of negative information about Fund 1's financial performance beginning at least as of mid-summer 2021 and that the trickle escalated to a flood through the fall of 2021. He obviously knew that Fund 1 had been hemorrhaging money for months and that the defendants had not been successful in turning around that trend by the time they were actively soliciting Heritage's investment. Irrespective of whether Lance Welch was actually aware of information from which he should have known by mid-September 2021 that Fund 1 failing, he had actual knowledge at least as of mid-October that Fund 1's real estate purchases had not been "disciplined" and that the risks of investing in real estate, even using the WCH entities' model, posed real risks that he downplayed in his communications with Bernis and Wallace.

The court finds that the plaintiff has presented evidence giving rise to a strong inference of Lance Welch's scienter—his actual intent to deceive—sufficient to withstand summary judgment.

### f) Loss Causation

"A party that brings a securities fraud claim bears the burden to prove 'that the act or omission of the defendant alleged to violate this chapter caused the loss for which the plaintiff seeks to recover damages.'" *Ohio Pub. Emps. Ret. Sys. v. Fed. Home Loan Mortg. Corp.*, 830 F.3d 376, 384 (6th Cir. 2016) (quoting 15 U.S.C. § 78u–4(b)(4)); *see also Halliburton II*, 573 U.S. at 267 (identifying "loss causation" as the sixth required element of a Section 10(b) claim).

"Loss causation is the causal link between the alleged misconduct and the economic harm ultimately suffered by the plaintiff." *Ohio Pub. Emps. Ret. Sys.*, 830 F.3d at 384 (quoting *Lentell v. Merrill Lynch & Co.*, 396 F.3d 161, 172 (2d Cir. 2005)). While loss causation "partakes of the traditional elements of loss and proximate causation," the analogy to these common law tort concepts is "imperfect because the alleged misstatements do not generally cause a security to drop in value, but rather, the 'underlying circumstance that is concealed or misstated.'" *Id.* (quoting *Lentell*, 396 F.3d at 173). Thus, in the securities fraud context, "a misstatement or omission is the 'proximate cause' of an investment loss if the risk that caused the loss was within the zone of risk *concealed* by the misrepresentations and omissions alleged by a disappointed investor." *Id.* (emphasis in original) (quoting *Lentell*, 396 F.3d at 173).

The defendants argue that they are entitled to summary judgment on the plaintiff's § 10(b) claim because the plaintiff has failed to proffer any evidence of loss causation, specifically because it has made "no attempt to identify which portion of its loss was caused by extraneous factors and which was caused by a materialization of a concealed risk."[25] (Doc. No. 77 at 38.) More to the point, according to the defendants, Heritage has not "disaggregated the impact of the particular representations it alleges were fraudulent—such as the 'success' assertion or the 'disciplined'/housing acquisition target statements—from other factors that affected its losses, such as market tightening, reduced property values, and fund wind down process—including

---

[25] In *Ohio Public Employees Retirement System*, the Sixth Circuit recognized a "corrective disclosure" theory of causation, to which it also referred as a "theory of materialization of the risk," under which a "plaintiff alleges 'cause-in-fact on the ground that the market reacted negatively to a corrective disclosure of fraud.'" *Ohio Pub. Emps. Ret. Sys.*, 830 F.3d at 384 (quoting *In re Omnicom Grp., Inc. Sec. Litig.*, 597 F.3d 501, 511 (2d Cir. 2010)). Under this theory, "a plaintiff may allege 'proximate cause on the ground that negative investor inferences,' drawn from a particular event or disclosure, 'caused the loss and were a foreseeable materialization of the risk concealed by the fraudulent statement.'" *Id.* at 384–85 (quoting *In re Omnicare*, 597 F.3d at 511). Obviously this theory does not apply in this case.

Bernis' role in that process." (*Id.* at 38–39.) The defendants maintain that, because of the "industry-wide" "market disruptions" that coincided with the determination in May 2022 that the Funds needed to be wound down, Heritage has the burden of coming forward with significant evidence to establish what portion of its loss was due to the alleged misrepresentations and omissions and which portion was due to "other disclosed market risks." (*Id.* at 39.)

The plaintiff's position is that, but for Lance Welch's misrepresentations and omissions, it would never have invested its $5,000,000 in Fund 2 in the first place and that the "market disruptions" to which the defendants refer demonstrably had no effect on its losses, since it is clear that the defendants immediately disbursed its investment by paying down Fund 1 investor obligations and later spent the remainder on paying off themselves and other Fund 1 investors, without ever having invested any of Heritage's funds in real estate purchases.

The court finds, under these unique circumstances, that material factual disputes preclude summary judgment on the issue of loss causation. This case is not about a market collapse based on foreseeable factors, and the plaintiff does not seek to recover, for example, the difference between the 10% return that was effectively promised on its investment and whatever loss the market forces alleged by the defendants might have caused. Rather, Heritage alleges that, irrespective of those market factors, it lost its entire investment because, in fact, those funds were not invested in the purchase of real estate by Fund 2, as the defendants allegedly represented they would be, but instead used to pay off other investors. This loss at least arguably falls within the zone of risk concealed by the defendants' statements about the success of Fund 1 and the discipline employed in making real estate purchase decisions, as well as their characterization of Fund 2 as a new, distinct fund. The plaintiff's expert's purported failure to allocate loss to the particular cause

56

to which the *defendants* seek to attribute the loss does not require judgment in favor of the defendants.

### 2. Counts 2–7: The Other Fraud Claims

The defendants make effectively no effort to distinguish among the plaintiff's various fraud claims based on the required elements of those claims, instead arguing, essentially, that summary judgment on the § 10(b) claims will require summary judgment on all of the other fraud-based claims.

The court has found that some of the alleged misrepresentations and omissions were not adequately alleged in the Complaint and that at least part of M6 has not been shown to be factually false. The defendants are entitled to partial summary judgment with respect to those specific alleged misrepresentations and omissions, but not with respect to the others. Specifically, the defendants are entitled to summary judgment on all of the plaintiff's fraud-based claims in Counts 1–7 with respect to M4, M5, part of M6, and M9, and O2, O3, O4, O6, O8, and O10. The are not entitled to summary judgment on the plaintiff's fraud claims arising from M1, M2, M3, part of M6, M7, and M8, or O1, O5, O7, O9, and O11.

### B. Breach of Contract Claims (Counts 10 and 11)

Counts 10 and 11 are for breach of contract and breach of the implied covenant of good faith and fair dealing. The parties agree that Delaware law applies to these claims.

The Delaware courts define a contract as "an agreement upon sufficient consideration to do or not to do a particular thing." *Freeman v. Scott*, No. CPU4-16-002251, 2017 WL 2633487, at *4 (Del. Ct. Com. Pl. June 19, 2017) (citation omitted). In Delaware, to prevail on a claim for breach of contract, a plaintiff must establish by a preponderance of the evidence (1) the existence of a contract, (2) breach, and (3) damages. *VLIW Tech., LLC v. Hewlett-Packard Co.*, 840 A.2d

606, 612 (Del. 2003). A breach may occur "by a party's non-performance, repudiation, or both." *Id.*

Under Delaware law, breach of a covenant of good faith and fair dealing may arise independently from breach of contract. "The implied covenant is inherent in all contracts and is used to infer contract terms 'to handle developments or contractual gaps that the asserting party pleads neither party anticipated.'" *Dieckman v. Regency GP LP*, 155 A.3d 358, 367 (Del. 2017) (quoting *Nemec v. Shrader*, 991 A.2d 1120, 1125 (Del. 2010)). It applies "when the party asserting the implied covenant proves that the other party has acted arbitrarily or unreasonably, thereby frustrating the fruits of the bargain that the asserting party reasonably expected." *Id.* The reasonable expectations of the contracting parties are assessed at the time of contracting. *Id.* And, despite the use of the terms "good faith" and "fair dealing," the covenant does not establish a "free-floating requirement that a party act in some morally commendable sense." *Allen v. El Paso Pipeline GP Co.*, 113 A.3d 167, 182–83 (Del. Ch. Ct. 2014) (citations omitted), *aff'd*, No. 399, 2014, 2015 WL 803053 (Del. Feb. 26, 2015). Rather, "[w]hen used with the implied covenant, the term 'good faith' contemplates faithfulness to the scope, purpose, and terms of the parties' contract," and "[t]he concept of 'fair dealing' similarly refers to a commitment to deal 'fairly' in the sense of consistently with the terms of the parties' agreement and its purpose." *Id.* (internal quotation marks and citation omitted).

In the Complaint, Heritage alleges that the Operating Agreement between Heritage and Fund 2 constitutes a binding and enforceable contract and that the Operating Agreement sets forth protocols to be followed in the event of dissolution. (Compl. ¶ 236; *see also* Doc. No. 81-12, Fund 2 Operating Agreement § 7.1.) Once dissolution is triggered, these protocols basically called for liquidation of Fund 2's assets and distribution of the funds first to creditors and then *pro rata* to

investing Members. (Compl. ¶ 237; *see also* Fund 2 Operating Agreement § 7.2.) The Complaint alleges that Heritage complied with its obligations under the Operating Agreement by transferring $5 million to Fund 2 and that Fund failed to fulfill its contractual obligations upon dissolution by failing to distribute the liquidated funds in accordance with the order of priority set forth in the Operating Agreement and instead "prioritizing paying Taylor Welch and Evans . . . and returning capital contributions to Fund 1 and other Fund 2 individual Investing Members." (Compl. ¶ 239.) Heritage asserts that, by "engaging in this and the other conduct alleged herein"—presumably relating to the "options" that were presented to Bernis when Taylor Welch and Lance Welch announced the dissolution of the funds and Fund 2's failure to repay any amount to Heritage— Fund 2 materially breached the Operating Agreement. (*Id.* ¶ 240; *see also id.* ¶¶ 136–59.)

In Count 11, Heritage also asserts breach of the duty of good faith and fair dealing, based on allegations that Fund 2 lacked any justification for paying any portion of Heritage's invested funds to Chris Evans or Taylor Welch, neither of whom invested in Fund 2, or in prioritizing repayment to other Fund 2 investing members and Fund 1 investors over Heritage. (*Id.* ¶ 245.) With respect to both claims, Heritage asserts damages in the amount of the $5,000,000 it invested in Fund 2.

In support of their Motion for Summary Judgment, the WC defendants argue that Heritage has failed to offer any "computations or evidence demonstrating what amount of damages was actually caused by the failure to follow the dissolution priority procedures in the Operating Agreement" and instead simply demands return of its $5,000,000 without taking into account the actual amount of assets and funds available to Fund 2 to distribute, the operational costs involved in selling off the remaining assets, or other related factors. (Doc. No. 77 at 41–42.) Alternatively, the defendants argue that Bernis waived, forfeited, or is estopped from demanding strict

compliance with the dissolution provisions of the Operating Agreement, because he acquiesced in the manner in which payments were to be made during the wind-down of Fund 2. (*Id.* at 42.)

The plaintiff responds that, to survive summary judgment, it only needs to present some evidence of damage and that any doubts about the extent of damages must be resolved against the breaching party. (Doc. No. 112 at 36 (citations omitted).) It also argues that the amount of its damages is established by the parties' agreement itself. As discussed above, the defendants, in the exercise of their discretion in determining how the liquidation process would be conducted, proposed two options to Heritage, one of which was the *pro rata* approach that the defendants expressly discouraged, and the second of which was a delayed payment approach under which Heritage would receive repayment of its entire $5,000,000 investment. Heritage selected option two, essentially because, based on how the options were presented to Bernis, it was the more reasonable option. Heritage also argues that the waiver/estoppel/forfeiture doctrines asserted by Fund simply do not apply.

The defendants' Reply asserts that the "contract" on which Heritage now relies is different from the contract on which the Complaint is based, that Heritage cannot thus change horses mid-stream, and that the plaintiff's mere assertion of $5,000,000 in damages is not sufficient to establish that it suffered damages.

First, regarding damages, in Delaware, the non-movant opposing summary judgment on a breach of contract claim "need only present some credible evidence . . . that supports a claim for damages." *Torrent Pharma, Inc. v. Priority Healthcare Distribution, Inc.*, No. N18C-05-094 CEB, 2022 WL 3272421, at *13 (Del. Super. Ct. Aug. 11, 2022) (citation omitted). Here, it is undisputed that the plaintiff invested $5,000,000 in Fund 2 and received none of it back during the dissolution.

Those facts alone are sufficient to give rise, at least, to an inference of nominal damages. *Accord id.*

Regarding the defendants' argument regarding the plaintiff's change of theory, the facts supporting the breach of contract claim were alleged in the Complaint, and it was readily inferable from the plaintiff's allegations that the parties agreed to alter the otherwise applicable terms of the Operating Agreement pertaining to the distribution of assets upon dissolution. Moreover, the facts in the record suggest, as also alleged in the Complaint, that Bernis was induced to agree to the option encouraged by the defendants without full disclosure of what had actually happened to the money Heritage had invested in Fund 2.

Notably, the defendants have not moved for summary judgment based on an argument that option two did not amount to an enforceable agreement. Nor do they contend that the plaintiff has failed to establish a breach. The plaintiff has presented evidence that the agreement was that Heritage would receive a full return of its $5,000,000 investment in exchange for Heritage's agreement not to demand *pro rata* distribution immediately and that $5,000,000 is the amount of its damages. A reasonable jury could conclude that Heritage is entitled to the full amount of its investment as damages for Fund 2's breach.[26]

### C.  Unjust Enrichment (Count 12)

The unjust enrichment claim is asserted against Fund 1, WCH, Taylor Welch, and Chris Evans. (Compl. at 45.) It is pleaded in the alternative. (*Id.* ¶ 248.) The theory behind this claim is

---

[26] It is difficult to view the breach of contract claim other than through the lens of the plaintiff's fraud claims. If the defendants had not (allegedly) disbursed Heritage's invested funds to cover Fund 1's obligations to investors and, instead, had invested it in real estate (that is, if they had treated Fund 2 as a separate fund rather than as a continuation of Fund 1), then there might be some basis for requiring Heritage to calculate the cost of liquidating those assets and deducting the overhead costs of winding down. But all of those costs were incurred by Fund 1, not Fund 2, because Fund 2 had no assets to liquidate.

that WCH and Fund 2 transferred Fund 2 investment capital to Fund 1, which used those proceeds to pay Taylor Welch and Chris Evans hundreds of thousands of dollars that would not otherwise have been available without Heritage's investment. In other words, according to the plaintiff, a benefit was conveyed to Fund 1, Taylor Welch, and Evans to the detriment of Heritage and without consideration to Heritage. (Compl. ¶¶ 251–54.)

The parties agree that Tennessee law applies to this claim. Under Tennessee law, the elements of an unjust enrichment claim are: (1) a benefit conferred upon the defendant by the plaintiff; (2) appreciation by the defendant of such benefit; and (3) acceptance of such benefit under such circumstances that it would be inequitable for him to retain the benefit without payment of the value thereof. *Freeman Indus., LLC v. Eastman Chem. Co.*, 172 S.W.3d 512, 525 (Tenn. 2005) (citing *Paschall's, Inc. v. Dozier*, 4407 S.W.2d 150, 155 (Tenn. 1966)).[27] "A benefit is any form of advantage that has a measurable value including the advantage of being saved from an expense or loss." *Id.* (citation omitted). The benefit, therefore, need not be direct. *Id.* "The underlying principle of the doctrine of unjust enrichment is that a party who receives a benefit that he or she desires, under circumstances rendering retention of the benefit without providing compensation inequitable, must compensate the provider of the benefit." *Id.*

As an initial matter, although the Complaint identifies WCH as a defendant with respect to this claim, it does not allege that WCH retained any benefit. The plaintiff, in response to the Motion

---

[27] While a plaintiff may not recover for both breach of contract and unjust enrichment, the Federal Rules of Civil Procedure affirmatively allow plaintiffs to plead in the alternative, "regardless of consistency." Fed. R. Civ. P. 8(d)(3); *United Tel. Se., LLC v. Bristol Tenn. Essential Servs.*, No. 14-242, 2015 WL 13186245, at *3 (E.D. Tenn. Aug. 5, 2015). In cases where the existence of an enforceable contract is undisputed, courts frequently find that an unjust enrichment claim necessarily fails. *See, e.g.*, *Doe v. BlueCross BlueShield of Tenn., Inc.*, No. 2:17-cv-02793-TLP-cgc, 2018 WL 3625012, at *12 (W.D. Tenn. July 30, 2018), *aff'd*, 926 F.3d 235 (6th Cir. 2019). The defendants do not seek summary judgment on this basis, and the court finds that there remains a factual dispute as to whether an enforceable contract exists.

for Summary Judgment, makes no effort to argue that WCH received an unjust benefit. Summary judgment as to WCH on this claim will be granted.

Fund 1 argues that there was no inequitable transfer from Fund 2 to Fund 1, both because Fund 2's PPM and Operating Agreement gave Fund 2 the discretion to lend money to Fund 1 and because Lori Corry tracked all such transfers, "marking them as due to Fund 2 from 1 as intercorporate transfers and obligations." (Doc. No. 77 at 44.) It also contends that, insofar as Heritage asserts that the moneys it invested in Fund 2 were transferred to Fund 1 to return capital to other investors in both Funds, "this appears to be an argument that subsequent recipients like Bernis . . . were enriched, not Fund 1." (*Id.*) Heritage responds that it invested in Fund 2, not Fund 1, but approximately 99% of its investment was transferred to Fund 1. (Doc. No. 112 at 39.) Heritage argues that, insofar as this transfer to Fund 1 allowed Fund 1 to pay off its investors (and, implicitly, without paying back Heritage or even paying interest on its unintended loan), Fund 1 benefited unjustly.

The defendants assert in their Reply that, insofar as the plaintiff maintains that the transfer of funds was unjust because "Fund 1 was not referenced or mentioned in the Fund 2 PPM," this argument fails because the Fund 2 PPM and Operating Agreement "both contemplated that transfers could occur to affiliated entities." (Doc. No. 117 at 12 (citing Doc. No. 81-13, PPM at 29, 83–85 (generally authorizing Fund 2 to extend loans to other persons at the Managing Member's discretion).) Nor, it argues, can Heritage dispute that the intercompany transfers were tracked and accounted for in the "books of the respective entities." (*Id.*)

The court is not persuaded that the mere fact that the PPM and/or the Operating Agreement permitted Fund 2 to extend loans to Fund 1 (or other persons) at its discretion obviates the plaintiff's unjust enrichment claim. That arrangement, at least as portrayed by the defendants,

amounts to a contractual arrangement between Fund 1 and Fund 2 (that Fund 1 evidently breached), but it remains no less true that Fund 1 benefited from Heritage's investment by receiving an infusion of cash at a time when it was, based on the plaintiff's evidence, out of cash.

Moreover, the fact that Fund 2 had the *discretion* to extend loans implies that it was authorized to exercise *reasonable* discretion. Here, a jury could find that Fund 2 did not reasonably exercise its discretion in extending a huge loan to an over-extended sister company that was demonstrably struggling financially. Fund 1 is not entitled to summary judgment on the plaintiff's (alternative) unjust enrichment claim, but the court will grant summary judgment to WCH on this claim.

### D. Conclusion

As set forth herein, the WC defendants' Motion for Summary Judgment will, for the most part, be denied, except for with respect to the alleged misrepresentations and omissions already identified and the unjust enrichment claim against WCH.

## V. TAYLOR WELCH AND CHRIS EVANS' MOTION FOR SUMMARY JUDGMENT

Chris Evans and Taylor Welch (referred to for purposes of the discussion of this motion as "Welch") (and collectively referred to as the "individual defendants") move separately for summary judgment on all claims asserted against them individually. In the Memorandum in support of their motion, the individual defendants argue that they cannot be directly liable for fraud under any of the plaintiff's theories because (1) they did not "make" any statements to Heritage on which Heritage relied; (2) they are not responsible for statements or omissions made by Lance Welch; and (3) accordingly, the plaintiff cannot prove that Evans or Welch had the requisite scienter as required for Heritage to prevail on its claims. Likewise, they contend that their lack of participation in Lance Welch's communications with Heritage defeats Heritage's "control person"

or "scheme" liability. Alternatively, they assert that undisputed evidence in the record supports their statutory good-faith affirmative defense. They also seek summary judgment on the unjust enrichment claim against them.

### A.     Direct Fraud Claims (Counts 1, 4, 6, 7)

Rule 10b-5 makes it "unlawful for any person, directly or indirectly":

(a) To employ any device, scheme, artifice to defraud,

(b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or

(c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person,

in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b-5. As noted above, Rule 10b-5 "encompasses only conduct already prohibited by § 10(b)." *Stoneridge Inv. Partners, LLC v. Scientific–Atlanta*, 552 U.S. 148, 157 (2008).

To establish a securities fraud claim under § 10(b) as enforced by Rule 10b-5*(b)*, the plaintiff must show that each defendant (1) made a materially false statement or omitted a material fact, (2) with scienter, (3) in connection with the purchase or sale of a security. *Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 341–42 (2005); *Sec. & Exch. Comm'n v. AgFeed Indus., Inc.*, No. 3:14-cv-00663, 2016 WL 10934942, at *9 (M.D. Tenn. July 21, 2016) (Crenshaw, J.). However, to establish liability under Rule 10b-5(a) or (c), the plaintiff does not have to show that the individual defendants made an untrue statement or omission. *Stoneridge Inv. Partners*, 552 U.S. at 158. Instead, it must prove that the defendants (1) committed a deceptive or manipulative act in furtherance of an alleged scheme to defraud, (2) with scienter, and (3) in connection with the purchase or sale of any security. *See AgFeed Indus.*, 2016 WL 10934942, at *9.

The plaintiff here brings both direct liability claims under Rule 10b-5(b) and "scheme" liability claims under Rule 10b-5(a) against the individual defendants. Evans and Welch seek summary judgment on both.

### 1. Alleged Misstatements—Maker Liability

As set forth above, under Rule 10b-5(b), "it is unlawful for 'any person, directly or indirectly, . . . [t]o make any untrue statement of a material fact' in connection with the purchase or sale of securities." J*anus Cap. Grp., Inc. v. First Derivative Traders*, 564 U.S. 135, 141 (2011) (quoting 17 C.F.R. § 240.10b-5(b)). Accordingly, to be liable, Evans and Welch must have "made" the material misrepresentations at issue in this case. *See id.* Evans and Welch argue that they are entitled to summary judgment on the 10b-5(b) claims against them because they were indisputably not the "makers" of any alleged misrepresentations.

As the Supreme Court has explained:

> For purposes of Rule 10b-5, the maker of a statement is the person or entity with ultimate authority over the statement, including its content and whether and how to communicate it. Without control, a person or entity can merely suggest what to say, not "make" a statement in its own right. One who prepares or publishes a statement on behalf of another is not its maker. And in the ordinary case, attribution within a statement or implicit from surrounding circumstances is strong evidence that a statement was made by—and only by—the party to whom it is attributed. This rule might best be exemplified by the relationship between a speechwriter and a speaker. Even when a speechwriter drafts a speech, the content is entirely within the control of the person who delivers it. And it is the speaker who takes credit—or blame—for what is ultimately said.

*Janus Cap.*, 564 U.S. at 142–43. Under *Janus*, the fact that a person or entity may "control" the company making the statements is not sufficient, standing alone, for "maker" liability; rather, he must have "actually exercised control over the content" of the statements at issue, as well as "whether and how they were communicated." *Glickenhaus & Co. v. Household Int'l, Inc.*, 787 F.3d 408, 427 (7th Cir. 2015). In fact, courts have recognized that "attaching 10b-5 liability after *Janus* to a party that did not directly communicate with investors is exceedingly difficult. Even

defendants who 'requested, influenced, helped create, or supplied information for the relevant false statements' cannot be liable under 10b-5." *Oaktree Principal Fund V, LP v. Warburg Pincus LLC*, No. CV 15-8574 PSG (MRWx), 2017 WL 3187688, at *6 (C.D. Cal. Jan. 17, 2017) (citing *Janus Cap.* 564 U.S. at 143).

It is clear in this case that only Lance Welch uttered or otherwise communicated the alleged misrepresentations at issue in this case. The individual defendants contend that there is no evidence in the record suggesting that they instructed or directed Lance Welch to make any of the alleged misrepresentations and did not exercise any control over the content of the statements or whether and how they were communicated. Heritage responds, first, that Evans and Welch were the "makers" of the Fund 2 PPM and that Welch signed it. Even accepting as true that Welch authored or had control over the Fund 2 PPM, Heritage does not base any of its alleged misrepresentation claims on statements in the PPM.[28]

Heritage also points to Fund 2's Form D filing, which was signed by Welch and identified Welch and Evans as Executive Officers and Promoters of Fund 2. However, as set forth above, the fact that Evans and Welch had the authority to control statements by Fund 2 does not, standing alone, mean that they exercised such authority with respect to the specific statements at issue.

Finally, Heritage argues that Evans and Welch are the "makers" of the actionable statements made by Lance Welch "by virtue of their authority over him and involvement in the solicitation of Heritage's investment." (Doc. No. 113 at 9.) That is, they "bestowed upon Lance the authority to act on behalf of the WC Entities." (*Id.*) Again, however, the individual defendants' authority over a corporate entity does not establish that they made the statements at issue. The fact

---

[28] The record is also clear that neither Bernis nor Wallace read the PPM in its entirety, and neither purports to have relied on it in making the investment decision.

that Lance Welch was in frequent communication with Evans and Welch about his dealings with Bernis and the status of Bernis's decision regarding whether to invest Heritage's funds is insufficient for the same reason.

Finally, Heritage points to a communication between Lance and Taylor Welch on December 2, 2021 as "particularly fatal to Movants' argument." (*Id.* at 10.) In this conversation, Lance notified Welch that he had "just finished putting together the one page summary to send to Bernis" and asked if Welch wanted to see it before he sent it. (Doc. No. 96-38 at 29.) "If not," Lance continued, he would "bcc" Evans and Welch" when he sent it out along with the Fund 2 PPM. (*Id.*) A few minutes later, Lance attached the document to a message to Welch and then told him the "Email has been sent." (*Id.* at 30.) Approximately thirty minutes later, Welch responded, "looks great just saw it!" (*Id.*)

This conversation certainly does not establish control by Evans, who was not even a party to the exchange. Moreover, nothing about that communication suggests that Welch directed Lance in what to say in the one-page summary or "exercised control over its content and whether and how to communicate it." *Janus Cap.*, 564 U.S. at 142. And, as Heritage acknowledges, Welch sent his "looks great just saw it!" response *after* Lance Welch had already sent the email to Bernis. The court finds that Welch's post-hoc thumbs-up does not establish that he ratified or approved the communication before it was sent, for purposes of exercising control over it. *Compare Strougo v. Tivity Health, Inc.*, 779 F. Supp. 3d 951, 969 (M.D. Tenn. 2025) (finding a material factual dispute as to whether the defendant's CEO was the "maker" of false statements in the company's Form 10-Qs, where there was evidence that she reviewed and provided feedback on them before they were issued); *see also In re Fannie Mae 2008 Sec. Litig.*, 891 F. Supp. 2d 458, 473 (S.D.N.Y. 2012) ("While it is correct that Dallavecchia did not sign any of the SEC filings at issue, he still

may be found to have made a misstatement. In the post-*Janus* world, an executive may be held accountable where the executive had ultimate authority over the company's statement; signed the company's statement; ratified and approved the company's statement; or where the statement is attributed to the executive.").

The plaintiff, in short, fails to establish actual control by Chris Evans or Taylor Welch over any of the alleged misrepresentations by Lance Welch, for purposes of direct liability under Rule 10b-5(b).

### 2. Alleged Omissions

The individual defendants argue that they cannot be liable under § 10(b) for allegedly fraudulent omissions when they were not the "makers" of any alleged misrepresentations and therefore cannot be liable for failing to correct them. (Doc. No. 80 at 12.) The plaintiff does not separately address this argument, instead asserting only that Evans and Welch "are not makers of the actionable statements and omissions by virtue of their 'title or position'" but because "they had authority over the PPM and Lance and actively exercised it." (Doc. No. 113 at 10.)

The individual defendants are correct that "[f]ederal securities laws impose no liability . . . when a person fails to correct a misstatement or misimpression created by another 'statement maker.'" *Oaktree Principal Fund*, 2017 WL 3187688, at *6 (citing *In re CytRx Corp. Sec. Litig.*, No. CV 14-1956-GHK (PJWx), 2015 WL 5031232, at *7 (C.D. Cal. July 13, 2015)). "Rather, speakers are only liable for failing to correct their own omissions." *Id.* (citing *Garvey v. Arkoosh*, 354 F. Supp. 2d 73, 83 (D. Mass. 2005) ("[T]he burden to disclose rests on the person who publishes the analyst's report; by contrast, there is no duty imposed by the statute on the issuer who has paid for the puffery.").[29]

---

[29] The individual defendants also assert, in a footnote, that the state law fraud claims premised on omissions fail as a matter of law because "neither fraud nor negligent

Because the plaintiff has not established that Evans and Welch were makers of misrepresentations, they also are not directly liable for the related omissions.

### 3. Scheme Liability

Heritage also asserts a § 10(b) claim premised on the defendants' employing a "device, scheme, or artifice to defraud." (Compl. ¶ 169.) The individual defendants assert that they are entitled to summary judgment on the claim based on this theory as well, adopting by reference that section of the WC defendants' Memorandum addressing this claim. (Doc. No. 80 at 14; *see also* Doc. No. 77 at 7–8.)

As indicated above, Rule 10b-5(a) prohibits any person from "employ[ing] any device, scheme, or artifice to defraud." 17 C.F.R. § 240.10b-5(a). This rule "encompass[es] conduct beyond disclosure violations." *Teamsters Loc. 237 Welfare Fund v. ServiceMaster Glob. Holdings, Inc.*, 83 F.4th 514, 525 (6th Cir. 2023) (quoting *Benzon v. Morgan Stanley Distribs., Inc.*, 420 F.3d 598, 610 (6th Cir. 2005)). "A scheme-liability claim is therefore different and separate from a nondisclosure claim." *Id.* To establish a scheme-liability claim, a plaintiff must prove "(1) that the defendant committed a deceptive or manipulative act, (2) in furtherance of the alleged scheme to defraud, (3) with scienter, and (4) reliance." *Id.* (quoting *Plumber & Steamfitters Local 773 Pension Fund v. Danske Bank A/S*, 11 F.4th 90, 105 (2d Cir. 2021)).

misrepresentation claims can be premised on an omission under Tennessee law." (Doc. No. 80 at 11 n.10.) This appears to be a correct statement of the law as well, at least in the absence of a fiduciary duty or some other duty to disclose. *See, e.g.*, *Grogan v. Uggla*, 535 S.W.3d 864, 870 (Tenn. 2017) (observing that the Restatement (Second) of Torts § 311, defining negligent misrepresentation, "by its own terms requires an affirmative misstatement, not just a non-disclosure"); *PNC Multifamily Cap. Institutional Fund XXVI Ltd. P'ship v. Bluff City Cmty. Dev. Corp.*, 387 S.W.3d 525, 550 (Tenn. Ct. App. 2012) (defining the tort of fraudulent concealment as requiring, "in addition to a failure to disclose known facts," "some trick or contrivance intended to exclude suspicion and prevent inquiry, or else there must be a legal or equitable duty on the party knowing such facts to disclose them" (citation omitted)).

While the language of subsection (b) of the rule "contemplates liability for more than just false statements, there is 'considerable overlap' between a typical Rule 10b–5(b) claim and scheme liability." *Newtyn Partners, LP v. All. Data Sys. Corp.*, 165 F.4th 947, 971 (6th Cir. 2026) (first citing *Benzon*, 420 F.3d at 610; and then quoting *Lorenzo v. Sec. & Exch. Comm'n*, 587 U.S. 71, 80 (2019)). However, "where the sole basis for such claims is alleged misrepresentations or omissions, plaintiffs have not made out a market manipulation claim under Rule 10b-5(a) and (c)." *Lentell v. Merrill Lynch & Co.*, 396 F.3d 161, 177 (2d Cir. 2005). Thus, for example, the "*dissemination* of false or misleading statements with intent to defraud can fall within the scope of subsections (a) and (c) of Rule 10b–5, as well as the relevant statutory provision," "even if the disseminator did not 'make' the statements and consequently falls outside subsection (b) of the Rule." *Lorenzo*, 587 U.S. at 78.

Here, however, the plaintiff's scheme liability theory is premised entirely on Lance Welch's material misrepresentations and omissions. (*See* Compl. ¶ 169 ("Defendants employed a device, scheme, or artifice to defraud Heritage through the conduct alleged herein. Defendants engaged in a plan, scheme, and course of conduct designed to deceive Heritage, by virtue of having made statements and prepared, approved, signed, and/or disseminated documents that contained untrue statements of material fact and/or omitted facts necessary to make the statements therein not misleading."; *see also id.* ¶¶ 170–75.) The facts have now been developed, and the plaintiff has not pointed to any evidence that Evans and Welch "disseminate[d] false statements" upon which Heritage relied, *see Lorenzo*, 587 U.S. at 81, much less that they did so with the intent to defraud Heritage. The entirety of the scheme, that is, is their alleged acquiescence in *Lance Welch's* making and dissemination of false statements, but the court has already concluded above that Evans and Welch are not liable for Lance's false statements or omissions.

Evans and Welch are entitled to summary judgment on the plaintiff's direct fraud claims, Counts 1, 4, 5, and 7.

### B. Derivative Fraud Claims (Counts 2 and 5)

As an alternative basis for liability on the part of Evans and Welch, Count 2 of the Complaint sets forth a claim against them under § 20(a) of the Exchange Act, which provides that "[e]very person who . . . controls any person liable under any provision of this title or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person." 15 U.S.C. § 78t(a). Count 5 similarly sets forth a claim under Tennessee's "Blue Sky Law" that imposes liability for those who control or materially aid in the underlying securities fraud. *See* Tenn. Code Ann. § 48-1-122(g).

There are two requirements for a finding of control person liability under § 20(a): "1) 'the "controlled person" must have committed an underlying violation of the securities laws or rules and regulations promulgated thereunder'; and 2) 'the "controlling person" defendant in a Section 20(a) claim must have directly or indirectly controlled the person liable for the securities law violation.'" *In re Huntington Bancshares Inc. Sec. Litig.*, 674 F. Supp. 2d 951, 975 (S.D. Ohio 2009) (quoting *PR Diamonds, Inc. v. Chandler*, 364 F.3d 671, 696 (6th Cir. 2004), *abrogated on other grounds by Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27 (2011)); *see also Ohio Pub. Emps. Ret. Sys. v. Fed. Home Loan Mortg. Corp.*, No. 4:08CV0160, 2025 WL 2494544, at *16 (N.D. Ohio Aug. 29, 2025) (same). Control is defined as "the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a person, whether through the ownership of voting securities, by contract, or otherwise." 17 C.F.R. § 230.405. A controlling person is liable "unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action." 15 U.S.C. § 78t(a). "[G]ood

faith is an affirmative defense that the defendant has the burden of establishing in a section 20(a) action." *Frank v. Dana Corp.*, 646 F.3d 954, 963 (6th Cir. 2011).

Evans and Welch assert, first, that they did not "culpably participate in any wrongful activity." (Doc. No. 80 at 16.) The court is not persuaded, as an initial matter, that culpable participation is required. The Sixth Circuit has defined a control person claim as requiring only that the controlling person exercise direct or indirect control over the controlled person who is directly liable for the underlying securities law violation. *PR Diamonds*, 364 F.3d at 696; *see also Sanders Confectionery Prods., Inc. v. Heller Fin., Inc.*, 973 F.2d 474, 486 (6th Cir. 1992) (for control-person liability, the plaintiff needs to establish "that the defendant lender actually participated in (*i.e.*, exercised control over) the operations of the [borrower/violator] in general . . . [and] that the defendant possessed the power to control the specific transaction or activity upon which the primary violation is predicated" (citation omitted)). Moreover, requiring "culpable" involvement as part of the plaintiff's claim would effectively obviate the need for a good faith affirmative defense.

Second, the defendants argue that, even if culpable involvement is not required, the actual exercise of control is required. They do not effectively distinguish between Evans and Welch in arguing that the facts in the record fail to show that they had the "power to control the specific transaction or activity upon which the primary violation is predicated **and** [their] actual participation (*i.e.*, exercise [of] control) in the operations of the primary violator in general." (Doc. No. 80 at 17 (quoting *N. Port Firefighters' Pension-Loc. Option Plan v. Fushi Copperweld, Inc.*, 929 F. Supp. 2d 740, 788 (M.D. Tenn. 2013) (alterations added) (emphasis in original)).) The defendants argue, essentially, that they entrusted Lance Welch with the responsibility for investor

relations and that there is no evidence that Evans or Welch actually exercised any influence or control over this aspect of WCH's business. (*Id.* at 19.)

The plaintiff responds that the record supports a conclusion that Evans and Welch did exercise control over Lance Welch. The court agrees that there is a material factual dispute on this issue. Given that Evans and Welch appointed Lance Welch to his position, oversaw his activities, required him to receive unanimous approval before taking any affirmative action on behalf of the WC entities, effectively fired him from his position as president of WCH and placed Taylor Welch in that position instead, maintained frequent communication with Lance Welch regarding his contacts with Bernis, and exercised control over the terms of the investment agreement to be offered to Heritage, a reasonable jury could conclude that Evans and Welch had the "power to control the specific transaction or activity" upon which the WC defendants' liability is predicated, *N. Port Firefighters' Pension*, 929 F. Supp. 2d at 788, and actually participated in the operations of both the WC entities and the specific area of investor relations.[30]

Third, the individual defendants maintain that they are entitled to the statutory good-faith defense. A controlling person is liable on a § 20(a) claim "unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action." 15 U.S.C. § 78t(a). Similarly, Tennessee's Blue Sky control-person statute provides that a control person defendant is liable unless that defendant "proves that [he] did not know, and in the exercise of reasonable care could not have known, of the existence of the facts by reason of which the liability is alleged to exist." Tenn. Code Ann. § 48-1-122(g). The court finds that there

---

[30] The court notes that the evidence in the record concerning Chris Evans' control over Lance Welch's activities is less robust than that pertaining to Taylor Welch. Because the individual defendants make no attempt to distinguish between themselves, the court will not engage in such an analysis *sua sponte*.

is ample evidence in the record, discussed herein, from which a jury could conclude that Chris Evans and Taylor Welch knew, at the time of Heritage's investment, that Fund 1 was facing catastrophic problems and had lost substantial amounts of money in the preceding months; that Fund 1's financial situation had continued to deteriorate despite their efforts to turn it around; and that Fund 1 desperately needed a cash infusion from Heritage to be able to continue to pay its investors. Evans and Welch were also following Lance Welch's communications with Bernis, had received a copy of his one-page summary of Fund 2, and were actively encouraging Lance's procurement of Heritage's investment. In other words, the plaintiff has presented evidence indicating that the individual defendants "(1) had actual knowledge of [the] material misrepresentations or omissions, (2) deliberately encouraged . . . deceptive practices, (3) acted with reckless disregard for the accuracy of disclosed information, [and] (4) failed to implement appropriate oversight or compliance measures." *Ohio Pub. Emps. Ret. Sys.*, 2025 WL 2494544, at *17. In sum, a jury could readily conclude that Chris Evans and Taylor Welch did not act in good faith vis-à-vis Heritage.

The individual defendants are not entitled to summary judgment on Counts 2 and 5.

## C.      Unjust Enrichment Claim

The individual defendants' motion for summary judgment on the unjust enrichment claim will be denied for the same reason as the WC defendants' motion on the same claim. The court notes in particular that the record does not support the defendants' assertion that the payments to Evans and Welch in January 2022 were "wholly permissible payments at the end of the one-year investment terms for each of them," as the evidence they cite for that assertion is in conflict with evidence presented by the plaintiff. (*See* discussion *supra* at 9–11.)

## VI. CONCLUSION

For the reasons set forth herein, the defendants' Motions for Summary Judgment (Doc. Nos. 76, 79) will be granted in part and denied in part. All defendants are entitled to summary judgment on the plaintiff's fraud and fraud-based claims (Counts 1–7) that are premised upon M4, M5, part of M6, and M9, and O2, O3, O4, O6, O8, and O10, as identified in the defendants' charts and herein, and WCH is entitled to summary judgment on the unjust enrichment claim (Count 12). Otherwise, the WC defendants' motion (Doc. No. 76) will be denied, leaving intact the fraud claims based on M1, M2, M3, part of M6, M7, and M8, and O1, O5, O7, O9, and O11; the contract-based claims against Fund 2 (Counts 10 and 11); and the unjust enrichment claim against Fund 1 (Count 12).

Defendants Chris Evans and Taylor Welch are entitled to summary judgment on the direct liability claims asserted against them in Counts 1, 4, 6, and 7 of the Complaint. However, summary judgment as to the derivative claims, Counts 2 and 5, will be denied, except with respect to the misrepresentations and omissions identified above. Summary judgment on the unjust enrichment claim (Count 12) will also be denied.

An appropriate Order is filed herewith.

_____

ALETA A. TRAUGER
United States District Judge