# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE
### NASHVILLE DIVISION

HERITAGE GLOBAL NETWORK LOS ANGELES, INC.,

    Plaintiff,

v.

TAYLOR WELCH; CHRIS EVANS; LANCE WELCH; WEALTH CAP HOLDINGS, LLC; WEALTH CAP FUNDS, LLC; WEALTH CAP FUND 2, LLC;

    Defendants, and

WCH AL-1001, LLC; WCH AL-1002, LLC; WCH AL-1003, LLC; WCH AL-1004, LLC; WCH MO-1001, LLC; WCH MO-1002, LLC; WCH MO-1003, LLC; WCH NC-1001, LLC; WCH NC-1002, LLC; WCH NC-1003, LLC; and WCH NC-1004, LLC,

    Relief Defendants.

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

Case No. 3:23-cv-00685
Judge Aleta A. Trauger

## MEMORANDUM and ORDER

Before the court is the defendants' Motion to Exclude the Opinions of Plaintiff's Disclosed Expert David Perry (Doc. No. 109), filed with a supporting Memorandum of law (Doc. No. 110). The plaintiff opposes the motion (Doc. No. 119), and the defendants filed a Reply in further support thereof (Doc. No. 122). The defendants ask the court to decline to consider Perry's opinions in ruling on their Motions for Summary Judgment or to admit his opinions as evidence at the upcoming trial.

As set forth herein, the motion will be granted in part and denied in part.

## I.      LEGAL STANDARDS

Federal Rule of Evidence 702 governs the admissibility of expert testimony. It states:

A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if the proponent demonstrates to the court that it is more likely than not that:

(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;

(b) the testimony is based on sufficient facts or data;

(c) the testimony is the product of reliable principles and methods; and

(d) the expert's opinion reflects a reliable application of the principles and methods to the facts of the case.

Thus, aside from establishing a witness's qualifications as an expert, the proponent of expert testimony must persuade the court by a preponderance of the evidence that the expert's testimony is both relevant and reliable. *United States v. LaVictor*, 848 F.3d 428, 441 (6th Cir. 2017) (citing *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 589 (1993)).

Regarding reliability, the Supreme Court in *Daubert* articulated a nonexclusive list of considerations for assessing a scientific expert's testimony, including (1) whether the theory or methodology has been or can be tested; (2) whether it has been subjected to peer review; (3) whether it has a known or potential rate of error; and (4) whether it has been generally accepted in the scientific community. *Daubert*, 509 U.S. at 593–94. In *Kumho Tire Co. v. Carmichael*, the Court clarified that the reliability inquiry *Daubert* outlined covers not just scientific testimony, but also expert testimony based on "technical" and "other specialized knowledge." 526 U.S. 137, 141 (1999) (citing Fed. R. Evid. 702). The Supreme Court also recognized that, in such cases, the *Daubert* factors "may or may not be pertinent in assessing reliability, depending on the nature of the issue, the expert's particular expertise, and the subject of his testimony." *Kumho Tire*, 526 U.S. at 150; *see also Gross v. Comm'r*, 272 F.3d 333, 339 (6th Cir. 2001) (explaining that the *Daubert*

factors "are not dispositive in every case" and should be applied only "where they are reasonable measures of the reliability of expert testimony").

Finally, the threshold consideration in all evidentiary issues is relevance. Fed. R. Ev. 402. Under Rule 401, evidence is relevant if it has "any tendency to make a fact more or less probable than it would be without the evidence" and "the fact is of consequence in determining the action." Irrelevant evidence is not admissible. Fed. R. Evid. 402. To determine whether an expert's testimony will assist the trier of fact, courts must "look to 'whether the untrained layman would be qualified to determine intelligently and to the best possible degree the particular issue without enlightenment from those having a specialized understanding of the subject involved in the dispute.'" *United States v. Rios*, 830 F.3d 403, 413 (6th Cir. 2016) (quoting Fed. R. Evid. 702, advisory committee's note to 1972 proposed rules). Accordingly, "[a] district court may commit manifest error by admitting expert testimony where the evidence impermissibly mirrors the testimony offered by fact witnesses, or the subject matter of the expert's testimony is not beyond the ken of the average juror." *Id.* (citation omitted).

Notably, Rule 702 was amended in 2023 to emphasize that the *court* is entrusted with determining whether the admissibility criteria have been established, rather than treating them as "questions of weight" to be determined by the factfinder. Fed. R. Evid. 702 advisory committee's notes to 2023 amendment; *see also* Fed. R. Evid. 104(a) ("The court must decide any preliminary question about whether a witness is qualified, a privilege exists, or evidence is admissible."). However, "nothing in the amendment requires the court to nitpick an expert's opinion in order to reach a perfect expression of what the basis and methodology can support. The Rule 104(a) standard does not require perfection." Fed. R. Evid. 702 advisory committee's notes to 2023 amendment. "The task for the district court in deciding whether an expert's opinion is reliable is

not to determine whether it is correct, but rather to determine whether it rests upon a reliable foundation, as opposed to, say, unsupported speculation." *In re Onglyza (Saxagliptin) & Kombiglyze (Saxagliptin & Metformin) Prods. Liab. Litig.*, 93 F.4th 339, 345 (6th Cir. 2024) (quoting *In re Scrap Metal Antitrust Litig.*, 527 F.3d 517, 529–30 (6th Cir. 2008)). "The party proffering the expert . . . bears the burden of showing by a preponderance of the evidence that the expert satisfies Rule 702." *Id.*

## II.    BACKGROUND

The court presumes familiarity with the contemporaneously filed Memorandum and Order on the defendants' summary judgment motion and supplies herein only the background strictly necessary to the present motion. The plaintiff in this case, Heritage Global Network Los Angeles, Inc. ("Heritage"), brings federal and state statutory securities fraud claims, along with state common law fraud, breach of contract, and unjust enrichment claims, against multiple entity and individual defendants. It claims that, as a result of the defendants' misdeeds, it lost $5,000,000 in an investment vehicle run by the defendants. Heritage's claims are largely premised upon allegations of material misrepresentations concerning the success of the defendants' "Fund 1" at the time that Heritage was considering investing in "Fund 2," both of which were real estate funds controlled by the defendants. In support of its position and in opposition to the defendants' Motions for Summary Judgment, Heritage relies on the June 16, 2025 Expert Report of David Perry ("Perry Report") (Doc. No. 96-11).

The Perry Report states that Perry was engaged by Heritage to "perform accounting, financial, and economic analysis" (Perry Report 2),[1] specifically an analysis of the operations of

---

[1] The court employs the pagination applied by Perry, rather than the page numbers assigned by CM/ECF.

Fund 1, Fund 2, and Wealth Cap Holdings, LLC ("WCH") (collectively, the "WC entities") and their financial condition in 2020 and 2021, prior to Heritage's investment, and in 2022, after its investment. Perry also analyzed the use of Heritage's $5,000,000 investment by the defendants. As relevant here, Perry opines that the financial records of Fund 1 show that its financial performance declined each quarter of 2021 and "deteriorated further in the three months immediately before Heritage's investment," with negative total income in September, October, and November 2021—meaning that its expenses exceeded its income—of almost $1.1 million. (*Id.* at 16–17.) He also opines that Fund 2, which commenced operations in September 2021, did not purchase real estate or other assets from any third parties after it began accepting investments, never generated income, and instead "just lent money interest-free to Fund 1 to support its unprofitable and failing operations," meaning that it "operated as an extension of Fund 1 and not as an independent business." (*Id.* at 15, 16.) "In summary," he concludes, "the Funds were in a dire financial situation during the three months immediately before Heritage's investment." (*Id.* at 17.) Although Perry does not specifically define the term "dire" or opine as to the defendants' actual knowledge of the funds' financial situation, the clear implication is that anyone paying attention to the company's balance sheets would have understood that they were in bad and worsening financial condition. (*See id.* at 17–18 (summarizing and discussing balance sheets).)

The Perry Report also examines in detail how Heritage's $5,000,000 investment in Fund 2 was actually allocated—primarily to pay principal to Fund 1 investors, cover expenses Fund 1 otherwise would not have been able to make (at least not immediately), and make interest payments on loans to Fund 1, but not to purchase investment properties.

Finally, the Report provides a computation of damages that assumes liability on the part of the defendants and assumes that "Heritage's economic loss is the sum of (i) its $5,000,000

principal investment and (ii) interest from May 1, 2022 through July 14, 2026," the anticipated trial date as of the date of the Report. (*Id.* at 41.)[2] Perry uses two different metrics to calculate the interest: (1) the "agreed-upon 10% annualized interest rate"; and (2) the more conservative interest rate drawn from risk-free U.S. treasure securities. (*Id.* at 41–42.) Perry does not purport to express an opinion either as to liability or the causation of damages.[3]

## III.     THE DEFENDANTS' MOTION

The defendants take issue, in particular, with Perry's conclusion that Fund 1, as of the end of 2021 when Heritage invested in Fund 2, was in a "dire financial situation" or a "dire and worsening financial situation." (*See* Perry Report, *passim*.) The defendants contend that Perry's opinions "cannot survive the gatekeeping requirements" of Rule 702 and *Daubert* because he fails to employ a reliable methodology or to "reliably apply any methodology" to the facts here, instead "us[ing] his own creation—a subjective, non-testable, nonrepeatable, 'dire financial situation' assessment that should be excluded." (Doc. No. 110 at 2–3; *see also id.* at 8, 13.) They further argue that his damages opinions generally should be excluded because they are not relevant and that his "testimony" that the plaintiff "purportedly suffered $5 million in damages" should be excluded because it is an assumption rather than an "actual opinion supported by analysis." (*Id.* at 3.) In addition, they contend that his computation of damages is unreliable because it assumes liability on the part of the defendants and then "offers merely a simple interest computation based on the assumption that the jury will find Defendants liable for the entire $5 million Heritage investment (without tying that amount to any particular claim Plaintiff asserts)." (*Id.* at 17.) They

---

[2] Trial has been continued to September 15, 2026, and the plaintiff states that Perry intends to supplement his calculation to reflect that date. (Doc. No. 119 at 21 n.13.)

[3] Perry prepared and submitted a Supplemental Report on October 6, 2025, which responded to the Expert Report of defendants' proffered expert, Joshua Stilts. (*See* Doc. No. 109-1.)

argue that the interest computation testimony is irrelevant, because it would not assist the trier of fact to understand the evidence or determine a fact at issue and that, because the interest computations are not relevant to the issues to be decided by the jury, and are the "only actual damages-related opinion testimony offered by Perry," his damages opinion "should be excluded in its entirety." (*Id.* at 19.)

They also contend that Perry's damages opinion should be excluded because he does not perform a "loss causation" analysis and does not make any distinction between the damages associated with the plaintiff's different claims for relief. (*Id.* at 19, 21.) Finally, the defendants argue that Perry's analysis of borrowings from Fund 1 by WCH and "insiders" (meaning Chris Evans, Taylor Welch, and/or other entities controlled by them), which is woven through his report, is irrelevant, because these borrowings do not involve Heritage's investment funds, are not the subject of the alleged misrepresentations and omissions on which Heritage's claims are premised, and did not violate any contractual obligation to Heritage.

The plaintiff in response, argues that Perry's qualifications—which the defendants do not contest—are unassailable and that Perry performed all of his work in this case in compliance with all professional standards applicable to experts in his field, utilizing the same financial-analysis techniques that he has used in numerous prior engagements and as commonly utilized by accounting experts, including the standards of the American Institute of Certified Public Accountants ("AICPA") and its Statement on Standards for Forensic Services (Doc. No. 119 at 5 (citing Doc. No. 119-4, April 24, 2026 Perry Decl. ¶¶ 11–12 & Ex. 2).) The plaintiff points out that the defendants' expert does not dispute any of Perry's financial calculations or financial determinations; the defendants simply disagree with the conclusion Perry draws from those calculations—namely, that Fund 1 was in a "dire financial situation" at the time the defendants

accepted Heritage's investment. (*Id.* at 9.) The plaintiff argues that Perry's opinions are reliable, helpful to the trier of fact, and "pass muster" under Rule 702 and *Daubert*. (*Id.* at 11.)

In their Reply, the defendants object to the plaintiff's "post-hoc assertion" that Perry's analysis complied with AICPA standards and argue that, regardless, compliance with AICPA ethical standards does not establish a reliable methodology for purposes of Rule 702. (Doc. No. 122 at 3.) Broadly, the defendants contend that the plaintiff's response is insufficient to rebut the arguments raised in their opening Memorandum. They concede that they do not "challenge Perry's data inputs; they challenge his methodology for evaluating that data." (*Id.* at 4.) And they contend that reliability "must be assessed at every stop of the analytical process." (*Id.* (citing *Knight v. Kirby Inland Marine Inc.*, 482 F.3d 347, 355 (5th Cir. 2007)).) Regarding Perry's damages computation, the defendants contend that the plaintiff "conflates assuming liability for a damages computation and the separate element of loss causation." (*Id.* a t6.)

## IV. DISCUSSION

### A. "Dire Financial Straits" Opinion

#### 1. *Perry Is Qualified.*

The defendants do not challenge Perry's qualifications, but, as part of its gatekeeping obligations, the court must nonetheless consider them and, having done so, finds that Perry is unquestionably qualified. He is a certified public accountant, accredited in business valuation, and certified in financial forensics. He has over 35 years of experience in accounting and finance and has primarily focused on damage calculations, financial investigations, and business valuations. He has performed numerous economic analyses, investigations, business valuations, and damages calculations related to commercial disputes. (*See generally* Doc. No. 3-5, Perry July 11, 2023 Decl. ¶¶ 3–4 & Ex. 1 (Perry Resume).) Perry is qualified to assess the WC entities' financial condition.

### 2. *Perry's Opinion Is Relevant.*

The defendants do not question the relevance of Perry's opinions concerning the WC entities' financial condition prior to Heritage's investment in Fund 2, and the court finds that it is clearly relevant. Indeed, district courts across the country have held that expert testimony regarding the financial condition of business entities based on their "opaque financial statements" is useful to the trier of fact. *Accord, e.g.*, *In re 3M Combat Arms Earplug Prods. Liab. Litig.*, No. 3:19md2885, 2021 WL 830309, at *7 (N.D. Fla. Mar. 4, 2021) (finding that, while the proffered expert's report was "largely based on data found in Defendant's public financial disclosures," the information contained in those disclosures "would not be easily understood by the average citizen" and collecting cases standing for that proposition); *Voilas v. Gen. Motors Corp.*, 73 F. Supp. 2d 452, 461 (D.N.J. 1999) (finding an expert's "summary of a large corporation's business plans could certainly prove helpful to the average juror who presumably lacks such experience in . . . complex financial matters, even if doing so does not require employing any particular methodology but simply a straightforward review of the corporation's data").

### 3. *Perry's Opinion About the WC Entities' Financial Condition Is Reliable.*

The plaintiff explains that it engaged Perry to analyze the financial records of the WC entities and to determine "what happened, when and why" respecting their performance and, subsequently, to respond to the defendants' expert's report and opinions. (Doc. No. 119 at 4.) As Heritage points out and as Perry's Report substantiates, Perry performed a detailed review of the accounting, financial, and other documents identified in Exhibit B to his Report—including general ledgers, balance sheets, income statements, and real estate transaction reports, among others—prior to formulating his opinions and preparing his report.

The defendants purport to object to Perry's methodology as unreliable, but it is clear that they do not take issue with the data upon which he relied or the calculations he made based upon

his review of the data. Rather, they dispute his characterization of the defendants' financial situation based on his analysis of the data. Their basic proposition is that "dire financial situation" is simply too vague and subjective to qualify as expert opinion. This objection is, as the plaintiff contends, essentially an objection to the expert's "utilization of adjectives." (Doc. No. 119 at 14.) The plaintiff points to another case in which Perry was engaged as an expert, there by the defendant, and the plaintiff unsuccessfully challenged Perry's proposed testimony to the effect that the plaintiff was in a "precarious financial position" before contracting with the defendant. *See Grouse River Outfitters Ltd. v. Oracle Corp.*, No. 16-cv-02954-LB, 2019 WL 8752335, at *1 (N.D. Cal. Feb. 19, 2019). The court in *Grouse River* found that Perry's opinion that the plaintiff was "in a precarious financial position" was relevant "because [it] undermine[d] Grouse River's claimed compensable losses" and reliable insofar as it was "based . . . on the sort of data consistently held to be reliable by federal courts." *Id.* at *4.[4]

Other courts have found similar assessments to be sufficiently reliable to be admissible under Rule 702. For example, in *American National Property & Casualty Co. v. Felix*, the defendant sought to exclude the testimony of the plaintiff's expert, who was engaged to "conduct an analysis of [the defendant's] financial condition" at the time of a fire at his home. No. 3:16-cv-147, 2018 WL 10247025, at *1 (W.D. Pa. Nov. 21, 2018). The expert issued a nine-page report, to which was attached more than sixty pages of exhibits, in which one of his opinions was that the defendant's "financial condition at the time of the subject fire . . . can best be described as overextended." *Id.* at *2. The court there rejected the motion to exclude, finding the expert's

---

[4] Though the court admitted Perry's opinion testimony in *Grouse River* as both relevant and reliable, the case is not particularly relevant here because the party challenging his testimony did not expressly target the language in which Perry's ultimate opinion was framed ("precarious financial situation").

opinions supported by "detailed charts, tables, and spreadsheets that show how he compiled and analyzed the personal financial data that [the defendant] produced" and that his conclusions were "based on reliable financial-analysis techniques." *Id.* at *3.

Similarly, in *U.S. Fire Insurance Co. v. Kelman Bottles LLC*, the court denied a motion to exclude experts who sought to testify about the defendant's "financial condition" (specifically, its "financial distress" during a particular time period) based upon financial records and other documentation that they had reviewed. No. 11cv0891, 2014 WL 3890355, at *5 (W.D. Pa. Aug. 8, 2014). The court noted that the experts' "backgrounds as certified public accountants qualifies them to testify about [the defendant's] financial condition, particularly where their testimony is based upon financial records that they have reviewed and incorporated in their expert reports," and that their opinions were "sufficiently based in fact" to satisfy Rule 702's reliability standard. *Id.*

Regarding the fact that Perry's proposed opinion about the WC entities' financial condition is based on net income rather than net worth, which the defendants appear to believe to be more relevant and reliable, courts have also held that "the choice between net worth and net income as a measure of financial condition is a matter of professional judgment," as "net worth alone may not always be illustrative of a corporation's financial situation." *Parker v. Transp. Leasing/Cont., Inc.*, No. 4:22-cv-00138-JD, 2025 WL 2528652, at *7 (D.S.C. Sept. 3, 2025) (citation omitted). In *Parker*, the plaintiff proffered expert testimony on the topic of the defendant's financial ability to pay punitive damages. The defendant sought to exclude his opinions as "lack[ing] meaningful conclusions, rel[iant] on improper methodology," and therefore unhelpful to the jury. *Id.* at *6. The court concluded that the challenged expert's "reliance on net income as a more accurate reflection of [the defendant's] resources is within the scope of accepted practice" and that "[a]ny disagreement with his emphasis is properly explored through cross-examination." *Id.* at *7.

As set forth above, the court's task is to determine whether a proffered expert opinion "rests upon a reliable foundation, as opposed to, say, unsupported speculation." *In re Onglyza Prods. Liab. Litig.*, 93 F.4th at 345. In this case, Perry attaches detailed charts and spreadsheets that show how he analyzed the financial data produced by the defendants, and his Report details the documents he relied on to reach his conclusions. Further, it is apparent that his conclusions are based on reliable and conventional financial-analysis techniques. The defendants here do not meaningfully challenge Perry's methodology in arriving at his opinion—they simply do not like the conclusion he reached. The appropriate means of challenging that conclusion, however, is through cross-examination and the proffer of the defendants' own expert's testimony, not excluding the plaintiff's.

The court finds, in short, that Perry's opinion regarding the defendants' financial condition is reliable and admissible under Rule 702.

## B. Damages Opinions

As indicated above, the defendants seek to exclude any part of Perry's opinion that pertains to damages, whether their cause or quantification.

### 1. Damages Calculation

As part of his assessment of the WC entities' financial condition, Perry shows and opines that approximately $3.95 million out of Heritage's total $5 million investment was "used between December 16, 2021 and May 2, 2022 to delay the Funds' failure," which included payments to "Insiders, entities related to them, and other investors that could not have been made without Heritage's investment." (Perry Report 4.) He further opines that, by the end of 2022, the "Funds had used available resources including almost all of Heritage's $5 million to repay investors except for $2.55 million owed to the Insiders and $5 million owed to Heritage." (*Id.*) Apparently based on the disbursement of nearly all of Heritage's investment to pay off other investors, Perry jumps

to the conclusion that Heritage's damages equal the total $5,000,000 investment plus interest. (*Id.* at 5 ("Heritage's economic damages as of the start of trial on July 14, 2026 are either (i) $7,102,500 using the agreed-upon 10% annualized interest rate or (ii) $5,844,774 using the interest rates on risk-free US treasury securities."); *see also id.* at 41–42 (stating that the damages calculation "assumes [that] Heritage's economic loss is the sum of (i) its $5,000,000 principal investment and (ii) interest from May 1, 2022 through July 14, 2026" based on one of the two referenced interest rates).)

Perry conceded during his deposition that he did not perform a "loss causation" analysis, except insofar as he details in his Report that the defendants "took the money when they're already about to fail." (Doc. No. 81-23, Perry Dep. 192.) The court has found in the Memorandum filed contemporaneously herewith, addressing the defendants' Motions for Summary Judgment, that the plaintiff's position is, essentially, that, but for the defendants' misrepresentations and omissions, it would never have invested its $5,000,000 with the defendants in the first place and that, because the defendants disbursed its investment by immediately paying down Fund 1 investor obligations and later on paying off themselves and other Fund 1 and Fund 2 investors, without ever having invested any of its funds in real estate purchases, it is entitled to recover its entire $5,000,000 investment. Under these circumstances, the court has also found that material factual disputes preclude summary judgment on the issue of loss causation.

Regardless, it is clear that, aside from analyzing how Heritage's funds were used, Perry does not conduct any analysis as to the causation or quantification of Heritage's damages (except with respect to interest, discussed below). While he will be permitted to testify about the defendants' use of Heritage's funds, he will not be able to—and apparently does not seek to— testify about the cause of the plaintiff's damages.

### 2. The Interest Computation

The final section of Perry's Report is entitled "Heritage's Economic Damages." (Perry Report 41.) In this section, Perry presumes the defendants' liability—which is not inappropriate. *See Kirkbride v. Kroger Co.*, 349 F.R.D. 160, 177 (S.D. Ohio 2025) ("[I]t is entirely appropriate for a damages expert to assume liability for the purposes of his or her opinion." (citation omitted)). Perry also presumes without conducting a causation analysis that the plaintiff's damages total the entirety of its $5,000,000 investment, plus interest dating from May 2, 2022 through the date of trial, and he computes such interest using two different rates. (*See id.* at 41–43.)

The defendants object to his proposed testimony regarding the calculation of interest as irrelevant on the basis that the *court* has the discretion to award prejudgment interest in securities fraud and common-law fraud cases, but "that is the job of the court after entry of judgment, not a jury." (Doc. No. 110 at 19.) The plaintiff apparently concedes this point with respect to federal securities fraud cases. (*See* Doc. No. 119 at 22 (agreeing that "federal law may control the questions of whether and how much prejudgment interest to award on federal securities law claims").)

The plaintiff contends, however, that state law governs awards of prejudgment interest in state law fraud and other common-law claims. (*Id.*) It contends that, under Tennessee law, either courts *or juries* may award prejudgment interest at a rate not to exceed 10% and that the jury "may be asked to determine the interest due." (*Id.*)

Tennessee law is clear that the decision to award prejudgment interest is a matter "within the sound discretion of the trial court." *Highlands Physicians, Inc. v. Wellmont Health Sys.*, 625 S.W.3d 262, 312 (Tenn. Ct. App. 2020) (quoting *Myint v. Allstate Ins. Co.*, 970 S.W.2d 920, 927 (Tenn. 1998)). The court will exercise its discretion in that regard, if necessary. Expert testimony on this topic is unnecessary.

In sum, the defendants' motion will be granted to the extent it seeks to exclude Perry's opinion testimony regarding the quantification and calculation of damages and interest, though he will be permitted to testify about the defendants' use of Heritage's investment.

## V.       CONCLUSION AND ORDER

For the reasons set forth herein, the defendants' Motion to Exclude the Opinions of Plaintiff's Disclosed Expert David Perry (Doc. No. 109) is **GRANTED IN PART AND DENIED IN PART**. The motion is **GRANTED** with respect to Perry's proposed opinions regarding the quantification of damages and the calculation of interest. Otherwise, the motion is **DENIED**.

It is so **ORDERED.**

_____
ALETA A. TRAUGER
United States District Judge